```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                        NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA,      )
                                    )
 5           vs.                    )   CRIMINAL CASE NO. BAH-22-0140
                                    )
 6   DENNIS ALLEN HAIRSTON and      )
     DONTE DAVON STANLEY            )
 7

 8                        MONDAY, MAY 20, 2024
                             Courtroom 3A
 9                        Baltimore, Maryland

10                       JURY TRIAL EXCERPT

11         BEFORE:  THE HONORABLE BRENDAN A. HURSON, Judge

12   On Behalf of the United States:

13       Paul Budlow, Esquire
         Spencer Todd, Esquire
14       Office of the United States Attorney
         36 S. Charles Street, 4th Floor
15       Baltimore, MD 21201

16   On Behalf of the Defendants:

17       Sasha Garcon, Esquire
         Andrew Szekely, Esquire
18       Office of the Federal Public Defender
         100 S Charles Street, # 900
19       Baltimore, MD 21201

20       Gary E. Proctor, Esquire
         Jennifer E. Smith, Esquire
21       233 E. Redwood Street, Suite 1000C
         Baltimore, MD 21202
22   _____
               (Computer-aided Transcript of Stenotype Notes.)
23
               Reported by:  Kassandra L. McPherson, RPR
24              Federal Official Court Reporter
               101 W. Lombard Street, 4th Floor
25                    Baltimore, MD 21201
                       (410) 962-4544
```

```
 1                    P R O C E E D I N G
                         9:51 a.m.
 2

 3        (Requested portion of transcript begins.)

 4        (Court called to order.)

 5        MR BUDLOW:  Good morning, Your Honor.  This is United

 6   States of America versus Dennis Hairston and Donte Stanley,

 7   Criminal Number BAH-22-140.  I'm Paul Budlow on behalf of the

 8   Government, joined by Assistant United States Attorney Spencer

 9   Todd and FBI Special Agent Amos Tang.

10        THE COURT:  Well, good morning.  For the defense.

11        MS. GARCON:  Good morning, Your Honor.  Sasha Garcon,

12   Assistant Federal Public Defender, and Mr. Andrew Szekely on

13   behalf of Mr. Hairston who is present to my right.

14        THE COURT:  All right.  Well, good morning.  Good

15   morning, Mr. Hairston.  For the defense on the other side.

16        MR. PROCTOR:  Gary Proctor and Jennifer Smith for

17   Mr. Stanley.

18        THE COURT:  All right.  Well, good morning to both of

19   you.  Mr. Stanley, did you cut your hair?  And -- wait, no it's

20   in the back.  Okay.  I got you.  Have a seat.  Good morning.

21        MR. PROCTOR:  Your Honor, Mr. Stanley is not feeling

22   well.  He thinks it's just a common cold.  The Federal Public

23   Defender is trying to track down a COVID test.  They think they

24   might have one at the office.  He was not tested at the

25   Chesapeake Detention Facility.  In the event we can find a test
```

1   we would ask for the Court to recess so --

2           THE COURT:  Yeah, we can, I'm sure, get one, too.

3           MR. PROCTOR:  If you have one all the better.

4           THE COURT:  Sure.  Thanks.  I'm sorry you're not

5   feeling well.  Just -- you have water over there and just keep

6   me posted.

7       All right.  So obviously we had the inquiry to end

8   Thursday, and then immediately after that I received -- or Ms.

9   Kelly received an email.  I referred to the juror anonymously.

10  I know who the juror is, it's Juror No. 9 who sits in the back

11  on the right; she sent the email.  I intend to put everything on

12  the docket at some point, including your correspondence, but

13  I'll just read in the record.

14      What she wrote was:  I've been meaning to pull you aside

15  but it seems we haven't had a moment to be alone.  I'm going to

16  pull you aside after we -- I was going to pull you aside after

17  we dismissed today but I received a call about my daughter.  I'm

18  reaching out because I'm wondering if we can request to have a

19  juror or jurors removed.  I believe there may be one to two

20  jurors who have already made -- who already have their minds

21  made up based on their personal opinions and not evidence.

22  There were numerous comments made yesterday, May 15th, about

23  whether or not the defendants, in quotes, had priors, comma, et

24  cetera.  A comment was also made stating that the defendants, in

25  quotes, should be in handcuffs.  I just feel like both of them

1    will not be able to provide a fair judgment.

2         We also received a phone call the next morning -- by we I

3    mean Ms. Kelly -- from Juror No. 5, who sits in the front row.

4    And she wanted to follow-up on the inquiry related to safety.

5    And specifically, she said that she wanted to, quote, clarify

6    some things.  She said she wanted to let it be known that when

7    she was initially asked the question -- she initially asked the

8    question to Ms. Kelly are we safe, that it had nothing to do

9    with the courthouse, the courtroom security, or the defendants.

10        Juror No. 5 stated that she made the statement, asked the

11   question, if you will, because earlier that morning, on the

12   15th, another juror came in the room and told the jurors about

13   an incident that happened to him while in the parking garage the

14   prior evening.  So that would be the night of, I think it's

15   Tuesday the 14th.  The other juror noted that someone, quote,

16   pounded or banged on his window as he was leaving the garage.

17   And this incident was the reason that Juror 5 asked the question

18   about safety.

19        Juror 5 stated that once I ordered that the courtroom

20   should be held and jurors could leave without encountering

21   anyone else they felt much more safe.  And she indicated she is

22   fine now, she just wanted to clarify after thinking on it and

23   stress that the safety comment had nothing to do with the

24   conversation about security in the courthouse.

25        So following that, I received -- I only had a couple

 1    minutes to get this out to you so I typed it up in a letter and
 2    sent it.  I may have -- you know, I was quick in the use of my
 3    words.  The FPD quoted some of the words back at me; perhaps I
 4    could have used different words as far as my assessment of the
 5    evidence that was presented in the call and in the email, but
 6    the FPD wrote a letter that I don't think accurately summarized
 7    my view of what was presented.
 8         It referenced that the -- and I'll just quote it directly.
 9    "Jurors have prematurely reached a decision on the defendants'
10    guilt.  Multiple jurors have disregarded the Court's
11    instructions not to discuss the case prior to deliberations, and
12    at least one juror has raised questions about evidence outside
13    the record.  At least one juror has lied to the Court."
14         I don't see it that way at all.  I don't think that -- I'm
15    assuming the lying juror is Number 5 in the view of the
16    defendants.  And I should say both defendants joined in this
17    letter.  I didn't see that as lying at all.  I thought the
18    Government's response summarized my recollection, which was a
19    lot of the jurors seemed a little bit flummoxed at the question,
20    or confused, perhaps because now I know that the question didn't
21    necessarily hit on the precise issue which was this window
22    banging thing, and that she was simply following up with further
23    detail.  I don't think it was a shift.  I think the word
24    shifting story was used, or lying.
25         I don't see it, anything of the sort.  I think it was a

 1  juror really trying to be fair and trying to share with the

 2  Court her thoughts and views, particularly after that inquiry.

 3      I noticed that the letter from the defendants really

 4  doesn't focus on the window banging incident at all.  I don't

 5  even think it's mentioned in the letter.  I think what is

 6  mentioned is the discussion of the comment regarding do the

 7  defendants have priors.

 8      Now, the FPD's letter, and I'm calling it that because it's

 9  on your letterhead, implies that the jurors have done improper

10  research on the internet.  I don't see that yet.  There's quite

11  the opposite.  I think the claim was there was some speculation

12  about whether defendants have priors, which obviously shows no

13  knowledge on the subject beyond just the speculation.

14      The FPD attached a Google search of the what would come up

15  if you did search for Mr. Hairston and they made a point of

16  showing that one press release, one article made reference to

17  Mr. Hairston being in custody on an unrelated charge.

18      I'd note explicitly for the record one of the voir dire

19  questions precisely envisioned this scenario and asked each

20  juror if you found out that a defendant was previously

21  incarcerated or in custody or in jail would that impact your

22  ability to be fair and impartial, and each of these jurors said

23  no to that question.

24      But the point is taken, that if you do, as in any criminal

25  case I think in this courthouse, if you Google it there will be

 1    a press release, typically from the U.S. Attorney's Office, that

 2    summarizes the charges.  And in this case I agree, there are

 3    some articles about the case.  They don't go into much more

 4    detail than the press release, but point taken that if someone

 5    were to Google the defendants there would be some information

 6    that may pop up.  But the information specifically cited, I'm

 7    actually not sure that moves the needle too much for me given

 8    that prior instruction and given the fact that there are going

 9    to be jail calls introduced, the full contours of which we'll

10    still discuss, but that will give some indication that the

11    parties may have been jailed prior to this.

12          So I don't see at this stage that there's a mistrial

13    situation.  I think that the note from Juror 9, the email, comes

14    really close to talking about internal juror deliberations of

15    the kind that Federal Rule 606(b) and numerous cases have really

16    said can't form the basis for a new trial motion.  Now, we are

17    not at the end of the case so, obviously, we're in a different

18    posture.  But that sort of vein of case law and those rules

19    really separates this issue from outside influences to internal

20    juror discussions.  And it's long recognized that the real

21    concern is outside influence on the jury.  And so the

22    information that gave rise to the email really does seem, to me

23    generally, to be internal juror communication and not an

24    external influence.

25          And there's actually some very interesting case law and

1    discussions on this point.  One thing I found, that I thought

2    was very interesting, was the -- and expressed some helpful

3    insight into this, was from a case call United States versus

4    Thompson, a 1984 case out of the Fourth Circuit, where a juror

5    had seen some very, very troubling evidence; a postmortem

6    photograph of a child victim in a murder case.  And there was

7    some back and forth there where the juror said that they could

8    no longer have an open mind and be fair.

9         Ultimately, the case, I think, resulted in the judge

10   refusing to grant a motion for mistrial basing the decision, in

11   part, on the expense of retrying the case, and just sort of

12   admonished the juror to not make up his mind yet and sent him

13   back.

14        The primary grievance was that not necessarily in what had

15   occurred but in how the trial court handled the issue.  And in a

16   dissent Judge Phillips had written that basically, and this is a

17   quote, "Once voir dire is completed inquiry into ongoing bias or

18   partiality ceases.  The jury is formally composed and the

19   working assumption is made at it must be, that then, as

20   composed, the jury impaneled is at least a tolerably impartial

21   body.  No one supposes that individual jurors then retained

22   throughout a trial the same level of impartiality of which it is

23   assumed, by virtue of their having survived the voir dire

24   process, they entered it.  Undoubtedly, depending on the case

25   and a variety of individual psychological and emotional and

1    cognitive factors, their impartiality as to the matter in issue
2    may wax and wane widely from start to finish.  And their final
3    vote in the jury room obviously reflects that it is decidedly
4    not impartial."
5         So the point is that there is nothing necessarily strange
6    about jurors waxing and waning in their views of the case.  And
7    it seems to me that the bulk of this discussion occurred,
8    whatever it was, on the 15th prior to repeated admonitions and
9    prior to the individual inquiry.
10        And I note that this external influence thing is the real
11   issue when it comes to Remmer and when it comes to a lot of the
12   cases that have been cited previously.  And it has to be that
13   there's some external source that comes before the jury and
14   provides information about the matter before the jury.  And so
15   that would be publicity or information related to the case that
16   -- and internal matters include the general body of experiences
17   that jurors are understood to bring with them into the jury room
18   along with what they've heard in the case.
19        So you know, the Sixth Amendment guarantees a speedy public
20   trial before an impartial jury, and guarding that guarantee is
21   -- as long required, ensuring that external influences do not
22   affect the deliberation.  And I'm just not seeing external
23   influences here.  At worst, there seems to be an incident of
24   someone banging on a car window on Tuesday night.  There's no
25   allegation it's connected to the case.  There's no allegation

1    it's connected to the defendants or that it was anybody who was
2    even in here in the room watching this trial.  In fact, the
3    juror who apparently experienced this didn't even share it with
4    the CRD.  I think it's important to note that the -- Juror No. 5
5    is the one who brought it to the Court's attention not the
6    person who experienced it.  The first we had heard of it was the
7    phone call.
8        And, you know, our jurors come from all over the state.
9    Our court is in downtown Baltimore.  A lot of the jurors are,
10   like anybody, fed this constant feed of downtown Baltimore is
11   crumbling and it's not safe.  And they come into the downtown
12   area with a -- frankly, a predisposition to think that there's a
13   lot of crime and a lot of vagrancy here.  And some have a real
14   discomfort with coming into the city.  And, unfortunately, that
15   juror's experience, as shared with the group, may have triggered
16   some of those discomforts.  But I think there's a big difference
17   between having a discomfort and coming downtown or experiencing
18   something like that juror did.  And by that juror I mean the
19   person who actually experienced it and the one who heard about
20   it, or the ones who heard about it, and then becoming completely
21   unbiased.  I think there's a big difference there.
22       The allegations in this case arise some from in the city
23   stuff, but not downtown, of course, outside the city.  There's
24   not much similarity between that incident and anything that
25   happened in this case that would trigger some sort of fear that

1  a juror might put themselves in an alleged victim's shoes.  And

2  again, all jurors have stated they can be fair and impartial.

3  So I think it's just a minor incident that is external and it's

4  not something I think merits much additional inquiry.

5      I do think the email though, I don't agree with the factual

6  assessment that the FPD has given of what it is, but it does --

7  it does, I think, raise a few issues.  And I think both sides

8  are in agreement that maybe some follow-up questions to Juror

9  No. 9, at minimum, are a good idea.  And so I'm inclined to do

10 that.  I'm not as inclined to question Juror No. 5, but I may

11 just follow-up and make sure that there wasn't anything that was

12 missed in her phone call, but I'm still thinking about that.

13     I'd also note some of the cases that were cited by the

14 defense I just want to put on the record because I'm not going

15 to get another chance to really dive into it, are very different

16 than I think what we have here.

17     There was a parenthetical cite to U.S. versus Haynes, but

18 U.S. versus Haynes is a Second Circuit case.  I think the

19 parenthetical said -- that was on -- it said U.S. versus Haynes,

20 reversing conviction where district court refused to engage in

21 inquiry after report that prior deliberations jurors -- prior to

22 deliberations jurors suggested defendant was guilty because

23 she's here.

24     I looked up Haynes and there was a lot more going on in

25 Haynes than simply that.  That was, of course, one issue but the

 1    -- there was no inquiry whatsoever.  We've already had one

 2    inquiry, and there was other issues that occurred.  And so I

 3    think our case is a little bit different than that case.

 4         There was the Vasquez-Ruiz case from the Seventh Circuit

 5    and that is a totally different set of facts.  That is where a

 6    book was found, a juror's notes that had the word "guilty"

 7    written in capital letters across the top of it.  And there was

 8    an insinuation that the juror whose book it was hadn't written

 9    the word guilty, that maybe it was somebody else in the jury

10    room.  And didn't entertain the idea that there may have been an

11    external influence or someone may have come in from the outside

12    and written the word.  And the appellate court had raised the

13    issue that the judge did not consider that or inquire into that.

14    So a little bit different than what we have here.

15         But that said, I think Juror No. 9, makes sense to have her

16    come out and talk a little bit about this email.  I have some

17    questions for her.  I'm hopeful that I'll get to the heart of

18    the matter.  But I want to be clear before she gets here that I

19    read her email as saying, I think, I believe that some other

20    jurors may not be fair.  That's a totally fair belief.

21         I mean, you may have a couple conversations with your

22    fellow jurors and look around the room and have assumptions

23    about them and about the way they think and about the way

24    they're going to decide the case.  And those may prove to be

25    true, they may prove to be incorrect, I don't know.  But I do

1    read the email as using some clarifying words like I think and

2    like I believe and sort of have been written out of the

3    defenses' correspondence to be more of a fact rather than an

4    opinion.  But let me hold off before I talk to her and we will

5    see where we are after she comes in and answers a few of my

6    questions.

7        So Ms. Kelly, if you can go grab Number 9 and have her come

8    out I'll start asking her questions.

9        (Juror No. 9 entered the courtroom.)

10           THE COURT:  Good morning.  Come on up.  How was your

11   weekend?

12           JUROR NO. 9:  Just okay.

13           THE COURT:  Just okay.  I won't ask anything about

14   that.

15       I wanted to follow-up a little bit.  First, I wanted to say

16   you're not in any sort of trouble.

17           JUROR NO. 9:  Okay.

18           THE COURT:  I wanted to follow-up on the emailed that

19   we got from you on Thursday at 5:30.  I'm not planning on

20   sharing the content of your email with anyone else on the

21   jury --

22           JUROR NO. 9:  Right.

23           THE COURT:  -- but I did want to follow-up with you a

24   little bit about some of the things that you said.  And I'm

25   going to read some of them and ask you a little bit.

```
1                JUROR NO. 9:  Uh-huh.

2                THE COURT:  You stated you believe there may be one to

3    two jurors who already have their minds made up based on their

4    personal opinions and not evidence.

5                JUROR NO. 9:  Uh-huh.

6                THE COURT:  And later you said you feel like they

7    won't be able to provide a fair judgment.

8          So my first question is, have you heard other jurors

9    discussing the evidence in this case?

10               JUROR NO. 9:  No.

11               THE COURT:  Okay.  And have you heard other jurors

12   discussing the guilt or innocence of the defendants?

13               JUROR NO. 9:  No.

14               THE COURT:  Okay.  So let me drill down a little bit

15   into the comments that you heard.  One of them you said was that

16   there was a question or a comment about whether the defendants

17   had priors.  Can you tell me what you heard?

18               JUROR NO. 9:  Priors.  Well, yeah.  So she was just

19   like -- she wondered did they have a criminal history or any

20   priors and, you know, that was it.

21               THE COURT:  Okay.  And which juror was that?

22               JUROR NO. 9:  That's Number 5.

23               THE COURT:  Okay.  So sits in the front row.  Number

24   5.

25               JUROR NO. 9:  Uh-huh.
```

 1          THE COURT:  Okay.  So that wondering, she said she

 2   wondered whether they had any prior convictions.

 3          JUROR NO. 9:  Uh-huh.  Right.

 4          THE COURT:  Okay.  And those comments, as you heard

 5   them, they didn't affect your ability to be fair --

 6          JUROR NO. 9:  No.

 7          THE COURT:  -- but they raised a concern that maybe

 8   people were thinking about things or trying to decide the case

 9   on something --

10          JUROR NO. 9:  Yeah.

11          THE COURT:  -- other than the evidence?

12          JUROR NO. 9:  Right.

13          THE COURT:  Okay.  You also had said at the end that a

14   juror made a comment that the defendants should be in handcuffs,

15   or why are they not in handcuffs.  Can you tell me more about

16   that?

17          JUROR NO. 9:  Why are they not in handcuffs.  So I'm

18   assuming she was referring to how -- she's just like well, if

19   they're on trial how come they aren't in handcuffs around us or

20   whatever and --

21          THE COURT:  And which juror was that?

22          JUROR NO. 9:  She was the last -- she's Number 13.

23          THE COURT:  Okay.  So she's still here and she sits in

24   the back row.

25          JUROR NO. 9:  Uh-huh.

```
 1            THE COURT:  So that statement that she made seemed to
 2   be about just, in general, how trials work?
 3            JUROR NO. 9:  Yeah.
 4            THE COURT:  Okay.  And who else do you know, in your
 5   opinion, heard all these comments?  Let's start with the
 6   speculation about records or whatever.  Who heard that?
 7            JUROR NO. 9:  It was pretty much everyone.
 8            THE COURT:  Okay.  And then how about the second
 9   comment?
10            JUROR NO. 9:  The second comment there was only a few
11   of us in there.  So maybe about six of us were there.
12            THE COURT:  Okay.  And you had said also at the end,
13   I'll quote it so it's clear, you said "There was a comment made
14   about whether or not the defendants have priors, comma, et
15   cetera."  Was there anything else?
16            JUROR NO. 9:  No.
17            THE COURT:  Okay.  So that was just --
18            JUROR NO. 9:  Like, just --
19            THE COURT:  You were typing and running.
20            JUROR NO. 9:  Yeah.
21            THE COURT:  Totally understood.  And this all happened
22   on the 15th.  So that is it, right?
23            JUROR NO. 9:  I want to say it was like on Wednesday
24   directly after lunch.
25            THE COURT:  Okay.  And after these -- after these
```

1    comments have you heard anybody say anything else concerning?

2            JUROR NO. 9:  No.

3            THE COURT:  Okay.  And so after we had the inquiry --

4    and you only obviously heard what I said to you, but after that

5    did anybody say anything --

6            JUROR NO. 9:  Uh-uh.

7            THE COURT:  -- problematic?

8            JUROR NO. 9:  Nope.

9            THE COURT:  Do you have any other issues or concerns

10   about your fellow jurors other than what you've stated?

11           JUROR NO. 9:  No.

12           THE COURT:  Okay.  And do you feel like you can

13   continue to have an open mind?

14           JUROR NO. 9:  One thousand percent.

15           THE COURT:  And you can continue to apply the

16   presumption of innocence and be fair and impartial?

17           JUROR NO. 9:  Uh-huh.  Yes, I can.

18           THE COURT:  Okay.  One thing I wanted to know is in

19   your letter you put quotations around the word defendants.

20           JUROR NO. 9:  Uh-huh.

21           THE COURT:  What was the reason for doing that?

22           JUROR NO. 9:  Because, you know, with the trial, for

23   me, I'm like I'm not sure how, you know --

24           THE COURT:  How to reference them?

25           JUROR NO. 9:  Yeah.  I wasn't sure how I was supposed

1    to reference them.  Make sure I do it properly.

2         THE COURT:  No, that is completely fine and you did it

3    absolutely correctly.

4       All right.  Well, I will ask you not to share what we just

5    talked about with your fellow jurors.  And I'll ask you one last

6    question before you go because you are being really open.  Is

7    there anything else that you've heard in the jury room, since

8    the case started, that gives you any concern that the jurors

9    that you're sitting with are not fair and impartial?

10        JUROR NO. 9:  No.

11        THE COURT:  Okay.  And has anything else happened

12   outside the courtroom, or at any point since the trial started,

13   that gives you concern as to your ability to be fair and

14   impartial?

15        JUROR NO. 9:  No.

16        THE COURT:  What about any of your other jurors?  Have

17   you heard of anything else happening that gives you any concern?

18        JUROR NO. 9:  Nope.

19        THE COURT:  Okay.  Well, you can head back into the

20   jury room.

21        JUROR NO. 9:  Okay.

22        THE COURT:  Thank you.

23        JUROR NO. 9:  You're welcome.

24      (Juror No. 9 returned to the jury room.)

25        THE COURT:  All right.  Well, I first thank the Juror

1   for being very candid.  It sounds like we're dealing with two
2   particular statements that happened on the 15th, and one was
3   Alternate -- she was originally Alternate 3 but now we're down
4   to Alternate 1, talking about courtroom procedure and why the
5   defendants are not handcuffed.  In a sort of weird twist,
6   typically it's the opposite, where people are -- either see or
7   assuming the defendants are detained.  This is actually this
8   weird twist where it sounds like the jurors actually don't think
9   that they're detained and are wondering why they are not
10  handcuffed, which I am chalking up to the precise discussion we
11  had the other day which is about courtroom safety and courthouse
12  safety.
13       The second one about the priors, and I think that's the one
14  that gives the defense the most pause, sounds like it is
15  speculation and comment, sort of off the cuff if you will, about
16  whether -- and wondering whether the defendants have any priors.
17       So what I'm going to do is I'm going to first ask the
18  defense briefly, based on what you've heard, to discuss your
19  position now that you kind of have the full understanding of
20  what was said.
21            MS. GARCON:  And, Your Honor, I think at this point we
22  are asking that you inquire as to Juror No. 5; she seems to keep
23  coming up.  And I think certainly given what this juror, Juror
24  No. 9 says, that it would be prudent to talk to Juror No. 5.
25            THE COURT:  Okay.  I will tell you one concern I have

```
 1   with Juror No. 5.  If I were to -- I'm not inclined to ask if
 2   Juror No. 5 said some of the things that were attributed to her.
 3   For example, I don't want to draw additional attention to this
 4   question about prior records because I actually think the real
 5   issue is are you going to decide the case based on the evidence
 6   that's before you and not on -- or not before you in a sense
 7   that if your defense is going to be that you're missing
 8   particular pieces of evidence.  I don't want to ask about
 9   whether she has looked up the defendants or taken any time to do
10   external research because I just don't think there's a basis to
11   do that and I think that may cause more problems.
12        So what is your take on that?  I mean, is that the kind of
13   question you want?  Or what do you want?
14             MS. GARCON:  Court's indulgence.
15             THE COURT:  Sure.  Defense.
16             MR. SZEKELY:  Your Honor, thank you.
17             THE COURT:  Sure.
18             MR. SZEKELY:  So I think this would be our request.
19   As to Juror No. 5 we would ask the Court to have a more probing
20   inquiry with her.  I understand what the Court is indicating
21   about not wanting to ask specific questions, but respectfully,
22   the Court on Thursday did a very broad inquiry, I think with the
23   intent at that point to, number one, not draw any attention to
24   matters that the jurors' may not be aware of; and number two, I
25   understand in an effort to protect Mr. Hairston and Mr. Stanley
```

 1    from kind of putting ideas in the jurors heads that weren't
 2    there.
 3        And I think at this point, I think we're sort of past that.
 4    I mean, we have a number of jurors who have prior jury
 5    experience and I think they know this is not typical.  This
 6    isn't typical in most federal trials.  Occasionally you get a
 7    juror or two has an issue but this is, you know, I wouldn't say
 8    this to be generous but --
 9            THE COURT:  But you asked for this.
10            MR. SZEKELY:  And I'm not saying --
11            THE COURT:  I just want to be clear.  The record is
12    clear that to the extent this is abnormal the defense has asked
13    for multiple mistrials and inquiries of the jurors and the
14    Government has agreed.  Not to the mistrials.
15            MR. SZEKELY:  Sorry to talk over you.
16        The reason we keep asking, it is abnormal because the
17    communications we're getting from the jurors are abnormal.
18            THE COURT:  I will say this about the communications.
19    I'm just going to cut you off because I agree with you and I
20    don't think it's necessarily a terrible thing.  I think a lot of
21    things we're hearing is sort of a rare, realtime look into what
22    jurors are thinking.  And to the extent that we're hearing it, I
23    think it's helpful.  I mean, quite frankly, it's -- now you're
24    getting sort of checks-ins with them and you kind of know, hey,
25    this juror is worried about this, this juror is worried about

1    this.

2         But I'm with you, I understand, and I think you're right,

3    that now -- I don't know that necessarily no one had too much

4    federal experience, and I think I'm trying to cover it as best I

5    can.  So I'm not too worried about them thinking it's out of the

6    ordinary.  And both of these two jurors made inquiries to the

7    Court so I'm trying to focus, as you saw, on the fact that they

8    did that, but I understand what you're saying.

9         So a more probing inquiry of Number 5 would look like what

10   to you?

11            MR. SZEKELY:  I mean, so, Your Honor, I think -- well,

12   let me take a step back.  I think we need to ask all the jurors

13   about this conversation about -- we had a juror speculating

14   about evidence which is not -- facts which are not in evidence,

15   facts which are specifically kept out of evidence because

16   they're so -- because they're so prejudicial, because the

17   circumstantial evidence is so powerful it's kept out.

18        And I want to go back to the inquiry we had Thursday,

19   because our position has been that there was -- we had evidence

20   -- we were told there was a conversation between jurors about

21   certain topics; about courthouse security.  Even assuming Juror

22   No. 1, who we lost due to that juror's bad cough, was one of the

23   participants in that conversation, you need two people to have a

24   conversation.  And not a single juror came in and told the Court

25   I was part of a conversation that we know happened.  We had --

1  several people overheard it.

2      So I understand the jurors are on -- sort of on the spot.

3  The conversation is clearly -- or maybe they, whoever it was,

4  thought it was sort of outside the Court's instructions.  No one

5  wants to fess up in front of the Court to not following the

6  Court's rules, but I think we have, sort of, for lack of a

7  better word, probable cause that there was a conversation.  We

8  have -- no one here doubts the conversation occurred but we have

9  this unusual situation where none of the potential participants

10  were part of it.

11      THE COURT:  It sounds like Number 5 and her phone call

12  back here was to essentially say, hey, I did say this.  And it

13  sounds like alternate -- now Alternate 1, originally Alternate

14  3, was the one who made the comment about the handcuffs.  So I

15  think if there's an issue with somebody not saying they were

16  part of the conversation it might be that alternate.

17      MR. SZEKELY:  Well, Your Honor, the Court's question

18  on Thursday was were you part of a conversation about courthouse

19  security.

20      THE COURT:  Or did you hear it.

21      MR. SZEKELY:  Or did you hear it.  And nobody said

22  they were part of it.  And that also included the Court's

23  inquiry about the Las Vegas video, you know, the viral video we

24  discussed enough so that I don't need to recount what's on it.

25  But the point is, we're at a point now that jurors, for one

1    reason or another haven't told a hundred percent of the truth --

2            THE COURT:  Let me pause you for a second because I --

3    I asked that very narrow question.  I didn't say Vegas.

4            MR. SZEKELY:  Okay.

5            THE COURT:  So I'm not -- I don't know what's in their

6    mind every second, obviously, or how they're taking the

7    question, but I'm not necessarily thinking that -- I kind of

8    think Juror No. 5 kind of explained that hey, I didn't realize

9    the scope of your inquiry, and it's possible that's the same

10   with Alternate 1.  But I'm okay with Number 5 having -- I can

11   bring Number 5 out.

12       Number 5 made a phone call to the Court so there's no --

13   it's not going to draw any attention.  It's not going to, in my

14   view, break up the jury deliberations or split the jury because

15   I will tell her I'm bringing you out because you placed a phone

16   call.  I think the question then becomes what type of inquiry to

17   do to 5.  And initially my thought was simply to have her sort

18   of summarize what she asked for or why she called and then

19   affirm that she maintains an open mind and can apply the

20   presumption of innocence and can follow the instructions not to

21   form an opinion until all of the evidence is in.

22       I'm okay with asking if she has done any outside research

23   and just -- or rather saying hey, just making sure you haven't

24   done any outside research, you haven't looked up any facts of

25   the case, any witnesses, or any parties or anything like that.

1  I can do that and I think that won't raise too much of a

2  concern.

3          MR. SZEKELY:  So, Your Honor, I would ask that you do

4  that inquiry of the entire jury.  And I think the Court can

5  phrase it, we had a long break over the weekend, I just want to

6  make sure we're -- the Court will say it however the Court

7  thinks is appropriate.  I think it can be couched.

8      And the other thing I would ask the Court is to either

9  remind the jurors as they come in that they remain under oath

10  from the original processor, or if they are no longer under oath

11  that they be re-sworn prior to this further individual voir

12  dire.

13          THE COURT:  So I thought about that before they came

14  out.  I do think they remain under oath from voir dire.  Do you

15  have any reason to doubt --

16          MR. SZEKELY:  I have no reason to -- I just think it

17  would be helpful to remind the jurors that -- they may not know

18  they remain under oath.  I have no reason to doubt -- I mean

19  this Juror No. 9 was quite frank.  I don't -- so I don't think

20  there's any reason we need to swear her.  Unless my colleagues

21  here otherwise disagree, I don't think there's any reason to

22  swear her and re-inquire of her.  But I would ask if we do this

23  individual voir dire that the jurors be reminded that they were

24  sworn in the beginning of the voir dire and they remain under

25  oath.

1        THE COURT:  Let me tell you my initial thoughts before

2   I go to the Government for theirs.  I'm not inclined to go

3   through every juror again.  I will give an instruction at the

4   next break and will continue just affirming that there is to be

5   no outside research.  And I will ask questions of Number 5.  And

6   I will remind 5 when she comes out, as casually as I can so as

7   not to -- you know, sometimes that -- you know you're under oath

8   is like fighting words.  So I'll try to do it as innocuously as

9   possible but I'm okay with reminding her of that as well.

10       Government, what is your thought?

11       MR BUDLOW:  Your Honor, in light of what we've learned

12  this morning, we agree that full inquiry is not necessary.  I

13  would just add that this discussion about whether or not some

14  jurors weren't completely truthful, in addition to the argument

15  they made with Number 5, I just don't think it's consistent with

16  the Court's questions and answers.

17       You did ask if somebody participated or heard a

18  conversation.  Participated to most people means talked.  What

19  we heard here was that one juror talked and everybody heard it.

20  And so that's why only one person, we've learned, did the

21  speaking and everybody else, almost, has indicated that they

22  heard something.  So I think that's consistent and I don't think

23  there's any sense that any of these jurors have misled the

24  Court.  I think that, again, the full inquiry is not necessary.

25       I do agree that re-instructing them, as the Court has

1    indicated, makes sense.  And we do not have any objection to

2    what the Court has indicated is your plan with respect to Juror

3    No. 5.

4         And I guess what I don't know from the defense, and maybe I

5    should let it go, is whether or not they're asking for something

6    more.  They have not certainly indicated any specific questions

7    that they want posed to Juror No. 5.

8              THE COURT:  I think I'm hearing from Mr. Szekely, you

9    can correct me if I'm wrong, that the question about doing

10   additional outside research is you approve of that.  You would

11   like to have it asked of everyone, along with a reaffirmation of

12   their ability to be fair and impartial.  And prior to that you

13   want everyone to be reminded they're under oath.  Is that

14   correct?

15             MR. SZEKELY:  I think that's right, Your Honor.  And I

16   think it's worth also for Juror No. 5, and I think the Court

17   said this, but asking those specific questions; have you engaged

18   in any deliberations.

19             THE COURT:  Okay.

20             MR. SZEKELY:  Those questions prior to this, have you

21   -- just to sort of to make sure that this is a juror who hasn't

22   sort of suspended her impartiality and decided, well, I'm going

23   to sit here for the balance of the Government's case but I've

24   already made up my mind having heard only a fraction of the

25   evidence.

```
 1              THE COURT:  Ms. Smith, I'm sort of assuming they're
 2    talking for you, and I'll come back.  I just wanted to give you
 3    an opportunity to add anything, if necessary.
 4              MR. PROCTOR:  Yes, Your Honor.  We have nothing
 5    additional to add.  But what wakes me up in the middle of the
 6    night is the Fourth Circuit saying we didn't preserve an issue.
 7    So everything they've said we adopt, we're with them, and that
 8    letter specifically noted that we joined in it.
 9              THE COURT:  Okay.  Absolutely.  That is noted for the
10    record that you're joining in all their arguments and it's
11    preserved as far as I'm concerned.
12              MR. SZEKELY:  One final request, just in terms of the
13    record, Your Honor.  We're not asking that the email -- the
14    juror's personal email be related to the party, but I would ask
15    that the actual email be preserved, and maybe made a Court
16    exhibit, even under seal, so that should the matter go up on
17    appeal the specific email itself will be part of the record.
18              THE COURT:  I was going to put my letter on the docket
19    that has the exact text of the email in it.  Is that acceptable?
20              MR. SZEKELY:  I think as long as the exact text is
21    preserved and there's some -- as long as -- I think that's fine.
22              THE COURT:  I can throw it on as an exhibit and just
23    remove her personal email address.
24              MR. SZEKELY:  Just so the timing and everything.
25              THE COURT:  We can clean it all up.  We can do that.
```

1          MR BUDLOW:  It's a game of Whac-A-Mole.  I forgot to
2   mention, because I can't read my own handwriting.  I just want
3   to make the record clear with respect to the speculation of the
4   defendants' criminal history and any sort of inappropriateness
5   to that.  There is going to be additional evidence, as the Court
6   mentioned in this case, that both defendants made calls while
7   incarcerated.

8          Additionally, the defense for Mr. Hairston, in opening
9   statement, spent a lot of time talking about how the defendant
10  was arrested for attempted burglary.  And so I just point that
11  out to say that the fact that a juror would speculate as to
12  whether or not they have a criminal history, while they
13  shouldn't be having that conversation, of course, I don't think
14  it's unusual that it would be in their mind.  And we made the
15  instruction they don't say those things, that's great, but
16  they're going to hear that.  The prejudice is really minimal.

17         MR. SZEKELY:  And, Your Honor, there's a tremendous
18  categorical difference between someone making a jail call while
19  detained pending trial in this case, someone maybe pending case
20  in an unrelated matter in another jurisdiction.  And like
21  Mr. Hairston's prior convictions, both of which are carjacking
22  convictions.  So that's -- the jurors were told someone might
23  have been in jail but the jurors weren't told someone may have a
24  conviction for the crime that they're charged with here.

25         THE COURT:  I agree.

1        MR. SZEKELY:  So I think that is why we're asking Your

2   Honor -- we would -- well, that's it, Your Honor.

3        THE COURT:  No, I understand.  I agree that, you know,

4   it's -- obviously, for the reasons you stated, there's always a

5   concern about propensity so -- all right.

6        Why don't we get 5, and then we'll, in my opinion, more

7   than likely be done with inquiries, but let's see where it goes.

8        (Juror No. 5 entered the courtroom.)

9        THE COURT:  Hi, how are you?

10       JUROR NO. 5:  Good morning, Your Honor.

11       THE COURT:  How was your weekend?

12       JUROR NO. 5:  It was fine.

13       THE COURT:  It looks like the best days we'll be

14  sitting in here.  Sorry I've been delaying everything this

15  morning, it's on me that we're a little bit late.  But I wanted

16  to follow-up on the phone call that you placed to the courtroom

17  deputy Friday morning.  You're not in trouble at all, I just

18  wanted to follow-up a little bit on it, and I appreciate your

19  efforts to clarify.

20       My understanding is that you called to share a little bit

21  more about an experience that you had in the jury room.  And

22  instead of me telling you what I think it is, would you mind

23  just sort of recounting what you said in your phone call?

24       JUROR NO. 5:  Sure.  My understanding of your question

25  to us on Friday, or at least to me on Friday was about how safe

 1  I felt in the courtroom.  And I wanted to clarify to the deputy
 2  clerk that I do feel safe.  She had already told us where guards
 3  were and, you know, that this is safe and so I felt already
 4  assured.  But I took the question -- I had raised that question,
 5  it was last Wednesday, was if we were safe once we left here.
 6             THE COURT:  Okay.
 7             JUROR NO. 5:  So she had suggested that we could, if
 8  we wanted to, request that you hold the room.  And that's when
 9  another jury member said yes, please do that.  And since then I
10  do feel better.  I wanted to let her know that I feel better
11  about that.  And I made a friend that we park in the same garage
12  and we walk out together.
13             THE COURT:  Okay.
14             THE JUROR:  But I also told her about a story from
15  that morning before, as we were all gathering and getting
16  together, before she had come in that morning, that one of the
17  jurors did say that when they left the day before, I don't know
18  if it was in a garage or out on the streets of Baltimore, but
19  someone came up and was banging on their window.  It could have
20  been they were cut off, it could have been a crosswalk, it could
21  have been just been a squeegee worker, you don't know.  But, of
22  course, that made them jump.  And that's when we were like oh,
23  we all -- but I think once we were told we could ask to have the
24  courtroom held, that I feel better now.  Like when we leave and
25  I walk out with somebody and we park on the same floor of the

```
1    garage and so --
2               THE COURT:  Okay.
3               JUROR NO. 5:  -- I feel better about that.
4               THE COURT:  So that particular window incident, as was
5    recounted to you, you don't have any reason to believe this is
6    connected to this case at all?
7               JUROR NO. 5:  I don't.  It's Baltimore, and that
8    person does not live near or around this area but I think it was
9    alarming to them.  I mean, I come into the city.  For me, that
10   was nothing.
11              THE COURT:  Okay.  So the -- all I'm just going to
12   say, everything that's been discussed in the jury room,
13   overheard in the jury room, is any of that making it hard for
14   you to be fair and impartial?
15              JUROR NO. 5:  Absolutely not.  I'm fine.
16              THE COURT:  So you feel like you are able to continue
17   to follow the instruction, which is to base your decisions in
18   this case when it's time to deliberate on the evidence that you
19   hear?
20              JUROR NO. 5:  Absolutely.
21              THE COURT:  You haven't done any outside research on
22   the witnesses, the defendants, or the parties or the lawyers?
23              JUROR NO. 5:  No.  Uh-uh.
24              THE COURT:  No?
25              JUROR NO. 5:  Uh-uh.
```

```
1              THE COURT:  And you feel like you can continue to keep
2   an open mind and follow my instructions that you don't form any
3   opinion on the guilt or innocence of the defendants until the
4   evidence is closed and you're debating.
5              JUROR NO. 5:  Yeah.  I'm taking all of it very
6   seriously.
7              THE COURT:  Okay.  Well, I certainly appreciate that
8   and I can tell.  I've watched everyone taking notes and
9   following it very seriously.
10             If there are any issues that come up throughout the trial
11  regarding courthouse safety, anything that happens, you can
12  always bring it to the attention of the courtroom deputy and she
13  will promptly notify me.  But since that incident has there been
14  anything else that has occurred --
15             JUROR NO. 5:  Uh-uh.
16             THE COURT:  -- that I should know about?
17             THE JUROR:  No.  But you would like for us, if we felt
18  anything or witness it, to let her know?
19             THE COURT:  Yes, that's completely fine.  Anything
20  else that's impacting -- you know, if you feel anything.  And
21  I'm not even going to speculate because I have no basis for it,
22  but anything that comes up like that safety-wise, that is
23  completely something you can share.
24             And the most important thing for me to get from you right
25  now is just an understanding that those concerns that you voiced
```

1  about safety and the question you asked about being safe, that
2  does not impact your ability to fairly assess the evidence in
3  this case.  Am I right?
4          JUROR NO. 5:  Correct.
5          THE COURT:  Okay.  And if there is anything about the
6  question I ask that's confusing or anything like that you can
7  ask me back.
8          JUROR NO. 5:  Okay.
9          THE COURT:  But I just want to make sure that that
10 feeling of maybe being a little bit unsafe is not going to creep
11 into your analysis of the evidence in this case.
12         JUROR NO. 5:  Right.
13         THE COURT:  And you can tell me with confidence that
14 that is true, that it's not creeping?
15         JUROR NO. 5:  No.  And if I was feeling or if I saw
16 anything I'll alert the deputy clerk.  She's been a great
17 liaison for us so I appreciate that.
18         THE COURT:  I second that.
19         JUROR NO. 5:  She's been great.
20         THE COURT:  Well, you can head back in.  I should have
21 let you say more nice things about Ms. Kelly on the record.
22         THE CLERK:  Yes, please.
23         THE COURT:  I cut it off.
24         JUROR NO. 5:  She's been great.
25     (Juror No. 5 was excused.)

1          THE COURT:  First things first.  The question to

2    outside research was posed as to the witnesses, the defendants,

3    the parties, and the answer may not have been verbalized but it

4    was a no and the head shaking no.

5          Government, do you agree with that?

6          MR BUDLOW:  Yes.

7          THE COURT:  Defense, Mr. Hairston, do you agree?

8          MR. SZEKELY:  Yes, Your Honor, that was the answer.

9          THE COURT:  And Ms. Smith, you agree the answer was

10   no?

11         MS. SMITH:  Yes.

12         THE COURT:  I am satisfied after that inquiry that

13   Juror No. 5 is fair and impartial.  I applaud her for bringing

14   all of this to the Court's attention.  I think I asked her as

15   many ways as I possibly could whether this has impacted her.

16   And by this I mean the number of incidents that she recounted

17   and discussions that she recounted, I'm satisfied that there's

18   been no external influence on the jury.  I'm satisfied that the

19   internal discussions, to the extent they happened, do not impact

20   the juror's ability to be fair and impartial.

21         Juror No. 9 stressed that all of those conversations

22   occurred prior to the admonition at the end of evidence on

23   Thursday and prior to the discussion.

24         Mr. Szekely, I completely forgot, after telling you I

25   would, to remind her that she was under oath, so I apologize for

 1  that.  I put it in my notes, I'm looking at it right now.  Do

 2  you feel a need to have her come back out and be reminded of

 3  that?  She won't necessarily know it's you.

 4          MR. SZEKELY:  No, I don't, Your Honor.  But can I make

 5  one comment?  So the answers the juror gave were effectively any

 6  sense of unsafety I had have nothing to do with what's happening

 7  in the courtroom.  Nevertheless, when the Court holds the people

 8  in the court and we get to leave before the people in the court

 9  do we feel safer.  Which does actually suggest that, in fact,

10  the fact that I assume it's not the defense teams but maybe

11  people here in the gallery on behalf of my client and his

12  co-defendant, they are making them feel unsafe in some way.  And

13  that doesn't really square with her answer that well, nothing in

14  the courtroom is making me feel unsafe, but now that the Court

15  is taking extra precautions to keep people in the courtroom

16  suggests it was, in fact, the courtroom.

17          THE COURT:  That's why I asked the last couple

18  questions.  Which was I want to make sure all the safety stuff

19  isn't creeping into your decisionmaking about the guilt or

20  innocence of the defendants.  That's exactly why I asked that

21  because I too had an issue there.

22      But to be frank, I don't think it's weird for jurors not to

23  want to encounter anyone involved in the case.  I already told

24  them they can't talk to you all, and you all can't talk to them.

25  But I will give you this.  I don't think it rises to that level.

1    But your point is well taken and it's noted for the record that

2    you believe the answer's inconsistent.  I don't think it rises

3    to the level of an inconsistency that gives me concern but it is

4    noted for the record.  That's why I asked those last couple

5    questions.

6            MR. SZEKELY:  So, Your Honor, given that we would ask

7    that the Court also then voir dire the parking buddy, who I

8    assume these topics of conversation -- this is all what prompted

9    them to develop that, and we would ask the Court to engage in

10   similar voir dire regarding safety with the juror who has been

11   identified as her parking garage buddy.

12           THE COURT:  I didn't get the number of that person,

13   but I don't think safety walking to the garage is something that

14   I need to probe with the jurors.  It's -- you know, people have

15   a right to voice concerns about downtown safety.  And actually,

16   I would note that juror seemed to be a little bit more fluid

17   with the realities of driving in and out of Baltimore and didn't

18   seem to be particularly bothered by the incident.

19        Look, last thought on this is, this is obviously a case

20   that has very serious accusations in it and I don't think it's

21   strange at all for jurors to react to that.  And at the time in

22   which this conversation apparently happened it was soon after

23   openings and soon after -- actually, maybe even have been before

24   the testimony.  Or, at worse, it would have been soon after the

25   testimony of the alleged victim, Ms. Tibaquira.

1    I just -- I can't fault jurors for having minds and for

2    running through this thought process.  And to the extent that

3    they're doing it out loud that's obviously been addressed.  But

4    jurors are people and their minds will, as that dissent noted,

5    wax and wane.  And what I'm on the lookout for is a juror who is

6    closed minded.  A juror who is saying I'm out, I can't do my job

7    anymore because this is just too much; this is too overwhelming

8    or the accusations are too serious.  And I'm not hearing that at

9    all, I'm hearing the exact opposite.

10    I have Juror No. 9 who is vigilant about alerting the Court

11    to potential biases, and Juror No. 5 who did the same thing who

12    could have just gone home and said, oh, I got through that but

13    didn't.  Called and said hey, this is what I meant.  So I think

14    we have a very, very, actively involved jury.

15    I want to state for the record again that each one of them

16    has been taking notes, paying attention.  Nobody appears to be

17    falling asleep even during testimony.  That I wouldn't blame

18    them if they had a little problem staying awake, because cell

19    site data is melatonin to some.  And this is a good jury; I

20    really do think that they're going to do their job and are

21    continuing to do their job.

22    So I'm going to bring them out to continue to do their job.

23            MR BUDLOW:  May I make an inquiry, Your Honor?

24            THE COURT:  Yeah.

25            MR BUDLOW:  I was wondering, it seems implicit in what

 1  you said, but if you would be willing to make any factual

 2  findings related to the credibility of the two jurors that we

 3  heard from today.

 4          THE COURT:  Yeah.  I think it goes without saying that

 5  my acceptance of their answers as true is an affirmation of

 6  their credibility.  They seemed to understand the questions,

 7  they listened to them, and I saw nothing in their demeanor,

 8  their tone, the way they looked at me, all of the sort of the

 9  normal indicators of credibility to reflect that they were not

10  telling the truth.  So I'm going to accept their answers as true

11  and we're going to move forward.

12          And everything will get docketed.  I'll figure out how to

13  do that, but I'll make sure it's all preserved.  And if there's

14  some error in your view of how I'm preserving the record, I'll

15  put it on there anyway, you want to make sure this record is

16  complete with your objections, I will do it.  So let's -- you

17  got a witness?

18          MR BUDLOW:  Yes, Your Honor.  Nicole Wilson.

19          MR. PROCTOR:  Your Honor, two things before the jury

20  comes out.

21          THE COURT:  Yes.

22          MR. PROCTOR:  One is what we were told in relation to

23  the Las Vegas thing is they were basically told this is federal

24  court, we have a lot more security, stuff like that.  What that

25  Juror No. 5 actually said is -- what I wrote down is, once we

```
 1   were told where the guards were.  I don't know what she was

 2   told.  I don't know if she was told either our marshals, they're

 3   sitting right next to them, and so I think that and that alone

 4   merits further inquiry.  What were they told about the security

 5   situation in this court?  Because depending on that answer it

 6   may well impact on my client's right to a fair trial.

 7            THE COURT:  So whatever she was told assuaged her

 8   concerns about safety.  And she's repeatedly said that she can

 9   be fair and impartial and continue to do her job to assess the

10   evidence fairly.  So I'm not inclined to do any further inquiry.

11   That's the issue for me is those last few questions that I asked

12   her.  Is any of this, whatever it may be, creeping in.  Because

13   then it's what did they say?  And then if we just continue to

14   have a back and forth, I'm not inclined to do that.

15            MR. PROCTOR:  If they're assuming my client has a stun

16   belt on because of what they were told that absolutely impacts

17   my client's right to a fair trial and I'd like to know what they

18   were told.

19            THE COURT:  Why would you bring up a stun belt?

20            MR. PROCTOR:  Once we were told where the guards were.

21            THE COURT:  Where does stun belt -- who said stun

22   belt?

23            MR. PROCTOR:  What's significant about that?

24            THE COURT:  Okay.  But I'm asking you another

25   question.  Who said stun belt?  Where did that come up?
```

```
 1            MR. PROCTOR:  It came up from me.

 2            THE COURT:  As long as you don't tell them about stun

 3   belts we'll be fine.  I understand your point but I think we've

 4   covered it.  And I understand your concern, I really do.  And I

 5   don't think -- I don't fault you at all.  You're argument is

 6   completely preserved but there's a point where continuing to

 7   pester the jurors about their conversations splits the jury.  It

 8   makes the jury start to think about why is this judge asking me

 9   so much about safety and concern.  It plants seeds in their

10   minds.  I'm not inclined to do it anymore.

11        I totally appreciate your point, and I will -- if you want

12   to write up that issue I totally will accept it for the record,

13   but I'm not inclined to continue to ask because I don't want to

14   taint things any more than we already arguably have.  It's a

15   fair point, but I'm not going to do anymore inquiry.

16        Mr. Szekely, Ms. Garcon, do you have anything to add to

17   that?

18            MR. SZEKELY:  Nothing at this time, Your Honor.

19            THE COURT:  Okay.  And you had another point?

20            MR. PROCTOR:  Yeah.

21            MR. SZEKELY:  We would join Mr. Proctor.

22            MR. PROCTOR:  Before the jury comes in I would ask

23   that we recess so that Mr. Stanley can have a COVID test.  Ms.

24   Smith is pregnant, she shouldn't have to sit next to someone who

25   is potentially COVID positive.  It should have happened already
```

05/20/2024 - Hairston/Stanley TRIAL Excerpt

1  at the jail, it did not, and I just don't think -- he's

2  coughing.  He's certainly sweating more than he was.  It could

3  just be a cold, it could be allergies, but we should find out.

4          THE COURT:  Well, it takes -- I think these tests are

5  45 minutes tests?

6          THE CLERK:  No, it's 25.

7          THE COURT:  25 minute tests so...

8          THE CLERK:  30 minutes.

9          THE COURT:  I mean, what, do you want recess for a

10  half an hour to see the result?

11          MR. PROCTOR:  Yes, sir.

12          THE COURT:  Did you ask for a test to be done prior to

13  this and it was refused?

14          MR. PROCTOR:  I was not aware until he got here this

15  morning.

16          THE COURT:  All right.  Well, I've got the jury

17  sitting back there.  I don't want -- I don't know if Ms. Smith

18  wants her business out on the transcript.  Is that okay what's

19  been said?  You don't need --

20          MR. PROCTOR:  I checked first.

21          THE COURT:  Okay.  Yeah.  I'm looking at the courtroom

22  deputy.  We have the COVID test here so, I mean, we can

23  administer it.  Mr. Stanley, have you done a nasal swab COVID

24  test before?

25          DEFENDANT STANLEY:  Yes.

```
 1                THE COURT:  So you know how to do it?  I'm not going
 2     to do it to you.
 3                THE DEFENDANT:  Unfortunately.
 4                THE COURT:  Yeah.  Okay.  All right.  Well, what have
 5     we got?  What kind do we have?
 6                THE CLERK:  The Inteliswab.
 7                THE COURT:  All right.  Well, this is what we'll do.
 8     I will have him do it right now, put it on the side over by
 9     Mr. Proctor where it's not visible, as the results come in.  And
10     then at lunch we will have the big reveal of the results, I
11     suppose.  And if you see something ahead of time, let me know.
12     But I know these are quick swabs but sometimes they take a
13     little bit longer to be completely accurate.
14                THE CLERK:  Normally when it's positive it pops up in
15     15 minutes.
16                THE COURT:  Why don't we do that right now and --
17          (Mr. Stanley being administered a COVID test.)
18                THE COURT:  Either way, Government can bring their
19     next witness in.
20                MR BUDLOW:  Thank you.
21                THE COURT:  I also think that in the chaos of all of
22     this I did not say congratulations, and that should have been
23     the first reaction.
24                MS. SMITH:  Thank you.
25                THE COURT:  So congratulations.
```

```
 1              MS. SMITH:  Thank you.

 2              THE COURT:  Come on up.  This is your next witness.

 3        You can come up here.  You don't have to go in there.

 4        Does anyone have any issue with the insignia that says

 5   Crime Scene Investigation being worn?

 6              MR. SZEKELY:  I assume the witness will testify she

 7   works as a crime scene investigator.

 8              THE COURT:  I'm hoping that's true.

 9              MR. PROCTOR:  Assuming there's no testimony.

10              MR BUDLOW:  I do have some similar situation but I

11   wouldn't wear it.

12              THE COURT:  That's.

13              THE WITNESS:  Part of my uniform.

14              MR. SZEKELY:  That's what I figured.

15              THE COURT:  Just making sure.

16        The record will reflect that Mr. Stanley is taking a CDC

17   certified COVID test in the courtroom.

18              MR BUDLOW:  I think that's been in a transcript.

19              THE COURT:  I hope I'm not the first.  I will also

20   note that Mr. Proctor is administering it with skill and has

21   reviewed all of the instructions.

22        Ms. Smith, I raise the issue about the forensics badge.  No

23   issue.

24              MS. SMITH:  No.

25              THE COURT:  Let's get the jury out here and get
```

1  started.  The jury is coming out so be on your best

2  behavior.

3      (Requested portion of transcript complete.)

4

5

6

7

8

9

10

11

12

13

14          CERTIFICATE OF OFFICIAL REPORTER

15      I, Kassandra L. McPherson, Registered Professional
   Reporter, in and for the United States District Court for the
16  District of Maryland, do hereby certify, pursuant to 28 U.S.C. §
   753, that the foregoing is a true and correct transcript of the
17  stenographically-reported proceedings held in the above-entitled
   matter and that the transcript page format is in conformance
18  with the regulations of the Judicial Conference of the United
   States.

19
                   Dated this 26th day of August 2024.
20
                      -S-
21                   _____
22                   KASSANDRA L. MCPHERSON, RPR
                     FEDERAL OFFICIAL COURT REPORTER
23

24

25

## 1

**1** [4] - 19:4, 22:22, 23:13, 24:10
**100** [1] - 1:18
**1000C** [1] - 1:21
**101** [1] - 1:24
**13** [1] - 15:22
**14th** [1] - 4:15
**15** [1] - 43:15
**15th** [5] - 3:22, 4:12, 9:8, 16:22, 19:2
**1984** [1] - 8:4

## 2

**20** [1] - 1:8
**2024** [2] - 1:8, 45:19
**21201** [3] - 1:15, 1:19, 1:25
**21202** [1] - 1:21
**233** [1] - 1:21
**25** [2] - 42:6, 42:7
**26th** [1] - 45:19
**28** [1] - 45:16

## 3

**3** [2] - 19:3, 23:14
**30** [1] - 42:8
**36** [1] - 1:14
**3A** [1] - 1:8

## 4

**410** [1] - 1:25
**45** [1] - 42:5
**4th** [2] - 1:14, 1:24

## 5

**5** [51] - 4:3, 4:10, 4:17, 4:19, 5:15, 10:4, 11:10, 14:22, 14:24, 19:22, 19:24, 20:1, 20:2, 20:19, 22:9, 23:11, 24:8, 24:10, 24:11, 24:12, 24:17, 26:5, 26:6, 26:15, 27:3, 27:7, 27:16, 30:6, 30:8, 30:10, 30:12, 30:24, 31:7, 32:3, 32:7,

32:15, 32:20, 32:23, 32:25, 33:5, 33:15, 34:4, 34:8, 34:12, 34:15, 34:19, 34:24, 34:25, 35:13, 38:11, 39:25
**5:30** [1] - 13:19

## 6

**606(b** [1] - 7:15

## 7

**753** [1] - 45:16

## 9

**9** [49] - 3:10, 7:13, 11:9, 12:15, 13:7, 13:9, 13:12, 13:17, 13:22, 14:1, 14:5, 14:10, 14:13, 14:18, 14:22, 14:25, 15:3, 15:6, 15:10, 15:12, 15:17, 15:22, 15:25, 16:3, 16:7, 16:10, 16:16, 16:18, 16:20, 16:23, 17:2, 17:6, 17:8, 17:11, 17:14, 17:17, 17:20, 17:22, 17:25, 18:10, 18:15, 18:18, 18:21, 18:23, 18:24, 19:24, 25:19, 35:21, 38:10
**900** [1] - 1:18
**962-4544** [1] - 1:25
**9:51** [1] - 2:1

## A

**a.m** [1] - 2:1
**ability** [6] - 6:22, 15:5, 18:13, 27:12, 34:2, 35:20
**able** [3] - 4:1, 14:7, 32:16
**abnormal** [3] - 21:12, 21:16, 21:17

**above-entitled** [1] - 45:17
**Absolutely** [1] - 32:20
**absolutely** [4] - 18:3, 28:9, 32:15, 40:16
**accept** [2] - 39:10, 41:12
**acceptable** [1] - 28:19
**acceptance** [1] - 39:5
**accurate** [1] - 43:13
**accurately** [1] - 5:6
**accusations** [2] - 37:20, 38:8
**actively** [1] - 38:14
**actual** [1] - 28:15
**add** [4] - 26:13, 28:3, 28:5, 41:16
**addition** [1] - 26:14
**additional** [5] - 11:4, 20:3, 27:10, 28:5, 29:5
**additionally** [1] - 29:8
**address** [1] - 28:23
**addressed** [1] - 38:3
**administer** [1] - 42:23
**administered** [1] - 43:17
**administering** [1] - 44:20
**admonished** [1] - 8:12
**admonition** [1] - 35:22
**admonitions** [1] - 9:8
**adopt** [1] - 28:7
**affect** [2] - 9:22, 15:5
**affirm** [1] - 24:19
**affirmation** [1] - 39:5
**affirming** [1] - 26:4
**Agent** [1] - 2:9
**agree** [10] - 7:2, 11:5, 21:19,

26:12, 26:25, 29:25, 30:3, 35:5, 35:7, 35:9
**agreed** [1] - 21:14
**agreement** [1] - 11:8
**ahead** [1] - 43:11
**aided** [1] - 1:22
**alarming** [1] - 32:9
**alert** [1] - 34:16
**alerting** [1] - 38:10
**allegation** [1] - 9:25
**allegations** [1] - 10:22
**alleged** [2] - 11:1, 37:25
**ALLEN** [1] - 1:6
**allergies** [1] - 42:3
**almost** [1] - 26:21
**alone** [2] - 3:15, 40:3
**alternate** [2] - 23:13, 23:16
**Alternate** [6] - 19:3, 19:4, 23:13, 24:10
**Amendment** [1] - 9:19
**America** [1] - 2:6
**AMERICA** [1] - 1:4
**Amos** [1] - 2:9
**analysis** [1] - 34:11
**Andrew** [2] - 1:17, 2:12
**anonymously** [1] - 3:9
**answer** [5] - 35:3, 35:8, 35:9, 36:13, 40:5
**answer's** [1] - 37:2
**answers** [5] - 13:5, 26:16, 36:5, 39:5, 39:10
**anyway** [1] - 39:15
**apologize** [1] - 35:25
**appeal** [1] - 28:17
**appellate** [1] - 12:12
**applaud** [1] - 35:13

**apply** [2] - 17:15, 24:19
**appreciate** [4] - 30:18, 33:7, 34:17, 41:11
**appropriate** [1] - 25:7
**approve** [1] - 27:10
**area** [2] - 10:12, 32:8
**arguably** [1] - 41:14
**argument** [2] - 26:14, 41:5
**arguments** [1] - 28:10
**arise** [1] - 10:22
**arrested** [1] - 29:10
**article** [1] - 6:16
**articles** [1] - 7:3
**aside** [3] - 3:14, 3:16
**asleep** [1] - 38:17
**assess** [2] - 34:2, 40:9
**assessment** [2] - 5:4, 11:6
**Assistant** [2] - 2:8, 2:12
**assuaged** [1] - 40:7
**assume** [3] - 36:10, 37:8, 44:6
**assumed** [1] - 8:23
**assuming** [7] - 5:15, 15:18, 19:7, 22:21, 28:1, 40:15, 44:9
**assumption** [1] - 8:19
**assumptions** [1] - 12:22
**assured** [1] - 31:4
**attached** [1] - 6:14
**attempted** [1] - 29:10
**attention** [7] - 10:5, 20:3, 20:23, 24:13, 33:12, 35:14, 38:16
**Attorney** [2] - 1:14, 2:8
**Attorney's** [1] -

7:1
**attributed** [1] - 20:2
**August** [1] - 45:19
**awake** [1] - 38:18
**aware** [2] - 20:24, 42:14

## B

**bad** [1] - 22:22
**badge** [1] - 44:22
**BAH-22-0140** [1] - 1:5
**BAH-22-140** [1] - 2:7
**balance** [1] - 27:23
**Baltimore** [10] - 1:9, 1:15, 1:19, 1:21, 1:25, 10:9, 10:10, 31:18, 32:7, 37:17
**banged** [1] - 4:16
**banging** [4] - 5:22, 6:4, 9:24, 31:19
**base** [1] - 32:17
**based** [4] - 3:21, 14:3, 19:18, 20:5
**basing** [1] - 8:10
**basis** [2] - 7:16, 20:10, 33:21
**becomes** [1] - 24:16
**becoming** [1] - 10:20
**BEFORE** [1] - 1:11
**beginning** [1] - 25:24
**begins** [1] - 2:3
**Behalf** [2] - 1:12, 1:16
**behalf** [3] - 2:7, 2:13, 36:11
**behavior** [1] - 45:2
**belief** [1] - 12:20
**belt** [5] - 40:16, 40:19, 40:21, 40:22, 40:25
**belts** [1] - 41:3
**best** [3] - 22:4, 30:13, 45:1
**better** [6] - 3:3, 23:7, 31:10, 31:24, 32:3
**between** [4] -

10:17, 10:24, 22:20, 29:18
**beyond** [1] - 6:13
**bias** [1] - 8:17
**biases** [1] - 38:11
**big** [3] - 10:16, 10:21, 43:10
**bit** [14] - 5:19, 12:3, 12:14, 12:16, 13:15, 13:24, 13:25, 14:14, 30:15, 30:18, 30:20, 34:10, 37:16, 43:13
**blame** [1] - 38:17
**body** [2] - 8:21, 9:16
**book** [2] - 12:6, 12:8
**bothered** [1] - 37:18
**break** [3] - 24:14, 25:5, 26:4
**BRENDAN** [1] - 1:11
**briefly** [1] - 19:18
**bring** [6] - 9:17, 24:11, 33:12, 38:22, 40:19, 43:18
**bringing** [2] - 24:15, 35:13
**broad** [1] - 20:22
**brought** [1] - 10:5
**buddy** [2] - 37:7, 37:11
**BUDLOW** [10] - 2:5, 26:11, 29:1, 35:6, 38:23, 38:25, 39:18, 43:20, 44:10, 44:18
**Budlow** [2] - 1:13, 2:7
**bulk** [1] - 9:7
**burglary** [1] - 29:10
**business** [1] - 42:18

**C**

**candid** [1] - 19:1
**capital** [1] - 12:7
**car** [1] - 9:24
**carjacking** [1] - 29:21
**CASE** [1] - 1:5
**case** [39] - 5:11,

6:25, 7:2, 7:3, 7:17, 7:18, 7:25, 8:3, 8:4, 8:6, 8:9, 8:11, 8:24, 9:6, 9:15, 9:18, 9:25, 10:22, 10:25, 11:18, 12:3, 12:4, 12:24, 14:9, 15:8, 18:8, 20:5, 24:25, 27:23, 29:6, 29:19, 32:6, 32:18, 34:3, 34:11, 36:23, 37:19
**cases** [3] - 7:15, 9:12, 11:13
**casually** [1] - 26:6
**categorical** [1] - 29:18
**CDC** [1] - 44:16
**ceases** [1] - 8:18
**cell** [1] - 38:18
**certain** [1] - 22:21
**certainly** [4] - 19:23, 27:6, 33:7, 42:2
**CERTIFICATE** [1] - 45:14
**certified** [1] - 44:17
**certify** [1] - 45:16
**cetera** [2] - 3:24, 16:15
**chalking** [1] - 19:10
**chance** [1] - 11:15
**chaos** [1] - 43:21
**charge** [1] - 6:17
**charged** [1] - 29:24
**charges** [1] - 7:2
**Charles** [2] - 1:14, 1:18
**checked** [1] - 42:20
**checks** [1] - 21:24
**checks-ins** [1] - 21:24
**Chesapeake** [1] - 2:25
**child** [1] - 8:6
**Circuit** [4] - 8:4, 11:18, 12:4, 28:6
**circumstantial** [1] - 22:17
**cite** [1] - 11:17
**cited** [3] - 7:6, 9:12, 11:13

**city** [4] - 10:14, 10:22, 10:23, 32:9
**claim** [1] - 6:11
**clarify** [4] - 4:5, 4:22, 30:19, 31:1
**clarifying** [1] - 13:1
**clean** [1] - 28:25
**clear** [5] - 12:18, 16:13, 21:11, 21:12, 29:3
**clearly** [1] - 23:3
**CLERK** [5] - 34:22, 42:6, 42:8, 43:6, 43:14
**clerk** [2] - 31:2, 34:16
**client** [2] - 36:11, 40:15
**client's** [2] - 40:6, 40:17
**close** [1] - 7:14
**closed** [2] - 33:4, 38:6
**co** [1] - 36:12
**co-defendant** [1] - 36:12
**cognitive** [1] - 9:1
**cold** [2] - 2:22, 42:3
**colleagues** [1] - 25:20
**coming** [4] - 10:14, 10:17, 19:23, 45:1
**comma** [2] - 3:23, 16:14
**comment** [11] - 3:24, 4:23, 6:6, 14:16, 15:14, 16:9, 16:10, 16:13, 19:15, 23:14, 36:5
**comments** [5] - 3:22, 14:15, 15:4, 16:5, 17:1
**common** [1] - 2:22
**communication** [1] - 7:23
**communications** [2] - 21:17, 21:18
**complete** [2] - 39:16, 45:3
**completed** [1] - 8:17

**completely** [8] - 10:20, 18:2, 26:14, 33:19, 33:23, 35:24, 41:6, 43:13
**composed** [2] - 8:18, 8:20
**Computer** [1] - 1:22
**Computer-aided** [1] - 1:22
**concern** [11] - 7:21, 15:7, 18:8, 18:13, 18:17, 19:25, 25:2, 30:5, 37:3, 41:4, 41:9
**concerned** [1] - 28:11
**concerning** [1] - 17:1
**concerns** [4] - 17:9, 33:25, 37:15, 40:8
**Conference** [1] - 45:18
**confidence** [1] - 34:13
**conformance** [1] - 45:17
**confused** [1] - 5:20
**confusing** [1] - 34:6
**congratulations** [2] - 43:22, 43:25
**connected** [3] - 9:25, 10:1, 32:6
**consider** [1] - 12:13
**consistent** [2] - 26:15, 26:22
**constant** [1] - 10:10
**content** [1] - 13:20
**continue** [9] - 17:13, 17:15, 26:4, 32:16, 33:1, 38:22, 40:9, 40:13, 41:13
**continuing** [2] - 38:21, 41:6
**contours** [1] - 7:9
**conversation** [15] - 4:24, 22:13, 22:20, 22:23, 22:24, 22:25,

23:3, 23:7, 23:8, 23:16, 23:18, 26:18, 29:13, 37:8, 37:22
**conversations** [3] - 12:21, 35:21, 41:7
**conviction** [1] - 11:20, 29:24
**convictions** [3] - 15:2, 29:21, 29:22
**correct** [4] - 27:9, 27:14, 34:4, 45:16
**correctly** [1] - 18:3
**correspondence** [2] - 3:12, 13:3
**couched** [1] - 25:7
**cough** [1] - 22:22
**coughing** [1] - 42:2
**couple** [4] - 4:25, 12:21, 36:17, 37:4
**course** [4] - 10:23, 11:25, 29:13, 31:22
**COURT** [122] - 1:1, 2:10, 2:14, 2:18, 3:2, 3:4, 13:10, 13:13, 13:18, 13:23, 14:2, 14:6, 14:11, 14:14, 14:21, 14:23, 15:1, 15:4, 15:7, 15:11, 15:13, 15:21, 15:23, 16:1, 16:4, 16:8, 16:12, 16:17, 16:19, 16:21, 16:25, 17:3, 17:7, 17:9, 17:12, 17:15, 17:18, 17:21, 17:24, 18:2, 18:11, 18:16, 18:19, 18:22, 18:25, 19:25, 20:15, 20:17, 21:9, 21:11, 21:18, 23:11, 23:20, 24:2, 24:5, 25:13, 26:1, 27:8, 27:19, 28:1, 28:9, 28:18,

28:22, 28:25, 29:25, 30:3, 30:9, 30:11, 30:13, 31:6, 31:13, 32:2, 32:4, 32:11, 32:16, 32:21, 32:24, 33:1, 33:7, 33:16, 33:19, 34:5, 34:9, 34:13, 34:18, 34:20, 34:23, 35:1, 35:7, 35:9, 35:12, 36:17, 37:12, 38:24, 39:4, 39:21, 40:7, 40:19, 40:21, 40:24, 41:2, 41:19, 42:4, 42:7, 42:9, 42:12, 42:16, 42:21, 43:1, 43:4, 43:7, 43:16, 43:18, 43:21, 43:25, 44:2, 44:8, 44:12, 44:15, 44:19, 44:25, 45:22
**Court** [28] - 1:24, 2:4, 3:1, 5:13, 6:2, 20:19, 20:20, 20:22, 22:7, 22:24, 23:5, 24:12, 25:4, 25:6, 25:8, 26:24, 26:25, 27:2, 27:16, 28:15, 29:5, 36:7, 36:14, 37:7, 37:9, 38:10, 45:15
**court** [8] - 8:15, 10:9, 11:20, 12:12, 36:8, 39:24, 40:5
**Court's** [9] - 5:10, 10:5, 20:14, 23:4, 23:6, 23:17, 23:22, 26:16, 35:14
**courthouse** [7] - 4:9, 4:24, 6:25, 19:11, 22:21, 23:18, 33:11
**Courtroom** [1] - 1:8
**courtroom** [17] - 4:9, 4:19, 13:9,

18:12, 19:4, 19:11, 30:8, 30:16, 31:1, 31:24, 33:12, 36:7, 36:14, 36:15, 36:16, 42:21, 44:17
**cover** [1] - 22:4
**covered** [1] - 41:4
**COVID** [7] - 2:23, 41:23, 41:25, 42:22, 42:23, 43:17, 44:17
**CRD** [1] - 10:4
**credibility** [3] - 39:2, 39:6, 39:9
**creep** [1] - 34:10
**creeping** [3] - 34:14, 36:19, 40:12
**Crime** [1] - 44:5
**crime** [3] - 10:13, 29:24, 44:7
**criminal** [4] - 6:24, 14:19, 29:4, 29:12
**CRIMINAL** [1] - 1:5
**Criminal** [1] - 2:7
**crosswalk** [1] - 31:20
**crumbling** [1] - 10:11
**cuff** [1] - 19:15
**custody** [2] - 6:17, 6:21
**cut** [4] - 2:19, 21:19, 31:20, 34:23

**D**

**data** [1] - 38:19
**Dated** [1] - 45:19
**daughter** [1] - 3:17
**DAVON** [1] - 1:6
**days** [1] - 30:13
**dealing** [1] - 19:1
**debating** [1] - 33:4
**decide** [3] - 12:24, 15:8, 20:5
**decided** [1] - 27:22
**decidedly** [1] - 9:3
**decision** [2] - 5:9, 8:10
**decisionmaking**

[1] - 36:19
**decisions** [1] - 32:17
**DEFENDANT** [2] - 42:25, 43:3
**defendant** [4] - 6:20, 11:22, 29:9, 36:12
**Defendants** [1] - 1:16
**defendants** [24] - 3:23, 3:24, 4:9, 5:16, 6:3, 6:7, 6:12, 7:5, 10:1, 14:12, 14:16, 15:14, 16:14, 17:19, 19:5, 19:7, 19:16, 20:9, 29:6, 32:22, 33:3, 35:2, 36:20
**defendants'** [2] - 5:9, 29:4
**Defender** [3] - 1:18, 2:12, 2:23
**defense** [12] - 2:10, 2:15, 11:14, 19:14, 19:18, 20:7, 20:15, 21:12, 27:4, 29:8, 35:7, 36:10
**defenses'** [1] - 13:3
**delaying** [1] - 30:14
**deliberate** [1] - 32:18
**deliberation** [1] - 9:22
**deliberations** [6] - 5:11, 7:14, 11:21, 11:22, 24:14, 27:18
**demeanor** [1] - 39:7
**Dennis** [1] - 2:6
**DENNIS** [1] - 1:6
**deputy** [5] - 30:17, 31:1, 33:12, 34:16, 42:22
**detail** [2] - 5:23, 7:4
**detained** [3] - 19:7, 19:9, 29:19
**Detention** [1] - 2:25
**develop** [1] - 37:9

**difference** [3] - 10:16, 10:21, 29:18
**different** [6] - 5:4, 7:17, 11:15, 12:3, 12:5, 12:14
**dire** [9] - 6:18, 8:17, 8:23, 25:12, 25:14, 25:23, 25:24, 37:7, 37:10
**directly** [2] - 5:8, 16:24
**disagree** [1] - 25:21
**discomfort** [2] - 10:14, 10:17
**discomforts** [1] - 10:16
**discuss** [3] - 5:11, 7:10, 19:18
**discussed** [2] - 23:24, 32:12
**discussing** [2] - 14:9, 14:12
**discussion** [5] - 6:6, 9:7, 19:10, 26:13, 35:23
**discussions** [4] - 7:20, 8:1, 35:17, 35:19
**dismissed** [1] - 3:17
**disregarded** [1] - 5:10
**dissent** [2] - 8:16, 38:4
**District** [2] - 45:15, 45:16
**district** [1] - 11:20
**DISTRICT** [2] - 1:1, 1:2
**dive** [1] - 11:15
**DIVISION** [1] - 1:2
**docket** [2] - 3:12, 28:18
**docketed** [1] - 39:12
**done** [7] - 6:9, 24:22, 24:24, 30:7, 32:21, 42:12, 42:23
**DONTE** [1] - 1:6
**Donte** [1] - 2:6
**doubt** [2] - 25:15, 25:18
**doubts** [1] - 23:8
**down** [4] - 2:23, 14:14, 19:3,

39:25
**downtown** [6] - 10:9, 10:10, 10:11, 10:17, 10:23, 37:15
**draw** [3] - 20:3, 20:23, 24:13
**drill** [1] - 14:14
**driving** [1] - 37:17
**due** [1] - 22:22
**during** [1] - 38:17

**E**

**effectively** [1] - 36:5
**effort** [1] - 20:25
**efforts** [1] - 30:19
**either** [4] - 19:6, 25:8, 40:2, 43:18
**email** [16] - 3:9, 3:11, 5:5, 7:13, 7:22, 11:5, 12:16, 12:19, 13:1, 13:20, 28:13, 28:14, 28:15, 28:17, 28:19, 28:23
**emailed** [1] - 13:18
**emotional** [1] - 8:25
**encounter** [1] - 36:23
**encountering** [1] - 4:20
**end** [5] - 3:7, 7:17, 15:13, 16:12, 35:22
**engage** [2] - 11:20, 37:9
**engaged** [1] - 27:17
**ensuring** [1] - 9:21
**entered** [3] - 8:24, 13:9, 30:8
**entertain** [1] - 12:10
**entire** [1] - 25:4
**entitled** [1] - 45:17
**envisioned** [1] - 6:19
**error** [1] - 39:14
**Esquire** [6] - 1:13, 1:13, 1:17, 1:17, 1:20, 1:20
**essentially** [1] -

23:12
**et** [2] - 3:23, 16:14
**evening** [1] - 4:14
**event** [1] - 2:25
**evidence** [23] - 3:21, 5:5, 5:12, 8:5, 14:4, 14:9, 15:11, 20:5, 20:8, 22:14, 22:15, 22:17, 22:19, 24:21, 27:25, 29:5, 32:18, 33:4, 34:2, 34:11, 35:22, 40:10
**exact** [3] - 28:19, 28:20, 38:9
**exactly** [1] - 36:20
**example** [1] - 20:3
**EXCERPT** [1] - 1:10
**excused** [1] - 34:25
**exhibit** [2] - 28:16, 28:22
**expense** [1] - 8:11
**experience** [4] - 10:15, 21:5, 22:4, 30:21
**experienced** [3] - 10:3, 10:6, 10:19
**experiences** [1] - 9:16
**experiencing** [1] - 10:17
**explained** [1] - 24:8
**explicitly** [1] - 6:18
**expressed** [1] - 8:2
**extent** [4] - 21:12, 21:22, 35:19, 38:2
**external** [9] - 7:24, 9:10, 9:13, 9:21, 9:22, 11:3, 12:11, 20:10, 35:18
**extra** [1] - 36:15

**F**

**Facility** [1] - 2:25
**fact** [8] - 7:8, 10:2, 13:3, 22:7, 29:11, 36:9, 36:10, 36:16
**factors** [1] - 9:1

**facts** [4] - 12:5, 22:14, 22:15, 24:24
**factual** [2] - 11:5, 39:1
**fair** [20] - 4:1, 6:1, 6:22, 8:8, 11:2, 12:20, 14:7, 15:5, 17:16, 18:9, 18:13, 27:12, 32:14, 35:13, 35:20, 40:6, 40:9, 40:17, 41:15
**fairly** [2] - 34:2, 40:10
**falling** [1] - 38:17
**far** [2] - 5:4, 28:11
**fault** [2] - 38:1, 41:5
**FBI** [1] - 2:9
**fear** [1] - 10:25
**fed** [1] - 10:10
**Federal** [5] - 1:18, 1:24, 2:12, 2:22, 7:15
**federal** [3] - 21:6, 22:4, 39:23
**FEDERAL** [1] - 45:22
**feed** [1] - 10:10
**fellow** [3] - 12:22, 17:10, 18:5
**felt** [4] - 4:21, 31:1, 31:3, 33:17
**fess** [1] - 23:5
**few** [4] - 11:7, 13:5, 16:10, 40:11
**fighting** [1] - 26:8
**figure** [1] - 39:12
**figured** [1] - 44:14
**final** [2] - 9:2, 28:12
**findings** [1] - 39:2
**fine** [7] - 4:22, 18:2, 28:21, 30:12, 32:15, 33:19, 41:3
**finish** [1] - 9:2
**first** [10] - 10:6, 13:15, 14:8, 18:25, 19:17, 35:1, 42:20, 43:23, 44:19
**floor** [1] - 31:25
**Floor** [2] - 1:14, 1:24
**fluid** [1] - 37:16

4

flummoxed [1] -
5:19
focus [2] - 6:4,
22:7
follow [11] - 4:4,
11:8, 11:11,
13:15, 13:18,
13:23, 24:20,
30:16, 30:18,
32:17, 33:2
follow-up [8] -
4:4, 11:8, 11:11,
13:15, 13:18,
13:23, 30:16,
30:18
following [4] -
4:25, 5:22, 23:5,
33:9
FOR [1] - 1:2
foregoing [1] -
45:16
forensics [1] -
44:22
forgot [2] - 29:1,
35:24
form [3] - 7:16,
24:21, 33:2
formally [1] - 8:18
format [1] - 45:17
forth [2] - 8:7,
40:14
forward [1] -
39:11
Fourth [2] - 8:4,
28:6
FPD [4] - 5:3, 5:6,
6:14, 11:6
FPD's [1] - 6:8
fraction [1] -
27:24
frank [2] - 25:19,
36:22
frankly [2] -
10:12, 21:23
Friday [3] - 30:17,
30:25
friend [1] - 31:11
front [3] - 4:3,
14:23, 23:5
full [4] - 7:9,
19:19, 26:12,
26:24

**G**

gallery [1] - 36:11
game [1] - 29:1
garage [7] - 4:13,
4:16, 31:11,
31:18, 32:1,

37:11, 37:13
GARCON [3] -
2:11, 19:21,
20:14
Garcon [3] - 1:17,
2:11, 41:16
Gary [2] - 1:20,
2:16
gathering [1] -
31:15
general [2] - 9:16,
16:2
generally [1] -
7:23
generous [1] -
21:8
given [5] - 7:7,
7:8, 11:6, 19:23,
37:6
Google [3] - 6:14,
6:25, 7:5
government [2] -
26:10, 35:5
Government [4] -
2:8, 21:14, 26:2,
43:18
Government's [2]
- 5:18, 27:23
grab [1] - 13:7
grant [1] - 8:10
great [4] - 29:15,
34:16, 34:19,
34:24
grievance [1] -
8:14
group [1] - 10:15
guarantee [1] -
9:20
guarantees [1] -
9:19
guarding [1] -
9:20
guards [3] - 31:2,
40:1, 40:20
guess [1] - 27:4
guilt [4] - 5:10,
14:12, 33:3,
36:19
guilty [3] - 11:22,
12:6, 12:9

**H**

hair [1] - 2:19
HAIRSTON [1] -
1:6
Hairston [8] - 2:6,
2:13, 2:15, 6:15,
6:17, 20:25,
29:8, 35:7

Hairston's [1] -
29:21
half [1] - 42:10
handcuffed [2] -
19:5, 19:10
handcuffs [6] -
3:25, 15:14,
15:15, 15:17,
15:19, 23:14
handled [1] - 8:15
handwriting [1] -
29:2
hard [1] - 32:13
Haynes [5] -
11:17, 11:18,
11:19, 11:24,
11:25
head [3] - 18:19,
34:20, 35:4
heads [1] - 21:1
hear [4] - 23:20,
23:21, 29:16,
32:19
heard [22] - 9:18,
10:6, 10:19,
10:20, 14:8,
14:11, 14:15,
14:17, 15:4,
16:5, 16:6, 17:1,
17:4, 18:7,
18:17, 19:18,
26:17, 26:19,
26:22, 27:24,
39:3
hearing [5] -
21:21, 21:22,
27:8, 38:8, 38:9
heart [1] - 12:17
held [3] - 4:20,
31:24, 45:17
helpful [3] - 8:2,
21:23, 25:17
hereby [1] - 45:16
hi [1] - 30:9
history [3] -
14:19, 29:4,
29:12
hit [1] - 5:21
hold [2] - 13:4,
31:8
holds [1] - 36:7
home [1] - 38:12
Honor [23] - 2:5,
2:11, 2:21,
19:21, 20:16,
22:11, 23:17,
25:3, 26:11,
27:15, 28:4,
28:13, 29:17,
30:2, 30:10,

35:8, 36:4, 37:6,
38:23, 39:18,
39:19, 41:18
HONORABLE [1]
- 1:11
hope [1] - 44:19
hopeful [1] -
12:17
hoping [1] - 44:8
hour [1] - 42:10
hundred [1] - 24:1
HURSON [1] -
1:11

**I**

idea [2] - 11:9,
12:10
ideas [1] - 21:1
identified [1] -
37:11
immediately [1] -
3:8
impact [4] - 6:21,
34:2, 35:19,
40:6
impacted [1] -
35:15
impacting [1] -
33:20
impacts [1] -
40:16
impaneled [1] -
8:20
impartial [13] -
6:22, 8:20, 9:4,
9:20, 11:2,
17:16, 18:9,
18:14, 27:12,
32:14, 35:13,
35:20, 40:9
impartiality [3] -
8:22, 9:1, 27:22
implicit [1] -
38:25
implies [1] - 6:9
important [2] -
10:4, 33:24
improper [1] - 6:9
IN [1] - 1:1
inappropriatene
ss [1] - 29:4
incarcerated [2] -
6:21, 29:7
incident [9] -
4:13, 4:17, 6:4,
9:23, 10:24,
11:3, 32:4,
33:13, 37:18
incidents [1] -

35:16
inclined [8] -
11:9, 11:10,
20:1, 26:2,
40:10, 40:14,
41:10, 41:13
include [1] - 9:16
included [1] -
23:22
including [1] -
3:12
inconsistency
- 37:3
inconsistent [1] -
37:2
incorrect [1] -
12:25
indicated [5] -
4:21, 26:21,
27:1, 27:2, 27:6
indicating [1] -
20:20
indication [1] -
7:10
indicators [1] -
39:9
individual [5] -
8:21, 8:25, 9:9,
25:11, 25:23
indulgence [1] -
20:14
influence [5] -
7:21, 7:24, 9:10,
12:11, 35:18
influences [3] -
7:19, 9:21, 9:23
information [5] -
7:5, 7:6, 7:22,
9:14, 9:15
initial [1] - 26:1
innocence [5] -
14:12, 17:16,
24:20, 33:3,
36:20
innocuously [1] -
26:8
inquire [3] -
12:13, 19:22,
25:22
inquiries [3] -
21:13, 22:6,
30:7
inquiry [25] - 3:7,
4:4, 6:2, 8:17,
9:9, 11:4, 11:21,
12:1, 12:2, 17:3,
20:20, 20:22,
22:9, 22:18,
23:23, 24:9,
24:16, 25:4,

26:12, 26:24,
35:12, 38:23,
40:4, 40:10,
41:15
insight [1] - 8:3
insignia [1] - 44:4
insinuation [1] -
12:8
instead [1] -
30:22
instructing [1] -
26:25
instruction [4] -
7:8, 26:3, 29:15,
32:17
instructions [5] -
5:11, 23:4,
24:20, 33:2,
44:21
Inteliswab [1] -
43:6
intend [1] - 3:11
intent [1] - 20:23
interesting [2] -
7:25, 8:2
internal [5] - 7:14,
7:19, 7:23, 9:16,
35:19
internet [1] - 6:10
introduced [1] -
7:9
Investigation [1] -
44:5
investigator [1] -
44:7
involved [2] -
36:23, 38:14
issue [17] - 5:21,
7:19, 8:15, 9:1,
9:11, 11:25,
12:13, 20:5,
21:7, 23:15,
28:6, 36:21,
40:11, 41:12,
44:4, 44:22,
44:23
issues [4] - 11:7,
12:2, 17:9,
33:10
itself [1] - 28:17

**J**

jail [5] - 6:21, 7:9,
29:18, 29:23,
42:1
jailed [1] - 7:11
Jennifer [2] -
1:20, 2:16
job [5] - 38:6,

38:20, 38:21,
38:22, 40:9
**join** [1] - 41:21
**joined** [3] - 2:8,
5:16, 28:8
**joining** [1] - 28:10
**Judge** [2] - 1:11,
8:16
**judge** [3] - 8:9,
12:13, 41:8
**judgment** [2] -
4:1, 14:7
**Judicial** [1] -
45:18
**jump** [1] - 31:22
**jurisdiction** [1] -
29:20
**JUROR** [58] -
13:12, 13:17,
13:22, 14:1,
14:5, 14:10,
14:13, 14:18,
14:22, 14:25,
15:3, 15:6,
15:10, 15:12,
15:17, 15:22,
15:25, 16:3,
16:7, 16:10,
16:16, 16:18,
16:20, 16:23,
17:2, 17:6, 17:8,
17:11, 17:14,
17:17, 17:20,
17:22, 17:25,
18:10, 18:15,
18:18, 18:21,
18:23, 30:10,
30:12, 30:24,
31:7, 31:14,
32:3, 32:7,
32:15, 32:20,
32:23, 32:25,
33:5, 33:15,
33:17, 34:4,
34:8, 34:12,
34:15, 34:19,
34:24
**juror** [41] - 3:9,
3:10, 3:19, 4:12,
4:15, 4:19, 5:12,
5:13, 5:15, 6:1,
6:20, 7:14, 7:20,
7:23, 8:4, 8:7,
8:12, 10:3,
10:18, 11:1,
12:8, 14:21,
15:14, 15:21,
18:24, 19:23,
21:7, 21:25,
22:13, 22:24,

26:3, 26:19,
27:21, 29:11,
36:5, 37:10,
37:16, 38:5,
38:6
**Juror** [30] - 3:10,
4:3, 4:10, 4:17,
7:13, 10:4, 11:8,
11:10, 12:15,
13:9, 18:25,
19:22, 19:23,
19:24, 20:1,
20:2, 20:19,
22:21, 24:8,
25:19, 27:2,
27:7, 27:16,
30:8, 34:25,
35:13, 35:21,
38:10, 38:11,
39:25
**juror's** [5] - 10:15,
12:6, 22:22,
28:14, 35:20
**jurors** [52] - 3:19,
3:20, 4:12, 4:20,
5:9, 5:10, 5:19,
6:9, 6:22, 8:21,
9:6, 9:17, 10:8,
10:9, 11:2,
11:21, 11:22,
12:20, 12:22,
14:3, 14:8,
14:11, 17:10,
18:5, 18:8,
18:16, 19:8,
21:1, 21:4,
21:13, 21:17,
21:22, 22:6,
22:12, 22:20,
23:2, 23:25,
25:9, 25:17,
25:23, 26:14,
26:23, 29:22,
29:23, 31:17,
36:22, 37:14,
37:21, 38:1,
38:4, 39:2, 41:7
**jurors'** [1] - 20:24
**JURY** [1] - 1:10
**jury** [31] - 7:21,
8:18, 8:20, 9:3,
9:13, 9:14, 9:17,
9:20, 12:9,
13:21, 18:7,
18:20, 18:24,
21:4, 24:14,
25:4, 30:21,
31:9, 32:12,
32:13, 35:18,
38:14, 38:19,

39:19, 41:7,
41:8, 41:22,
42:16, 44:25,
45:1

## K

**Kassandra** [2] -
1:23, 45:15
**KASSANDRA** [1]
- 45:21
**keep** [5] - 3:5,
19:22, 21:16,
33:1, 36:15
**Kelly** [5] - 3:9,
4:3, 4:8, 13:7,
34:21
**kept** [2] - 22:15,
22:17
**kind** [8] - 7:15,
19:19, 20:12,
21:1, 21:24,
24:7, 24:8, 43:5
**knowledge** [1] -
6:13
**known** [1] - 4:6

## L

**lack** [1] - 23:6
**Las** [2] - 23:23,
39:23
**last** [7] - 15:22,
18:5, 31:5,
36:17, 37:4,
37:19, 40:11
**late** [1] - 30:15
**law** [2] - 7:18,
7:25
**lawyers** [1] -
32:22
**learned** [2] -
26:11, 26:20
**least** [4] - 5:12,
5:13, 8:20,
30:25
**leave** [3] - 4:20,
31:24, 36:8
**leaving** [1] - 4:16
**left** [2] - 31:5,
31:17
**letter** [9] - 5:1,
5:6, 5:17, 6:3,
6:5, 6:8, 17:19,
28:8, 28:18
**letterhead** [1] -
6:9
**letters** [1] - 12:7
**level** [3] - 8:22,
36:25, 37:3

**liaison** [1] - 34:17
**lied** [1] - 5:13
**light** [1] - 26:11
**likely** [1] - 30:7
**listened** [1] - 39:7
**live** [1] - 32:8
**Lombard** [1] -
1:24
**look** [4] - 12:22,
21:21, 22:9,
37:19
**looked** [4] -
11:24, 20:9,
24:24, 39:8
**looking** [2] - 36:1,
42:21
**lookout** [1] - 38:5
**looks** [1] - 30:13
**lost** [1] - 22:22
**loud** [1] - 38:3
**lunch** [2] - 16:24,
43:10
**lying** [3] - 5:15,
5:17, 5:24

## M

**maintains** [1] -
24:19
**marshals** [1] -
40:2
**MARYLAND** [1] -
1:2
**Maryland** [2] -
1:9, 45:16
**matter** [6] - 9:1,
9:14, 12:18,
28:16, 29:20,
45:17
**matters** [2] - 9:16,
20:24
**MAY** [1] - 1:8
**MCPHERSON** [1]
- 45:21
**McPherson** [2] -
1:23, 45:15
**MD** [4] - 1:15,
1:19, 1:21, 1:25
**mean** [12] - 4:3,
10:18, 12:21,
20:12, 21:4,
21:23, 22:11,
25:18, 32:9,
35:16, 42:9,
42:22
**meaning** [1] -
3:14
**means** [1] - 26:18
**meant** [1] - 38:13
**melatonin** [1] -

38:19
**member** [1] - 31:9
**mention** [1] - 29:2
**mentioned** [3] -
6:5, 6:6, 29:6
**merits** [2] - 11:4,
40:4
**middle** [1] - 28:5
**might** [4] - 2:24,
11:1, 23:16,
29:22
**mind** [9] - 8:8,
8:12, 17:13,
24:6, 24:19,
27:24, 29:14,
30:22, 33:2
**minded** [1] - 38:6
**minds** [5] - 3:20,
14:3, 38:1, 38:4,
41:10
**minimal** [1] -
29:16
**minimum** [1] -
11:9
**minor** [1] - 11:3
**minute** [1] - 42:7
**minutes** [4] - 5:1,
42:5, 42:8,
43:15
**misled** [1] - 26:23
**missed** [1] - 11:12
**missing** [1] - 20:7
**mistrial** [2] - 7:12,
8:10
**mistrials** [2] -
21:13, 21:14
**Mole** [1] - 29:1
**moment** [1] - 3:15
**MONDAY** [1] - 1:8
**morning** [17] -
2:5, 2:10, 2:11,
2:14, 2:15, 2:18,
2:20, 4:2, 4:11,
13:10, 26:12,
30:10, 30:15,
30:17, 31:15,
31:16, 42:15
**most** [4] - 19:14,
21:6, 26:18,
33:24
**motion** [2] - 7:16,
8:10
**move** [1] - 39:11
**moves** [1] - 7:7
**multiple** [2] -
5:10, 21:13
**murder** [1] - 8:6
**must** [1] - 8:19

## N

**narrow** [1] - 24:3
**nasal** [1] - 42:23
**near** [1] - 32:8
**necessarily** [7] -
5:21, 8:14, 9:5,
21:20, 22:3,
24:7, 36:3
**necessary** [3] -
26:12, 26:24,
28:3
**need** [7] - 22:12,
22:23, 23:24,
25:20, 36:2,
37:14, 42:19
**needle** [1] - 7:7
**nevertheless** [1] -
36:7
**new** [1] - 7:16
**next** [6] - 4:2,
26:4, 40:3,
41:24, 43:19,
44:2
**nice** [1] - 34:21
**Nicole** [1] - 39:18
**night** [3] - 4:14,
9:24, 28:6
**NO** [57] - 1:5,
13:12, 13:17,
13:22, 14:1,
14:5, 14:10,
14:13, 14:18,
14:22, 14:25,
15:3, 15:6,
15:10, 15:12,
15:17, 15:22,
15:25, 16:3,
16:7, 16:10,
16:16, 16:18,
16:20, 16:23,
17:2, 17:6, 17:8,
17:11, 17:14,
17:17, 17:20,
17:22, 17:25,
18:10, 18:15,
18:18, 18:21,
18:23, 30:10,
30:12, 30:24,
31:7, 32:3, 32:7,
32:15, 32:20,
32:23, 32:25,
33:5, 33:15,
34:4, 34:8,
34:12, 34:15,
34:19, 34:24
**nobody** [2] -
23:21, 38:16
**none** [1] - 23:9
**normal** [1] - 39:9

6

normally [1] - 43:14
NORTHERN [1] - 1:2
note [7] - 6:18, 7:13, 9:10, 10:4, 11:13, 37:16, 44:20
noted [6] - 4:15, 28:8, 28:9, 37:1, 37:4, 38:4
Notes [1] - 1:22
notes [4] - 12:6, 33:8, 36:1, 38:16
nothing [9] - 4:8, 4:23, 9:5, 28:4, 32:10, 36:6, 36:13, 39:7, 41:18
noticed [1] - 6:3
notify [1] - 33:13
number [6] - 20:23, 20:24, 21:4, 24:12, 35:16, 37:12
Number [12] - 2:7, 5:15, 13:7, 14:22, 14:23, 15:22, 22:9, 23:11, 24:10, 24:11, 26:5, 26:15
numerous [2] - 3:22, 7:15

**O**

oath [8] - 25:9, 25:10, 25:14, 25:18, 25:25, 26:7, 27:13, 35:25
objection [1] - 27:1
objections [1] - 39:16
obviously [9] - 3:7, 6:12, 7:17, 9:3, 17:4, 24:6, 30:4, 37:19, 38:3
occasionally [1] - 21:6
occurred [6] - 8:15, 9:7, 12:2, 23:8, 33:14, 35:22
OF [3] - 1:2, 1:4, 45:14

office [1] - 2:24
Office [3] - 1:14, 1:18, 7:1
OFFICIAL [2] - 45:14, 45:22
Official [1] - 1:24
Once [1] - 8:17
once [5] - 4:19, 31:5, 31:23, 39:25, 40:20
one [38] - 2:24, 3:2, 3:3, 3:19, 5:12, 5:13, 6:16, 6:18, 8:1, 8:21, 10:5, 10:19, 11:25, 12:1, 14:2, 14:15, 17:14, 17:18, 18:5, 19:2, 19:13, 19:25, 20:23, 22:3, 22:22, 23:4, 23:8, 23:14, 23:25, 26:19, 26:20, 28:12, 31:16, 36:5, 38:15, 39:22
ones [1] - 10:20
ongoing [1] - 8:17
open [5] - 8:8, 17:13, 18:6, 24:19, 33:2
opening [1] - 29:8
openings [1] - 37:23
opinion [5] - 13:4, 16:5, 24:21, 30:6, 33:3
opinions [2] - 3:21, 14:4
opportunity [1] - 28:3
opposite [3] - 6:11, 19:6, 38:9
order [1] - 2:4
ordered [1] - 4:19
ordinary [1] - 22:6
original [1] - 25:10
originally [2] - 19:3, 23:13
otherwise [1] - 25:21
outside [13] - 5:12, 7:19, 7:21, 10:23, 12:11, 18:12, 23:4, 24:22, 24:24, 26:5, 27:10, 32:21, 35:2

overheard [2] - 23:1, 32:13
overwhelming [1] - 38:7
own [1] - 29:2

**P**

page [1] - 45:17
parenthetical [2] - 11:17, 11:18
park [2] - 31:11, 31:25
parking [3] - 4:13, 37:7, 37:11
part [8] - 8:11, 22:25, 23:10, 23:16, 23:18, 23:22, 28:17, 44:13
partiality [1] - 8:18
participants [2] - 22:23, 23:9
participated [2] - 26:17, 26:18
particular [3] - 19:2, 20:8, 32:4
particularly [2] - 6:2, 37:18
parties [4] - 7:11, 24:25, 32:22, 35:3
party [1] - 28:14
past [1] - 21:3
paul [1] - 1:13
Paul [1] - 2:7
pause [2] - 19:14, 24:2
paying [1] - 38:16
pending [2] - 29:19
people [1] - 15:8, 19:6, 22:23, 23:1, 26:18, 36:7, 36:8, 36:11, 36:15, 37:14, 38:4
percent [2] - 17:14, 24:1
perhaps [2] - 5:3, 5:20
person [5] - 10:6, 10:19, 26:20, 32:8, 37:12
personal [4] - 3:21, 14:4, 28:14, 28:23
pester [1] - 41:7
Phillips [1] - 8:16

phone [8] - 4:2, 10:7, 11:12, 23:11, 24:12, 24:15, 30:16, 30:23
photograph [1] - 8:6
phrase [1] - 25:5
pieces [1] - 20:8
placed [2] - 24:15, 30:16
plan [1] - 27:2
planning [1] - 13:19
plants [1] - 41:9
point [19] - 3:12, 6:15, 6:24, 7:4, 8:1, 9:5, 18:12, 19:21, 20:23, 21:3, 23:25, 29:10, 37:1, 41:3, 41:6, 41:11, 41:15, 41:19
pop [1] - 7:6
pops [1] - 43:14
portion [2] - 2:3, 45:3
posed [2] - 27:7, 35:2
position [2] - 19:19, 22:19
positive [2] - 41:25, 43:14
possible [2] - 24:9, 26:9
possibly [1] - 35:15
posted [1] - 3:6
postmortem [1] - 8:5
posture [1] - 7:18
potential [2] - 23:9, 38:11
potentially [1] - 41:25
pounded [1] - 4:16
powerful [1] - 22:17
precautions [1] - 36:15
precise [2] - 5:21, 19:10
precisely [1] - 6:19
predisposition [1] - 10:12
pregnant [1] - 41:24

prejudice [1] - 29:16
prejudicial [1] - 22:16
prematurely [1] - 5:9
present [1] - 2:13
presented [2] - 5:5, 5:7
preserve [1] - 28:6
preserved [5] - 28:11, 28:15, 28:21, 39:13, 41:6
preserving [1] - 39:14
press [3] - 6:16, 7:1, 7:4
presumption [2] - 17:16, 24:20
pretty [1] - 16:7
previously [2] - 6:20, 9:12
primary [1] - 8:14
priors [9] - 3:23, 6:7, 6:12, 14:17, 14:18, 14:20, 16:14, 19:13, 19:16
probable [1] - 23:7
probe [1] - 37:14
probing [2] - 20:19, 22:9
problem [1] - 38:18
problematic [1] - 17:7
problems [1] - 20:11
procedure [1] - 19:4
proceedings [1] - 45:17
process [2] - 8:24, 38:2
processor [1] - 25:10
proctor [3] - 41:21, 43:9, 44:20
Proctor [2] - 1:20, 2:16
PROCTOR [16] - 2:16, 2:21, 3:3, 28:4, 39:19, 39:22, 40:15, 40:20, 40:23, 41:1, 41:20,

41:22, 42:11, 42:14, 42:20, 44:9
Professional [1] - 45:15
prompted [1] - 37:8
promptly [1] - 33:13
propensity [1] - 30:5
properly [1] - 18:1
protect [2] - 10:25
prove [2] - 12:24, 12:25
provide [2] - 4:1, 14:7
provides [1] - 9:14
prudent [1] - 19:24
psychological [1] - 8:25
public [1] - 9:19
Public [3] - 1:18, 2:12, 2:22
publicity [1] - 9:15
pull [3] - 3:14, 3:16
pursuant [1] - 45:16
put [8] - 3:11, 11:1, 11:14, 17:19, 28:18, 36:1, 39:15, 43:8
putting [1] - 21:1

**Q**

questions [16] - 5:12, 6:19, 11:8, 12:17, 13:6, 13:8, 20:21, 26:5, 26:16, 27:6, 27:17, 27:20, 36:18, 37:5, 39:6, 40:11
quick [2] - 5:2, 43:12
quite [3] - 6:10, 21:23, 25:19
quotations [1] - 17:19
quote [5] - 4:5, 4:15, 5:8, 8:17, 16:13
quoted [1] - 5:3

**quotes** [2] - 3:23, 3:25

## R

**raise** [3] - 11:7, 25:1, 44:22
**raised** [4] - 5:12, 12:12, 15:7, 31:4
**rare** [1] - 21:21
**rather** [2] - 13:3, 24:23
**re** [3] - 25:11, 25:22, 26:25
**re-inquire** [1] - 25:22
**re-instructing** [1] - 26:25
**re-sworn** [1] - 25:11
**reached** [1] - 5:9
**reaching** [1] - 3:18
**react** [1] - 37:21
**reaction** [1] - 43:23
**read** [5] - 3:13, 12:19, 13:1, 13:25, 29:2
**reaffirmation** [1] - 27:11
**real** [4] - 7:20, 9:10, 10:13, 20:4
**realities** [1] - 37:17
**realize** [1] - 24:8
**really** [12] - 6:1, 6:3, 7:14, 7:15, 7:19, 7:22, 11:15, 18:6, 29:16, 36:13, 38:20, 41:4
**realtime** [1] - 21:21
**reason** [10] - 4:17, 17:21, 21:16, 24:1, 25:15, 25:16, 25:18, 25:20, 25:21, 32:5
**reasons** [1] - 30:4
**received** [5] - 3:8, 3:9, 3:17, 4:2, 4:25
**recess** [3] - 3:1, 41:23, 42:9
**recognized** [1] - 7:20

**recollection** [1] - 5:18
**record** [17] - 3:13, 5:13, 6:18, 11:14, 21:11, 28:10, 28:13, 28:17, 29:3, 34:21, 37:1, 37:4, 38:15, 39:14, 39:15, 41:12, 44:16
**records** [2] - 16:6, 20:4
**recount** [1] - 23:24
**recounted** [3] - 32:5, 35:16, 35:17
**recounting** [1] - 30:23
**Redwood** [1] - 1:21
**reference** [3] - 6:16, 17:24, 18:1
**referenced** [1] - 5:8
**referred** [1] - 3:9
**referring** [1] - 15:18
**reflect** [2] - 39:9, 44:16
**reflects** [1] - 9:3
**refused** [2] - 11:20, 42:13
**refusing** [1] - 8:10
**regarding** [3] - 6:6, 33:11, 37:10
**Registered** [1] - 45:15
**regulations** [1] - 45:18
**related** [4] - 4:4, 9:15, 28:14, 39:2
**relation** [1] - 39:22
**release** [3] - 6:16, 7:1, 7:4
**remain** [4] - 25:9, 25:14, 25:18, 25:24
**remind** [4] - 25:9, 25:17, 26:6, 35:25
**reminded** [3] - 25:23, 27:13, 36:2
**reminding** [1] -

26:9
**Remmer** [1] - 9:11
**remove** [1] - 28:23
**removed** [1] - 3:19
**repeated** [1] - 9:8
**repeatedly** [1] - 40:8
**report** [1] - 11:21
**Reported** [1] - 1:23
**reported** [1] - 45:17
**Reporter** [2] - 1:24, 45:15
**REPORTER** [2] - 45:14, 45:22
**request** [4] - 3:18, 20:18, 28:12, 31:8
**Requested** [2] - 2:3, 45:3
**required** [1] - 9:21
**research** [8] - 6:10, 20:10, 24:22, 24:24, 26:5, 27:10, 32:21, 35:2
**respect** [2] - 27:2, 29:3
**respectfully** [1] - 20:21
**response** [1] - 5:18
**result** [1] - 42:10
**resulted** [1] - 8:9
**results** [2] - 43:9, 43:10
**retained** [1] - 8:21
**retrying** [1] - 8:11
**returned** [1] - 18:24
**reveal** [1] - 43:10
**reversing** [1] - 11:20
**reviewed** [1] - 44:21
**rise** [1] - 7:22
**rises** [2] - 36:25, 37:2
**room** [13] - 4:12, 9:3, 9:17, 10:2, 12:10, 12:22, 18:7, 18:20, 18:24, 30:21, 31:8, 32:12, 32:13
**row** [3] - 4:3, 14:23, 15:24

**RPR** [2] - 1:23, 45:21
**Ruiz** [1] - 12:4
**Rule** [1] - 7:15
**rules** [2] - 7:18, 23:6
**running** [2] - 16:19, 38:2

## S

**safe** [8] - 4:8, 4:21, 10:11, 30:25, 31:2, 31:3, 31:5, 34:1
**safer** [1] - 36:9
**safety** [14] - 4:4, 4:18, 4:23, 19:11, 19:12, 33:11, 33:22, 34:1, 36:18, 37:10, 37:13, 37:15, 40:8, 41:9
**safety-wise** [1] - 33:22
**Sasha** [2] - 1:17, 2:11
**satisfied** [3] - 35:12, 35:17, 35:18
**saw** [3] - 22:7, 34:15, 39:7
**scenario** [1] - 6:19
**Scene** [1] - 44:5
**scene** [1] - 44:7
**scope** [1] - 24:9
**seal** [1] - 28:16
**search** [2] - 6:14, 6:15
**seat** [1] - 2:20
**second** [6] - 16:8, 16:10, 19:13, 24:2, 24:6, 34:18
**Second** [1] - 11:18
**security** [6] - 4:9, 4:24, 22:21, 23:19, 39:24, 40:4
**see** [10] - 5:14, 5:17, 5:25, 6:10, 7:12, 13:5, 19:6, 30:7, 42:10, 43:11
**seeds** [1] - 41:9
**seeing** [1] - 9:22
**seem** [2] - 7:22,

37:18
**sense** [5] - 12:15, 20:6, 26:23, 27:1, 36:6
**sent** [3] - 3:11, 5:2, 8:12
**separates** [1] - 7:19
**serious** [2] - 37:20, 38:8
**seriously** [2] - 33:6, 33:9
**set** [1] - 12:5
**Seventh** [1] - 12:4
**several** [1] - 23:1
**shaking** [1] - 35:4
**share** [5] - 6:1, 10:3, 18:4, 30:20, 33:23
**shared** [1] - 10:15
**sharing** [1] - 13:20
**shift** [1] - 5:23
**shifting** [1] - 5:24
**shoes** [1] - 11:1
**showing** [1] - 6:16
**shows** [1] - 6:12
**side** [2] - 2:15, 43:8
**sides** [1] - 11:7
**significant** [1] - 40:23
**similar** [2] - 37:10, 44:10
**similarity** [1] - 10:24
**simply** [5] - 5:22, 11:25, 24:17
**single** [1] - 22:24
**sit** [2] - 27:23, 41:24
**site** [1] - 38:19
**sits** [4] - 3:10, 4:3, 14:23, 15:23
**sitting** [4] - 18:9, 30:14, 40:3, 42:17
**situation** [4] - 7:13, 23:9, 40:5, 44:10
**six** [1] - 16:11
**Sixth** [1] - 9:19
**skill** [1] - 44:20
**SMITH** [4] - 35:11, 43:24, 44:1, 44:24
**Smith** [7] - 1:20, 2:16, 28:1, 35:9, 41:24, 42:17,

44:22
**so..** [1] - 42:7
**someone** [10] - 4:15, 7:4, 9:24, 12:11, 29:18, 29:19, 29:22, 29:23, 31:19, 41:24
**sometimes** [2] - 26:7, 43:12
**soon** [3] - 37:22, 37:23, 37:24
**sorry** [3] - 3:4, 21:15, 30:14
**sort** [21] - 5:25, 7:18, 8:11, 10:25, 13:2, 13:16, 19:5, 19:15, 21:3, 21:21, 21:24, 23:2, 23:4, 23:6, 24:17, 27:21, 27:22, 28:1, 29:4, 30:23, 39:8
**sounds** [5] - 19:1, 19:8, 19:14, 23:11, 23:13
**source** [1] - 9:13
**speaking** [1] - 26:21
**Special** [1] - 2:9
**specific** [4] - 20:21, 27:6, 27:17, 28:17
**specifically** [4] - 4:5, 7:6, 22:15, 28:8
**speculate** [2] - 29:11, 33:21
**speculating** [1] - 22:13
**speculation** [5] - 6:11, 6:13, 16:6, 19:15, 29:3
**speedy** [1] - 9:19
**Spencer** [2] - 1:13, 2:8
**spent** [1] - 29:9
**split** [1] - 24:14
**splits** [1] - 41:7
**spot** [1] - 23:2
**square** [1] - 36:13
**squeegee** [1] - 31:21
**stage** [1] - 7:12
**Stanley** [9] - 2:6, 2:17, 2:19, 2:21, 20:25, 41:23, 42:23, 43:17,

44:16
**STANLEY** [2] - 1:6, 42:25
**start** [4] - 9:2, 13:8, 16:5, 41:8
**started** [3] - 18:8, 18:12, 45:1
**state** [2] - 10:8, 38:15
**statement** [3] - 4:10, 16:1, 29:9
**statements** [1] - 19:2
**STATES** [2] - 1:1, 1:4
**States** [7] - 1:12, 1:14, 2:6, 2:8, 8:3, 45:15, 45:18
**stating** [1] - 3:24
**staying** [1] - 38:18
**stenographicall y** [1] - 45:17
**stenographicall y-reported** [1] - 45:17
**Stenotype** [1] - 1:22
**step** [1] - 22:12
**still** [3] - 7:10, 11:12, 15:23
**story** [2] - 5:24, 31:14
**strange** [2] - 9:5, 37:21
**Street** [4] - 1:14, 1:18, 1:21, 1:24
**streets** [1] - 31:18
**stress** [1] - 4:23
**stressed** [1] - 35:21
**stuff** [3] - 10:23, 36:18, 39:24
**stun** [6] - 40:15, 40:19, 40:21, 40:25, 41:2
**subject** [1] - 6:13
**suggest** [1] - 36:9
**suggested** [2] - 11:22, 31:7
**suggests** [1] - 36:16
**Suite** [1] - 1:21
**summarize** [1] - 24:18
**summarized** [2] - 5:6, 5:18
**summarizes** [1] - 7:2

**suppose** [1] - 43:11
**supposed** [1] - 17:25
**supposes** [1] - 8:21
**survived** [1] - 8:23
**suspended** [1] - 27:22
**swab** [1] - 42:23
**swabs** [1] - 43:12
**swear** [2] - 25:20, 25:22
**sweating** [1] - 42:2
**sworn** [2] - 25:11, 25:24
**Szekely** [5] - 1:17, 2:12, 27:8, 35:24, 41:16
**SZEKELY** [24] - 20:16, 20:18, 21:10, 21:15, 22:11, 23:17, 23:21, 24:4, 25:3, 25:16, 27:15, 27:20, 28:12, 28:20, 28:24, 29:17, 30:1, 35:8, 36:4, 37:6, 41:18, 41:21, 44:6, 44:14

**T**

**taint** [1] - 41:14
**Tang** [1] - 2:9
**teams** [1] - 36:10
**terms** [1] - 28:12
**terrible** [1] - 21:20
**test** [8] - 2:23, 2:25, 41:23, 42:12, 42:22, 42:24, 43:17, 44:17
**tested** [1] - 2:24
**testify** [1] - 44:6
**testimony** [4] - 37:24, 37:25, 38:17, 44:9
**tests** [3] - 42:4, 42:5, 42:7
**text** [2] - 28:19, 28:20
**THE** [132] - 1:1, 1:2, 1:11, 2:10, 2:14, 2:18, 3:2, 3:4, 13:10,

13:13, 13:18, 13:23, 14:2, 14:6, 14:11, 14:14, 14:21, 14:23, 15:1, 15:4, 15:7, 15:11, 15:13, 15:21, 15:23, 16:1, 16:4, 16:8, 16:12, 16:17, 16:19, 16:21, 16:25, 17:3, 17:7, 17:9, 17:12, 17:15, 17:18, 17:21, 17:24, 18:2, 18:11, 18:16, 18:19, 18:22, 18:25, 19:25, 20:15, 20:17, 21:9, 21:11, 21:18, 23:11, 23:20, 24:2, 24:5, 25:13, 26:1, 27:8, 27:19, 28:1, 28:9, 28:18, 28:22, 28:25, 29:25, 30:3, 30:9, 30:11, 30:13, 31:6, 31:13, 31:14, 32:2, 32:4, 32:11, 32:16, 32:21, 32:24, 33:1, 33:7, 33:16, 33:17, 33:19, 34:5, 34:9, 34:13, 34:18, 34:20, 34:22, 34:23, 35:1, 35:7, 35:9, 35:12, 36:17, 37:12, 38:24, 39:4, 39:21, 40:7, 40:19, 40:21, 40:24, 41:2, 41:19, 42:4, 42:6, 42:7, 42:8, 42:9, 42:12, 42:16, 42:21, 43:1, 43:3, 43:4, 43:6, 43:7, 43:14, 43:16, 43:18, 43:21, 43:25, 44:2, 44:8, 44:12, 44:13, 44:15, 44:19, 44:25
**theirs** [1] - 26:2

**themselves** [1] - 11:1
**they've** [2] - 9:18, 28:7
**thinking** [6] - 4:22, 11:12, 15:8, 21:22, 22:5, 24:7
**thinks** [2] - 2:22, 25:7
**Thompson** [1] - 8:4
**thoughts** [2] - 6:2, 26:1
**thousand** [1] - 17:14
**throughout** [2] - 8:22, 33:10
**throw** [1] - 28:22
**Thursday** [6] - 3:8, 13:19, 20:22, 22:18, 23:18, 35:23
**Tibaquira** [1] - 37:25
**timing** [1] - 28:24
**today** [2] - 3:17, 39:3
**Todd** [2] - 1:13, 2:9
**together** [2] - 31:12, 31:16
**tolerably** [1] - 8:20
**tone** [1] - 39:8
**took** [1] - 31:4
**top** [1] - 12:7
**topics** [2] - 22:21, 37:8
**totally** [5] - 12:5, 12:20, 16:21, 41:11, 41:12
**track** [1] - 2:23
**Transcript** [1] - 1:22
**transcript** [6] - 2:3, 42:18, 44:18, 45:3, 45:16, 45:17
**tremendous** [1] - 29:17
**TRIAL** [1] - 1:10
**trial** [12] - 7:16, 8:15, 8:22, 9:20, 10:2, 15:19, 17:22, 18:12, 29:19, 33:10, 40:6, 40:17
**trials** [2] - 16:2, 21:6

**trigger** [1] - 10:25
**triggered** [1] - 10:15
**trouble** [2] - 13:16, 30:17
**troubling** [1] - 8:5
**true** [6] - 12:25, 34:14, 39:5, 39:10, 44:8, 45:16
**truth** [2] - 24:1, 39:10
**truthful** [1] - 26:14
**try** [1] - 26:8
**trying** [6] - 2:23, 6:1, 15:8, 22:4, 22:7
**Tuesday** [2] - 4:15, 9:24
**twist** [2] - 19:5, 19:8
**two** [9] - 3:19, 14:3, 19:1, 20:24, 21:7, 22:6, 22:23, 39:2, 39:19
**type** [1] - 24:16
**typed** [1] - 5:1
**typical** [2] - 21:5, 21:6
**typically** [2] - 7:1, 19:6
**typing** [1] - 16:19

**U**

**U.S** [4] - 7:1, 11:17, 11:18, 11:19
**U.S.C** [1] - 45:16
**ultimately** [1] - 8:9
**unbiased** [1] - 10:21
**under** [9] - 25:9, 25:10, 25:14, 25:18, 25:24, 26:7, 27:13, 28:16, 35:25
**understood** [2] - 9:17, 16:21
**undoubtedly** [1] - 8:24
**unfortunately** [2] - 10:14, 43:3
**uniform** [1] - 44:13
**UNITED** [2] - 1:1, 1:4

**United** [7] - 1:12, 1:14, 2:5, 2:8, 8:3, 45:15, 45:18
**unless** [1] - 25:20
**unrelated** [2] - 6:17, 29:20
**unsafe** [3] - 34:10, 36:12, 36:14
**unsafety** [1] - 36:6
**unusual** [2] - 23:9, 29:14
**up** [37] - 3:21, 4:4, 5:1, 5:22, 6:14, 7:6, 8:12, 11:8, 11:11, 11:24, 13:10, 13:15, 13:18, 13:23, 14:3, 19:10, 19:23, 20:9, 23:5, 24:14, 24:24, 27:24, 28:5, 28:16, 28:25, 30:16, 30:18, 31:19, 33:10, 33:22, 40:19, 40:25, 41:1, 41:12, 43:14, 44:2, 44:3

**V**

**vagrancy** [1] - 10:13
**variety** [1] - 8:25
**Vasquez** [1] - 12:4
**Vasquez-Ruiz** [1] - 12:4
**Vegas** [3] - 23:23, 24:3, 39:23
**vein** [1] - 7:18
**verbalized** [1] - 35:3
**versus** [5] - 2:6, 8:3, 11:17, 11:18, 11:19
**victim** [2] - 8:6, 37:25
**victim's** [1] - 11:1
**video** [2] - 23:23
**view** [4] - 5:7, 5:15, 24:14, 39:14
**views** [2] - 6:2, 9:6
**vigilant** [1] -

9

38:10
**viral** [1] - 23:23
**virtue** [1] - 8:23
**visible** [1] - 43:9
**voice** [1] - 37:15
**voiced** [1] - 33:25
**voir** [9] - 6:18,
  8:17, 8:23,
  25:11, 25:14,
  25:23, 25:24,
  37:7, 37:10
**vote** [1] - 9:3
**vs** [1] - 1:5

## W

**wait** [1] - 2:19
**wakes** [1] - 28:5
**walk** [2] - 31:12,
  31:25
**walking** [1] -
  37:13
**wane** [2] - 9:2,
  38:5
**waning** [1] - 9:6
**wants** [2] - 23:5,
  42:18
**watched** [1] - 33:8
**watching** [1] -
  10:2
**water** [1] - 3:5
**wax** [2] - 9:2, 38:5
**waxing** [1] - 9:6
**ways** [1] - 35:15
**wear** [1] - 44:11
**Wednesday** [2] -
  16:23, 31:5
**weekend** [3] -
  13:11, 25:5,
  30:11
**weird** [3] - 19:5,
  19:8, 36:22
**welcome** [1] -
  18:23
**Whac** [1] - 29:1
**Whac-A-Mole** [1]
  - 29:1
**whatsoever** [1] -
  12:1
**widely** [1] - 9:2
**willing** [1] - 39:1
**Wilson** [1] - 39:18
**window** [6] - 4:16,
  5:21, 6:4, 9:24,
  31:19, 32:4
**wise** [1] - 33:22
**WITNESS** [1] -
  44:13
**witness** [5] -
  33:18, 39:17,

43:19, 44:2,
  44:6
**witnesses** [3] -
  24:25, 32:22,
  35:2
**wondered** [2] -
  14:19, 15:2
**wondering** [5] -
  3:18, 15:1, 19:9,
  19:16, 38:25
**word** [6] - 5:23,
  12:6, 12:9,
  12:12, 17:19,
  23:7
**words** [5] - 5:3,
  5:4, 13:1, 26:8
**worker** [1] - 31:21
**works** [1] - 44:7
**worn** [1] - 44:5
**worried** [3] -
  21:25, 22:5
**worse** [1] - 37:24
**worst** [1] - 9:23
**worth** [1] - 27:16
**write** [1] - 41:12
**written** [5] - 8:16,
  12:7, 12:8,
  12:12, 13:2
**wrote** [3] - 3:14,
  5:6, 39:25

## Y

**yesterday** [1] -
  3:22

## §

**§** [1] - 45:16