**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND**

| UNITED STATES | : | |
|---|---|---|
| | : | |
| | : | |
| v. | : | Case No. BAH-22-0140 |
| | : | |
| DENNIS HAIRSTON, et al. | : | |
| | : | |
| Defendant | : | |

**JOINT MOTION FOR NEW TRIAL**

Dennis Hairston, by and through Andrew R. Szekely and Sasha Garcon, Assistant Federal Public Defenders, and Donte Stanley, by and through Gary Proctor and Jennifer Smith, hereby move, pursuant to Fed.R.Crim.P. 33 (Rule 33), for a new trial. A new trial is warranted because the courtroom deputy clerk assigned to Mr. Hairston and Mr. Stanley's trial accepted a job offer from the United States Attorney's Office prior to the start of trial and had failed to disclose that job offer to the Court or to any supervisor in the Clerk's Office until submitting her resignation weeks after the trial ended. Her failure to disclose her acceptance of a job with a party to the case casts an appearance of impropriety back onto the trial.

**FACTUAL AND PROCEDURAL BACKGROUND**

On April 14, 2022, a grand jury returned an indictment charging Mr. Hairston and Mr. Stanley (and others) with conducting a series of carjackings, kidnappings, and robberies between May 2021 and August 2021. *See* Indictment, ECF No. 1. Trial began on May 13, 2024. Yasmine Kelly (the CRD), then-employed as a courtroom deputy by the District Court of Maryland, was the assigned courtroom deputy clerk for the trial. Feb. 25, 2025, Trans. at 23, Ex. A The CRD served as the deputy for all sessions of the trial except for one witness. *Id.* at 23-24.

During Mr. Hairston's trial, the CRD had regular contact with the jury outside the presence of Court and counsel. Most of these interactions dealt with the smooth running of the trial, *e.g.*, providing parking vouchers, making sure all the jurors were present before court

1

sessions began, and other "logistics." *Id.* at 26-27. The CRD testified that she had been trained to "just keep it professional without going into too much personal detail[]" when interacting with jurors. *Id.* at 22.

Not all the CRD's interactions with the jury dealt with logistics, however. Several of CRD's interactions with jurors required the CRD to bring her communications with the jury to the Court's attention. *See generally*, May 15, 2024, Trans. Excerpt 1, Ex. B and May 16, 2024, Trans. Excerpt 2, Ex. C. The Court summarized the first set of interactions and follow-up inquiries with jurors:

> [T]here were a couple instances during the trial where the courtroom deputy interacted with the jurors, and those interactions led to some further inquiry.
>
> I went back to make sure I got it all right. And what I understand it to be is that she was the only individual authorized to communicate with jurors. At one point in the trial her communications with jurors did lead to a motion for voir dire of the jurors, additional voir dire. That's at ECF 201. I granted that.
>
> This request was based on the representation that a juror had asked her about a few things. One was do jurors ever cry; one was am I safe, are we safe; one was apparently a discussion about the video on the internet about the defendant in Las Vegas leaping over the judge's bench and tackling the judge, and then one was talking about courthouse security and potentially why the defendants were not handcuffed.
>
> These musings by the jurors that went through her led to additional questioning which was attached at ECF 274-1, the transcript of that questioning. And we had a pretty vibrant back and forth, the parties, as to what we would ask or what I would ask and what the conversation with the jurors would look like.
>
> And, ultimately, each juror was called out and asked about a conversation involving courtroom security or courthouse safety. I asked each if they had participated in it or heard it. I think one juror said they had heard it, others said they hadn't heard it. No one said they participated in it. Now, to be fair, I think one juror had been excused prior to the – it was after the statements were made but before the questioning.
>
> But either way, every juror on that day, which was, I think May 16th, was asked explicitly whether they could continue to be fair or whether anything they had heard had impacted their ability to assess the evidence, and each one said no, absolutely not. Some added, you know, descriptors, some didn't. But there was no

> doubt in the Court's mind that we could move forward. And, in fact, there was no motion subsequent to that, immediately, to address what had -- the answers because there really was nothing there at that point.

Ex. A at 4-5. Just days later, the CRD had another set of juror communications she brought to the Court's attention:

> Now later, at ECF 207 I think it is, I sent a letter to the parties memorializing two additional communications. One was an email from a juror to the CRD that asked whether jurors could be removed if -- because this juror thought that perhaps some of her fellow jurors were not being fair. I'm entirely paraphrasing because this actual content is in the record.
>
> And there was a phone call from Juror No. 5 where she clarified some information for the Court. Well, that's sort of misleading, the way I described it. I didn't ask for the call, she called and said hey, I wanted to give you some more info about what happened earlier this week. And the contents of that call were fleshed out in a conversation with that juror.
>
> Because what ultimately happened is, I called out Juror -- I think it was Juror 5 and I think it was Juror 9, and we discussed Juror 9's email and we discussed Juror 5's call. And what came out was that Juror 5 was talking about an incident involving another juror where someone had banged on the window of the other juror's car as they left the parking lot. And it's kind of sad, I think the juror said well, it doesn't affect me, it's just Baltimore. I don't really know what that means, but it's unfortunate that that's that juror's view of what had happened.
>
> But what that juror -- and I'm talking about 5 -- it was unequivocal that nothing that happened changed her ability to be fair and impartial. And the same was true of Juror No. 9, the juror who had sent the email to the Court, to the courtroom deputy.
>
> That conversation did generate a motion for a mistrial, if I remember correctly. That was at -- or at least an inquiry into the possibility of external influences at ECF 208, but that was denied and the trial went forward.
>
> And really nothing else that I recall involving the jurors was brought to the Court's attention, or really nothing happened after that other than what happened in the courtroom.

*Id.* at 5-7.[1]

---

[1] Mr. Hairston and Mr. Stanley are not pursuing further *Remer* claims in this motion but are preserving their earlier mid-trial requests for further inquiries of the jury and mistrial.

3

As noted above, the CRD was not present for the testimony of one government witness – Marquis Horsey. Mr. Horsey worked as a car salesman and had sold the CRD's family four cars. *Id.* During trial, the Court noted that "there may be a personal relationship between -- like sort of a business relationship between the courtroom deputy and one of the witnesses. So she's going to sub out when that witness is called." May 16, 2024, Trans. Excerpt at 2, Ex. at 2 ,Ex. D. This was a change from the previous day when after the Court had noted the CRD had bought a car from the witness, she stated "He's going to be surprised." May 15, 2024, Trans. Excerpt 2, Ex. F at 2. The Court suggested the government alert the witness, but otherwise stated it was not "an issue." *Id.* at 2-3. During the evidentiary hearing, the CRD testified that she asked to be relieved during Mr. Horsey's testimony, but stated it was because she "didn't care for him to know that" she worked at the court. Ex. A at 24. The CRD also testified that she was aware of a case where a judge removed a CRD from a murder trial due to a relationship between the CRD's family and a member of the jury. *Id.* at 17. She recalled the judge removed the CRD as soon as the judge learned of the situation. *Id.* Related to the topics of conflict of interest, the CRD testified that she had received no training at the District Court on conflicts. Ex. A at 16-17.

During trial, the CRD had regular interactions with counsel for both the Defendants and the Government. *Id.* at 38-39 The CRD recalled that she interacted more with the Government, specifically with their paralegal, as the Government had more exhibits. *Id.*

On June 5, 2024, the jury found Mr. Hairston and Mr. Stanley guilty on several counts and not guilty on others. *See* Jury Verdict, ECF No. 235. While the cases were pending sentencing, on July 3, 2024, the Court wrote the parties inform them that the CRD notified the Clerk's Office on June 17, 2024, that she had accepted a position with the United States Attorney's Office for the District of Maryland. The Court provided the parties with a two-page letter detailing Chief Deputy Clerk David Ciambruschini's investigation into the timeline of the CRD's

4

hiring by a party to this case. June 28, 2024, Letter to Judge Hurson, Ex. F. The letter established the following facts.

The CRD applied for a litigation support position with the USAO on November 24, 2023. *Id.* at 1. She had her first interview on or about January 8, 2024. *Id.* On April 16, 2024, the CRD received a job offer contingent on passing a drug test and a background check. *Id.* at 2. The CRD received a redundant notification of the tentative job offer on May 3, 2024, and was later told that her background check had started on May 1, 2024. *Id.* Shortly after the jury returned its verdict, the CRD learned she had passed her background check. *Id.* The CRD stated that prior to providing her resignation notice, she had not shared with any supervisor or manager from the Court information that she was seeking a job at the USAO. *Id.* When asked why she never told anyone at the Clerk's Office she applied to work for the USAO, the CRD thrice stated "I didn't feel the need." *Id.* at 34-35.

Despite the CRD's "equivocation" on whether she expected a formal job offer, the Court found it 'unequivocally clear" that on April 16, 2024, the CRD "affirmed her desire to continue to be considered for the job." *Id.* at 60. At the February 25, 2025, evidentiary hearing, the CRD adopted the letter as her testimony. Ex. A at 19-20.

## ARGUMENT

### I. Mr. Hairston and Mr. Stanley May Move for a New Trial Based on the Interests of Justice

Rule 33 permits the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." The rule sets two different deadlines for making a Motion for New Trial. If the motion is based on any reason other than newly discovered evidence, a defendant must file the motion with 14 days of verdict. Fed.R.Crim.P. 33(b)(2). If the motion is based on "newly discovered evidence" then the defendant may file anytime within 3 years of the verdict. Fed.R.Crim.P. 33(b)(1). As detailed below, although Mr. Hairston and Mr. Stanley did not file

5

this motion within 14 days of verdict, the Court should nevertheless analyze their claim under the prong of the rule addressing all claims except newly discovered evidence.

Mr. Stanley and Mr. Hairston's claim arises out of the appearance of impropriety caused by the CRD's failure to disclose her job offer with a party to the trial. While this fact was not revealed until after the 14 day-window for filing a motion for new trial under Rule 33(b)(2) had passed, it is not "newly discovered evidence" under Rule 33. "Newly discovered evidence" has largely been applied to evidence that bears on the verdict – facts not presented to the jury that should have been, false testimony, or *Brady* violations. *E.g., United States v. Fulcher*, 250 F.3d 244 (4th Cir. 2001) (outlining the five-part test for granting a new trial based on newly discovered evidence where the new evidence would "probably produce an acquittal"); *United States v. Lofton*, 233 F.3d 313 (4th Cir. 2000) (holding that when a motion for new trial is based on the government's presentation of false testimony, courts permit a new trial where "the jury might have reached a different conclusion" absent the false testimony; and *United States v. Wolf*, 860 F.3d 175 (4th Cir. 2017) (holding that new trial claims based on newly discovered evidence that was withheld in violation of *Giglio* or *Brady* should be evaluated using *Brady/Giglio* standard, not the five-part test from *Fulcher*), *but see United States v. Bowen*, 799 F.3d. 336 (5th Cir. 2015) (holding that prosecutors' pervasive misconduct throughout the trial and their failure to promptly investigate the allegations merited a new trial even though the newly discovered evidence of the misconduct did not related to guilt or innocence, but was relevant to a controlling issue of law) (citations omitted).

Mr. Stanley and Mr. Hairston's new trial motion is properly brought under Rule 33(b)(2) because the 14-day deadline in the rule is non-jurisdictional. *Eberhart v. United States*, 546 U.S. 12, 19 (2005). Because Rule 33 is not jurisdictional, the Court should determine whether Mr.

Stanley and Mr. Hairston's not filing the motion within 14 days of verdict constitutes "excusable neglect" under Fed.R.Crim.P. 45 (b)(1)(B). It does.

In evaluating whether the failure to meet a filing deadline is excused, the Court considers several factors: "[T]he danger of prejudice [to the opposing party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *United States v. Farris*, 834 F. App'x. 811, 812 (4th Cir. 2021) (quoting *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 395 (1993)). The analysis "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* Further, the factor related to the reason for the delay is the most important one. *Id.* (citations omitted).

Here, each factor weighs in favor of finding there was excusable neglect for Mr. Hairston and Mr. Stanley not filing this motion with 14 days of verdict. First, the reason for the delay in filing is not attributable to Mr. Stanley and Mr. Hairston. The basis for the motion, the CRD's acceptance of a job offer with the government, was not disclosed to anyone until after Ms. Kelly noted her resignation and the Court conducted its internal investigation into the matter.

The Court notified counsel of the issue July 3, 2024. Since that date, defense counsel has pursued the claim diligently, culminating in the February 25, 2025, evidentiary hearing and this motion. The length of the delay and its impact on the proceedings also weigh in Mr. Stanley and Mr. Hairston's favor. As noted, the delay was relatively brief, and the parties began to brief the issue within weeks of the Court's letter to the parties. Currently, the only proceeding being delayed are the sentencing hearing in this case, not a trial or other pre-judgment matters. Finally, there is little prejudice to the government in litigating this motion now, instead of closer to the verdict. The government is as able to defend against this claim today as it would have been then.

7

Further, although government trial counsel had no knowledge of the CRD's hiring prior to Court's letter, the United States Attorney's Office nevertheless played a role in creating this situation when it hired the CRD and failed to provide her guidance on handling the transition from court staff to employee of the Court's most frequent litigant.

Mr. Hairston and Mr. Stanley's failure to file the motion was excused by the CRD's failure to promptly disclose her job offer to the Court. The Court should therefore find this Motion for New Trial has been timely filed.

## II. The Interests of Justice Require a New Trial

At the beginning of the February 7, 2025, hearing the Court stated, "it's concerning to have someone working on this side of the courtroom who has taken a position with a party. And I think it's fair to say that when it's a criminal case, that concern is amplified." Feb. 7, 2025, Trans. at 3, Ex. G. The Court's concern was well-placed because "the administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach." *Kyle v. United States*, 297 F.2d 507, 514 (2d Cir. 1961) (quoting *People v. Savvides*, 136 N.E.2d 853, 887 (N.Y. 1956)). In this case, being "beyond the suspicion of reproach" means not having a key member of the Court's staff, the "face of the courtroom", Ex. A at 36, having accepted a job offer with a party.

Rule 33 "[b]y its terms, ... confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). Further, "[a] miscarriage of justice warranting a new trial in certain circumstances may occur even where there has been no specific legal error." *United States v. Scroggins*, 379 F.3d 233, 255 (5th Cir. 2004), *cert. granted*, judgment vacated on other grounds, 543 U.S. 1112 (2005). This is one such case because although no party or the Court can identify a case with similar facts, the CRD's conduct requires a new trial.

Once she accepted an offer of employment with the government, the CRD's continued role in the case created an ongoing conflict. While the Code of Conduct of Judicial Employees defines conflicts narrowly by limiting them to situations whether the employee has a personal or financial interest in the case, the CRD's job offer nevertheless was a conflict. Guide to Judiciary Policy, Vol. 2A, Ch. 3 at Canon 3. The record in the case shows that this district's approach has been to adopt a broader definition of conflicts intended to ensure there is no doubt as the integrity of the proceedings.

For example, the CRD testified about the removal of a courtroom deputy from a trial when the judge learned the family member of a deputy had a relationship to a jury. Ex. A at 17.. Likewise, the CRD, although she was inconsistent in her reasoning, asked to not be present when someone she had a *prior* financial relationship with was testifying. She made no such request when a party to the case was her future employer.

As part of her on-boarding process with the Court, the CRD received a series of trainings related to the Court's operations. In contrast to her statement that she received no training on conflicts, she did. Among the materials the CRD received an Ethics Checklist that covered topics ranging from outside activities and seeking new employment. Ethics Checklist, Ex. H (under seal). The checklist directs judiciary employees to "discuss with your supervisor any specific or unique requirements concerning", among other items, "Seeking future employment, including applying to or interviewing with prospective employers." *Id*. The same training included a quiz section reviewing the material and reinforcing the lesson that matters related to future or outside employment should be discussed with a supervisor. Avoiding Ethics Pitfalls Screenshots, Ex. I (under seal).

The CRD further certified that she had watched an approximately hour-long video regarding ethics as part of her training.[2] Approximately 37 minutes into the video, the training stressed the importance of screening for potential conflicts and repeatedly encouraged communication with an ethics advisor if there might even be an appearance of impropriety.

Despite her training, the CRD either failed to spot an obvious "ethical pitfall" or chose to ignore it. Regardless, she did not follow clear policy directing her to consult with a supervisor about her job search and potential employment with a party to a trial.

There are no cases, one way or the other, addressing what a trial court should do when the courtroom deputy assigned to a trial has accepted a job with one of the parties. In general, the Guide to Judiciary Policy recognizes that courtroom deputy could be "reasonably perceived" to be a member of the "judge's personal staff." Guide to Judiciary Policy, Vol. 2A, Ch. 3 at Canon 3. For these employees, the canon imposes an even higher standard. When asked if she as the judge's "right-hand woman" she responded "I'm the face of the courtroom," Ex A. at 36. The CRD's duties showed she was the Court's right-hand woman and the "face of the courtroom" through the trial from the perspective of a juror or member of the public attending the trial.

While the CRD seemingly played no decision-making role in the case, her acceptance of employment with a party to the case nonetheless creates the appearance of impropriety, especially because she was the only individual who had unmonitored contact with jurors in this case. The question is not whether the CRD's conflict can be imputed to the Court, but whether the nature of the CRD's conflict is such that a reasonable observer might question the impartiality of the proceedings. The statute addressing judicial disqualification addresses specific situations where

---

[2]The Court conducted an *in camera* review of the CRD's personnel file and court trainings. The Court noted its review of the file and made the relevant trainings available to the parties to review.

a conflict is deemed to exist but begins with a catchall prison that requires recusal "in any proceeding in which [the judge's] impartiality might reasonably be questioned." 28 U.S.C. § 455. In determining disqualification, the question is whether a reasonable observer, not the judge or even someone familiar with the judicial system, but rather an average member of the public, would harbor doubts about the judge's impartiality. *United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir. 1998).

The Department of Justice, similarly, prohibits employees from being part of prosecutions or investigations where the employee has a "personal or political relationship" with the subject of the investigation or prosecution. 28 C.F.R. § 45.2. The Federal Defender organization likewise has a conflict policy and a duty to consult about conflicts. Guide to Judiciary Policy, Vol. 2A, Ch. 4 at Canon 3.

These policies and the ethics trainings the CRD received all reinforce rule that the appearance of impropriety or partiality is as corrosive to trust in the courts as actual impropriety or partiality; or put differently "what matters is not the reality of bias or prejudice but its appearance." *Likety v. United States*, 510 U.S. 540, 548 (1994). Mr. Hairston and Mr. Stanley's trial appears unfair to the outside observer when the judge's closest staff assistant, the "face of the courtroom", and the only individual with unmonitored access to the jury has taken a job with a party to the case to start after the case concludes. That the CRD claims to have attended to her trial duties no differently than if she had not been offered the job is of no moment. Mr. Hairston and Mr. Stanley do not have to show the CRD acted improperly because:

> [T]he showing of prejudice required to bring down the balance in favor of a new trial will vary from case to case [because] the pans contain weights and counterweights other than the interest in a perfect trial. Sometimes only a small showing of prejudice, or none, is demanded because that interest is reinforced by the necessity that 'The administration of justice must not only be above reproach, it must also the beyond the suspicion of reproach,' *People v. Savvides, supra,* and by the teaching of experience that mere admonitions are insufficient to prevent

11

repetition of abuse. *See Mapp v. Ohio*, 367 U.S. 643, 650-653, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

*Kyle v. United States*, 297 F.2d 507, 514 (2d Cir. 1961).

Mr. Hairston and Mr. Stanley's trial was not above reproach. When a key member of the Court's trial staff intends to work for a party to the case, the public's faith that the administration of justice is fair and impartial is shaken. The remedy is for Mr. Hairston and Mr. Stanley to have a fair trial. The Court should therefore order a new trial on Counts One, Two, Three, Four, Five. Six, Seven, and Eight as to Mr. Hairston and Counts One, Two, Three, and Four as to Mr. Stanley.

Respectfully submitted,

James Wyda
Federal Public Defender
 for the District of Maryland

\_\_\_/s/_____
Andrew R. Szekely
Sasha Garcon
Assistant Federal Public Defenders
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-3976
Email: andrew_szekely@fd.org
         sasha_garcon@fd.org


/s/ _____
Gary E. Proctor (Bar No. 27936)
 /s/ _____
Jennifer E. Smith (Bar No. 20767)
The Law Offices of Gary E. Proctor, LLC
8 E. Mulberry Street
Baltimore, Maryland 21202
(410) 444-1500 (tel.)
(443) 836-9162 (fac.)
garyeproctor@gmail.com
jennsmith0890@gmail.com