IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

Criminal No. 22-140-BAH

DENNIS ALLEN HAIRSTON AND
DONTE DAVON STANLEY,

Defendants.

## MEMORANDUM OPINION

"There is no right more sacred to our institutions of government than the right to a public

trial by a fair and impartial jury; no wrong more grievous than its denial, and no greater duty is

enjoined upon the courts than to preserve that right untarnished and undefiled." *Baker v. Hudspeth*,

129 F.2d 779, 781 (10th Cir. 1942). Co-defendants Dennis Allen Hairston ("Hairston") and Donte

Davon Stanley ("Stanley") (collectively "Defendants") allege that their criminal jury trial failed to

meet this high standard because the courtroom deputy ("CRD") assigned to assist with the trial

accepted an offer to work at the United States Attorney's Office for the District of Maryland

("USAO") prior to the start of the trial and failed to disclose that offer until weeks after the trial

ended. *See* ECF 306 (motion for a new trial).[1] Though they point to no specific instance of

---

[1] Defendants filed exhibits with their motion for a new trial. *See* ECF 306-2 (transcript of February 25, 2025 evidentiary hearing on the motion); ECF 306-3 (May 15, 2024 trial transcript); ECFs 306-4 and 306-5 (May 16, 2024 trial transcripts); ECF 306-6 (May 15, 2024 trial transcript); 306-7 (letter from Chief Deputy Clerk); ECF 306-8 (transcript of February 7, 2025 motions hearing). Defendants also filed, under seal, excerpts of a training on ethics given to the CRD when she began her employment with the Court. *See* ECF 308 (filed under seal). The Government filed a response to the motion, *see* ECF 311, and attached the transcript of the February 25, 2025 evidentiary hearing as an exhibit to its filing. *See* ECF 311-1. Defendants filed a reply. ECF 316. The Court

improper influence on the jury on the part of the now-former CRD, they seek a new trial nonetheless because, they argue, the CRD's failure to disclose her "acceptance of a job with a party to the case casts an appearance of impropriety" that cannot be cured. *Id.* at 8. Though what occurred in this case is extremely concerning to the Court and may have warranted a different outcome under circumstances not present here, the Court finds that a new trial is unwarranted and thus denies the motion.

In ruling against Defendants, the Court does not excuse what happened here nor minimize its significance. Quite the opposite. The CRD unquestionably should have shared her decision to accept employment with the USAO prior to the start of trial so that the Court and the parties could discuss an appropriate next step, which likely would have meant her recusal. Similarly, the Court finds it inexcusable that the relevant parties at the USAO did not, at minimum, alert the prosecutors[2] assigned to the case of the decision to hire the CRD. But for the chance discovery that the CRD had secured new employment, the Court wonders when, or even if, Defendants would have been informed that the CRD had taken a position with their adversary at trial. The CRD's decision to hide her job search, and the USAO's failure to disclose her hiring, jeopardized the fair administration of justice and nearly resulted in a jury verdict being set aside.

However, that the USAO and the CRD made poor decisions does not meet the high standard for ordering a new trial, a remedy that is "highly disfavored" and should be "grant[ed]

---

references the exhibits throughout this opinion, but for clarity will endeavor to cite transcripts as filed on the docket.

[2] As has been noted repeatedly during arguments related to the motion, the individual prosecutors who tried this case were completely unaware of the CRD's efforts to seek employment at their office and had no knowledge of her hiring. ECF 311, at 12 (noting that "[t]rial counsel for both parties were unaware of the circumstances of the CRD's employment prior to" learning about it from the Court).

only 'sparingly.'" *United States v. Ali*, 991 F.3d 561, 570 (4th Cir. 2021) (quoting *United States v. Palin*, 874 F.3d 418, 423 (4th Cir. 2017)). The Court is charged with setting aside a jury verdict and ordering a new trial only when required "to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). Having observed the entire trial closely, the Court is convinced that no miscarriage of justice happened here. To be sure, if the Court had any doubt, even a slight one, that Stanley and Hairston did not receive a fair trial, it would not hesitate for a second to afford the requested relief. However, given that the record before the Court reflects that the only non-ministerial contact the CRD had with the jury did not impact any juror's ability to fairly and impartially assess Defendants' guilt, the Court will not upset the findings of the jury. The motion for a new trial, ECF 306, is **DENIED**. The parties will be directed to contact the Court to schedule sentencings for Stanley and Hairston.

## I.    RELEVANT FACTS

The relevant facts at issue here are largely, if not entirely, agreed to, and have been repeatedly summarized at hearings on the matter, *see* ECF 291, at 2:19–8:18, and in the parties' respective filings, *see* ECF 306, at 1–5; ECF 311, at 7–16. As such, the Court will assume familiarity with the record and will summarize only the pertinent facts here.

On May 13, 2024, a multi-week jury trial commenced on allegations that Hairston and Stanley (and others) kidnapped and robbed three victims in and around Baltimore City in May and August of 2021. ECF 1, at 2–6. Two of these victims—A.T. and A.K.—were abducted at gunpoint soon after leaving work at check cashing outlets. *Id.* at 3–4. Two—A.T. and J.H.—were carjacked

and later tortured with a blow torch when their kidnappers did not receive the money they demanded. *Id.* Yasmine Kelly served as the CRD throughout the trial.[3]

The trial lasted several weeks and contained a few incidents that required the questioning of jurors. The first incident occurred on May 15, 2024, after jurors heard the testimony of A.T. ECF 311, at 8. A.T.'s testimony was emotional as she recounted being kidnapped, sexually assaulted, and burned with a blowtorch. *Id.* During a break in the trial, a juror asked the CRD whether "it was okay to cry during a victim's testimony." ECF 306-2, at 27. This inquiry apparently prompted a discussion about safety, which included reference to a viral video of an assault on a judge in a Las Vegas courthouse. ECF 298, at 17–18. As the Court recounted soon after it occurred, the conversation continued:

> [A]nother juror then said something to the effect of, "well, the defendants here aren't handcuffed and they're not shackled at the legs." Or "I wonder if they're shackled at the legs," or something along those lines. Another juror laughed and said "this isn't CSI, this isn't Law & Order. Court is different than what's on television."

*Id.* at 18:6–11. The CRD was present for the conversation and upon questioning in open court confirmed that the Court's summary of events was accurate, but noted that "[she] told [the jurors] a couple other things[.]" *Id.* at 18:22. Asked to recount these additional details, the CRD said, "well, when they talked about the Las Vegas incident I just told them that was not federal court and we have much more security here, and that pretty much was it." *Id.* at 19:1–4. She also told the jurors that "[she'd] never seen anything like that happen here," meaning she'd never witnessed an assault on a judge like what had occurred in Las Vegas. *Id.* at 19:6–7.

---

[3] Ms. Kelly was replaced by another CRD during the testimony of one witness at trial. *See* ECF 299, at 2.

Defendants promptly filed a motion seeking voir dire of the jurors and seeking an evidentiary hearing under *Remmer v. United States*, 347 U.S. 227 (1954). ECF 201, at 1. The Government disputed that a *Remmer* hearing was appropriate. ECF 300, at 4. The Court agreed with the Government and articulated its reasons on the record. *Id.* at 16:23–20:2. However, pursuant to *United States v. Smith*, 919 F.3d 825 (4th Cir. 2019), the Court endorsed a limited, Court-led inquiry into whether the conversations in the jury room had generated bias against Hairston and Stanley. *Id.* at 22:18–24:9. With the general agreement of the parties, *id.* at 24:9–12,[4] that inquiry commenced at the close of the day on May 16, 2024. *Id.* at 26:1. Each juror (including the remaining alternate juror) was brought into the courtroom individually to be questioned. *Id.* at 27:19–28:9 (Juror #1), at 28:11–20 (Juror #2), at 28:22–29:14 (Juror #3), at 29:16–30:4 (Juror #4), at 30:6–23 (Juror #5), at 30:25–31:16 (Juror #6), at 31:18–32:7 (Juror #7), at 32:9–23 (Juror #8), at 32:25–33:17 (Juror #9), at 33:19–34:15 (Juror #10), at 34:17–35:7 (Juror #11), at 35:9–22 (Juror #12), at 35:24–36:14 (Alternate #1). All were asked the same questions: 1) whether they overheard a conversation about courthouse security or courtroom security; 2) whether they'd participated in it; and 3) whether anything they'd heard impacted their ability to be fair and impartial. *Id.* at 27:19–36:14. After hearing from all jurors, the Court concluded that each remained fair and impartial and closed the inquiry. *Id.* at 36:19–20 ("I'm satisfied that the jurors remain fair and impartial. And so I think this episode is closed.").

The evening of May 16, 2024, the CRD received an email from Juror #9, the contents of which were recounted by the Court verbatim, *see* ECF 301, at 3:14–4:1, and provided to the parties

---

[4] The Court gave Defendants a final opportunity to prevent any inquiry and identified the risk of "plant[ing] seeds in jurors' minds" that something was amiss by questioning the jurors. ECF 300, at 25:12–18. Both Hairston and Stanley persisted in the request for an inquiry but re-affirmed their request that it be conducted pursuant to *Remmer*. *Id.* at 25:19–22.

in a letter docketed at ECF 207. In short, Juror #9 asked the CRD whether it was possible to "request to have a juror or jurors removed" because Juror #9 believed "there may be one or two jurors who already have their minds made up." ECF 301, at 3:17–21. Juror #9 stated in her email that "[t]here were numerous comments made yesterday, May 15th about whether or not the 'defendants' had priors, etc." and that "[a] comment was also made stating that the 'defendants' should be in handcuffs." *Id.* at 3:22–25 (quotations in original).

The following morning, the CRD received a phone call from Juror #5 who "wanted to follow-up on the inquiry related to safety" conducted the day before. ECF 301, at 4:2–24. This conversation was summarized on the record and an additional description was included in a letter to the parties. *See* ECF 207, at 1–2. In sum, Juror #5 noted an incident involving another juror in the parking garage after trial but stated that since the Court was allowing jurors to leave before the public at the end of testimony each day, the jurors "felt much more safe." *Id.* at 19:24. On May 21, 2024, the Court docketed a letter to the parties dated May 17, 2024, memorializing the email and the phone call and attaching a copy of the email from Juror #9. ECF 207, at 1–2; ECF 207-1, at 1–2.

Defendants promptly filed a motion seeking a mistrial or, in the alternative, "an evidentiary hearing to explore the circumstances surrounding the courtroom deputy's communications with jurors." ECF 208, at 2. Defendants also raised allegations that jurors had done outside research on the case and contended that at least one must have been untruthful with the Court during the May 16, 2024 inquiry because "many jurors affirmed that they overheard a juror discuss safety with [the CRD]; yet, under direct questioning by this Court, no juror admitted to having made the statements." *Id.* at 4. "At the very least," Defendants asked the Court to "conduct a more searching

individualized voir dire to develop the record regarding the identities and statements of each juror referenced in the May 17th letter." *Id.* The Government responded in opposition. ECF 209.

On May 20, 2024, the Court addressed Defendants' motion for a mistrial. Though it denied the mistrial request and again denied a full-on *Remmer* inquiry, the Court agreed that a limited voir dire of Jurors #5 and #9 was appropriate. ECF 301, at 11:7–12 (agreeing to question Juror #9); 26:5 (agreeing question Juror #5). Juror #9 was questioned first and explained the email she had sent to the CRD. ECF 301, at 13:23–18:24. Juror #9 noted that she had not heard jurors discussing the evidence in the case. *Id.* at 14:8–10. Nor had Juror #9 heard "other jurors discussing the guilt or innocence of the defendants." *Id.* at 14:11–13. Juror #9 recounted hearing Juror #5 "wonder[]" [if Defendants] have a criminal history or any priors," *id.* at 14:18–20, and heard another, Alternate #1, inquire "[w]hy [Defendants] [were] not in handcuffs," *id.* at 15:17–25. Juror #9 noted that all alleged comments were made prior to the Court's questioning of each juror. *Id.* at 16:21–24. Juror #9 noted that there were no additional "problematic" comments or "other issues or concerns," *id.* at 17:3–11, and closed the voir dire by affirming, "one thousand percent," that she retained the "ability to be fair and impartial." *Id.* at 17:14–18:15.

Juror #5 was questioned second and provided additional details of her phone conversation with the CRD. Juror #5 explained that she wished to "clarify" issues related to the discussion about courthouse safety that had occurred earlier that day. *Id.* at 31:1–5. Juror #5 noted that she did "feel safe," and further detailed another incident involving a different juror who had an unpleasant encounter with a person unrelated to the trial after leaving the courthouse on a date earlier in the trial. *Id.* at 31:14–25, at 32:1–10. Juror #5 affirmed that the conversations in the jury room had no impact on her ability to be "fair and impartial." *Id.* at 32:11–20. Juror #5 was then asked whether she could "continue to keep an open mind and follow [the Court's] instructions that

7

[she wasn't to] form any opinion on the guilt or innocence of the defendants until the evidence is closed and [the jury is] debating." *Id.* at 33:1–4. Juror #5 responded, "Yeah. I'm taking all of it very seriously." *Id.* at 33:5. Juror #5 closed the voir dire by repeatedly affirming that the issues and discussions related to "safety" did not impact her "ability to fairly assess the evidence," *id.* at 34:1–4, and affirmed that the "feeling of maybe being a little bit unsafe [was] not going to creep into [her] analysis of the evidence in this case." *Id.* at 33:24–34:4. The Court closed the inquiry by crediting the testimony of both jurors, *id.* at 39:4–11, and after counsel for Stanley raised an additional concern related to Juror #5's testimony,[5] closed the matter.

After the close of evidence and lengthy deliberations, on June 5, 2024, the jury returned a verdict finding both Hairston and Stanley guilty of conspiracy to commit kidnapping (Count 1) and conspiracy to affect commerce by robbery (Count 2). ECF 235, at 1–2. The jury split on subsequent counts alleging robbery, kidnapping, and use of a firearm in furtherance of a crime of violence. Both Hairston and Stanley were found guilty of kidnapping and carjacking A.T. on May 5, 2021 through May 6, 2021 (Counts 3 and 4). *Id.* at 2–3. The jury found Hairston guilty of affecting commerce through robbery on those same dates (Count 5) and, further, that he brandished a firearm during the robbery involving A.T. (Count 6). *Id.* at 2–3. Stanley was acquitted on all counts related to the abduction of A.T. *Id.* at 3. Hairston was convicted of kidnapping (Count 7) and carjacking (Count 8) J.H. on May 15, 2021. *Id.* at 4. The jury did not, however, find that Hairston used a weapon during that offense. *Id.* at 5. Stanley was acquitted on all counts related

---

[5] Counsel for Stanley took issue with Juror #5 noting that she learned "where the guards were" during the "safety conversation" with the CRD and asked for another inquiry of Juror #5. ECF 301, at 40:2–6. The Court invited counsel to file a formal motion on that point but ruled that it was not going to engage in another inquiry at the time the issue was raised. *Id.* at 41:11–15. The docket reflects that no additional motions were filed related to the comment.

to J.H. *Id.* Both Stanley and Hairston were found not guilty on kidnapping and robbery charges related to the abduction of A.K. on August 2, 2021 (Counts 10 through 12). *Id.* at 6–8.

On June 20, 2024, the Court received an email from the Court's chief human resources officer noting that the CRD was ending her service to the Court and transferring to the USAO on Friday, July 12, 2024. ECF 263-1, at 1. The Court notified the parties via email of the CRD's departure in a letter emailed directly to counsel on July 3, 2024. Attached to that email was correspondence from the Chief Deputy Clerk of Court dated June 28, 2024, memorializing an investigation into the circumstances of the CRD's pursuit of employment with the USAO. ECF 203-1, at 1–2.[6] The letter from the Chief Deputy Clerk is repeated verbatim below:

> As you know, a jury trial was held in this matter from May 13, 2024 until June 5, 2024. Courtroom Deputy Clerk Yasmine Kelly was assigned to this trial for its duration.
>
> On June 17, 2024, Ms. Kelly submitted a resignation letter to our office advising that she had accepted a position with the U.S. Attorney's Office in Baltimore, Maryland and providing notice that her last day of employment with the Clerk's Office will be July 12, 2024. After receiving this information, I began an investigation to determine the relevant dates and other facts relating to Ms. Kelly's attempt to seek employment with the U.S. Attorney's Office. I met with Ms. Kelly and her supervisor. This letter provides a summary of my findings.
>
> On or about November 24, 2023, Ms. Kelly applied for a position as a Legal Administrative Specialist (Litigation Support) with the U.S. Attorney's Office via USAJobs.gov.[] Ms. Kelly understood some of the duties and responsibilities of this position to include assisting attorneys with trial preparation, preparing exhibits for trial, and assistance with subpoenas, among other duties. Ms. Kelly was asked to interview for this position and did so on or about January 8, 2024. Ms. Kelly interviewed with Kristy Penny, Supervisory Legal Administrative Specialist, who will be Ms. Kelly's future supervisor, and another individual named Tony, last name and title unknown. To Ms. Kelly's knowledge, neither Ms. Penny nor Tony are attorneys. Counsel of record in this case were not on the interview panel, and to Ms. Kelly's knowledge, did not participate in the hiring process in any way.

---

[6] At the Court's request both the Court's and the Chief Deputy Clerk's letters were attached to a subsequent submission by Defendants. *See* ECF 263-1, at 1–3.

In February 2024, Ms. Kelly was asked to provide references to the U.S. Attorney's Office. Ms. Kelly did not submit information for her current supervisor or any other supervisor or manager from the Court.[] At no point did the U.S. Attorney's Office contact any supervisor or manager from the Court to discuss Ms. Kelly's application for employment.

On or about April 16, 2024, Ms. Kelly received a tentative offer of employment from Lisa Savage, Human Resources Specialist with the U.S. Attorney's Office. This offer of employment was subject to a drug test and favorable determination of a pre-employment background check. Ms. Kelly accepted this offer. Ms. Kelly did not notify her supervisor or any other supervisor or manager from the Court. On May 3, 2024, Ms. Kelly was contacted by Lisa Ordonez, Human Resources Assistant with the Office of Personnel Management, who also offered her a tentative offer of employment. This was a redundant offer of employment, apparently due to a mistake. By email on May 16, 2024, Ms. Ordonez clarified the offer of employment and advised Ms. Kelly that her background check was initiated on May 1, 2024.

Ms. Kelly reported that on or about May 29, 2024, Ms. Penny attended court proceedings in this matter. To Ms. Kelly's knowledge, Ms. Penny appeared to observe trial testimony and not to evaluate Ms. Kelly's performance in the courtroom. Ms. Kelly did not speak with Ms. Penny.

On June 5, 2024, a few hours after a verdict was reached in this case, Ms. Ordonez called Ms. Kelly to advise that her background check received a favorable determination and discussed start dates for her employment with the U.S. Attorney's Office. Ms. Kelly negotiated a start date of July 15, 2024. As noted above, Ms. Kelly submitted her resignation on June 17, 2024, which was the first time any supervisor or manager from the Court learned of Ms. Kelly's attempts to seek employment with the U.S. Attorney's Office.

Ms. Kelly stated that she did not discuss this case with anyone from the U.S. Attorney's Office other than counsel of record. Ms. Kelly stated that no one from the U.S. Attorney's Office suggested that an offer of employment was in any way connected to, or contingent upon, her performance in this trial. Ms. Kelly stated that no one from the U.S. Attorney's Office advised her on disclosure of her pending employment to the Court.

ECF 263-1, at 1–2 (footnotes and signature omitted).

On August 12, 2024, Defendants responded to the Court's letter by asking "the Court to convene a hearing prior to Mr. Hairston's and Mr. Stanley's sentencing hearings to determine whether [the CRD's] accepted offer of employment with one of the parties to the case impacted

her regular, unmonitored communications with the jury." ECF 250, at 1. Defendants argued that authority for the hearing stemmed from *Remmer*, 347 U.S. at 227, or *Smith*, 919 F.3d at 825, and was "proper here because [the CRD's] communications were already the subject of litigation in this case, albeit from the perspective of [the CRD's] observations of the jurors and their communications with her." *Id.* at 2. Defendants argued that given the CRD's communications with jurors throughout the trial, "[the CRD's] accepted job offer may have impacted, consciously or not, her communications with the jury." *Id.* Defendants did not, however, ask the Court to "voir dire [jurors] regarding their interactions with [the CRD]," choosing instead to leave such questioning to another day "depending on [the CRD's] testimony at the *Remmer/Smith* hearing." *Id.* at 2 n.1.

The Court responded the next day by asking Defendants to supplement their letter with a filing containing answers to specific questions including what witnesses, if any, they intended to call at the hearing. ECF 251, at 1–2. Defendants answered these questions and informed the Court of their intention to call Ms. Kelly, three jurors (Jurors #1, #5, and #9), and Ms. Penny, who was Ms. Kelly's supervisor at the USAO. ECF 263, at 2. Defendants sought Ms. Penny's testimony "about the USAO's hiring practices as they relate to conflicts and office policy on hiring court employees who are actively working on matters the USAO is litigating." *Id.* The filing also noted that "both Mr. Stanley and Mr. Hairston consent to the postponement of their sentencing hearings to fully litigate this matter." *Id.* at 4. The Government responded on September 6, 2024, agreeing that a hearing was appropriate but contending that only Ms. Kelly should testify. *See* ECF 274. The Government attached transcript excerpts from the trial. *See* ECF 274-1. Hairston and Stanley replied on September 13, 2024. *See* ECF 278, at 1–3. On September 17, 2024, the Government filed a short letter clarifying the Government's position as to Ms. Kelly's duty to disclose her

11

position at the USAO but again agreeing that "an evidentiary hearing was appropriate." ECF 280, at 1.

On January 1, 2025, the parties jointly wrote the Court to affirm that the "issue is ripe for addressing" and asking the Court to convene a status call "to discuss next steps in the case." ECF 284, at 1. On January 23, 2025, the Court issued a letter order providing some preliminary observations on the matter and explaining the next steps the Court intended to take. ECF 285, at 1. Specifically, the Court agreed to hold two hearings on the issue, one featuring argument to hash out how to "best address the pending issues" and a second evidentiary hearing featuring live witness testimony. *Id.* With the input of the parties as to scheduling, *see* ECF 286, the Court held a hearing on February 7, 2025, laying out the parameters of a future evidentiary hearing. *See* ECF 291 (transcript of February 7, 2025 hearing).

On February 25, 2025, the Court held an evidentiary hearing at which Ms. Kelly testified. ECF 303 (transcript of February 25, 2025 hearing).[7] Ms. Kelly confirmed the accuracy of the summary of events included in the Deputy Clerk's letter. ECF 303, at 19:3–14. She testified that she received job offers from the USAO on April 16, 2024, and May 3, 2024. *Id.* at 24:22–23. She testified that she did not share the offer with anyone other than her listed professional reference, affirming that she had not shared her job offer with the undersigned or "any of the supervisors or staff at the court." *Id.* at 45:1–6. Ms. Kelly described the offers as "tentative" and acknowledged that she would not receive a formal offer until she completed a successful background check. *Id.* at 33:19. However, she conceded that she had no reason to conclude she would not pass the

---

[7] To further ensure that Ms. Kelly was able to give full and accurate testimony, the Court ordered that any questions by the Government be asked by a member of another United States Attorney's Office and that local counsel stay outside of the courtroom during testimony. ECF 291, at 21:1–24:16. To that end, an Assistant United States Attorney assigned to the District of Columbia questioned Ms. Kelly on February 25, 2025. ECF 303, at 2:4–6.

background check. *Id.* at 34:7. Ms. Kelly also confirmed that she formally accepted the job offer "when the [Hairston/Stanley] trial ended." *Id.* at 25:5–6.

Ms. Kelly confirmed that there were times when she "met with the jury outside the presence of judges and counsel," namely "at the start of the day," "the middle of the day," "the end of the day," and "during breaks." *Id.* As to the nature of those interactions, Ms. Kelly testified that her interactions were "in line" with her training and that she aimed to "[k]eep it professional, keep it polite, keep it short." *Id.* at 25:7–19. She noted that some interactions would not rise to the level of requiring notice to the presiding judge, such as a juror inquiring into "a good place to get lunch" or "asking [her] for more paper[]." *Id.* at 26:4–10, 13–15. However, "[i]f there was anything that dealt with the logistics of the actual trial, then [she] reported all of that information to the judge." *Id.* at 26:11–12.

Ms. Kelly noted that she was always "professional" with the jury, as she "always [was]" in her nearly decade-long service as a CRD in the District of Maryland and elsewhere. *Id.* at 41:20–25. She affirmed that in serving as a CRD, she had never "shared [her] personal views about anything related to the trial or the witnesses or the evidence[.]" *Id.* at 42:3–4. She noted that she had never initiated a conversation with a juror about anything related to the trial. *Id.* at 42:11–15. When something did arise that was "related to the trial," she noted that she brought it to the Court's attention "[i]mmediately after" it was raised. *Id.* at 43:2–5. Ms. Kelly affirmed that she felt no "need to impress the Government" and did nothing "related to the job application during the trial." *Id.* at 44:2–8.

Ms. Kelly closed her testimony by affirming that she "treated the trial the exact same as [she had] treated all [her] previous trials" and was not "thinking about the U.S. Attorney's Office" during the trial. *Id.* at 45:19–21. She noted that she had no office space in the chambers of the

undersigned during trial, *id.* at 46:5–7, and played no role in any court decisions including decisions on motions, evidentiary objections, or jury instructions, *id.* at 46:13–47:25. She similarly affirmed that she was not consulted on how the Court should respond to inquiries raised by jurors during trial. *Id.* at 47:7–10. Finally, Ms. Kelly again confirmed the accuracy of the summary of her discussions with the jurors regarding safety. *Id.* at 48:3–15. Ms. Kelly was not questioned about additional interactions with jurors.[8]

Following the hearing, the Court set a schedule for the filing of any motions related to Ms. Kelly's testimony and specifically asked Defendants to identify the "full scope of the relief" Defendants intended to seek in whatever they chose to file. ECF 303, at 65. On March 25, 2025, Defendants filed a joint motion for a new trial. *See* ECF 306. The Government responded, *see* ECF 311, and Defendants filed a reply, *see* ECF 316. Argument on the motion was heard on August 7, 2025. *See* ECF 319. The motion is now ripe for review.

## II.    RELEVANT LAW

The Due Process Clause of the Fifth Amendment requires a "fair trial in a fair tribunal before a judge with no actual bias against the defendant." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (internal quotation marks and citations omitted). Defendants argue they did not receive a fair trial and move for a new one pursuant to Fed. R. Crim. P. 33(a). Under Rule 33(a), "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of

---

[8] At the February 7, 2025 hearing, Defendants represented that they "don't think we need to bring the jurors for the first hearing," referencing the evidentiary hearing at which Ms. Kelly would testify. ECF 291, at 13:22–23. Defendants did not renew any request to bring jurors in for questioning following her testimony beyond reaffirming that they had previously sought a more robust inquiry during the trial. ECF 303, at 63:21–64:2. In the motion seeking a new trial, Defendants explicitly note that they "are not pursuing further *Rem[m]er* claims in this motion but are preserving their earlier mid-trial requests for further inquiries of the jury and mistrial." ECF 306, at 3 n.1.

justice so requires." Rule 33(b) provides that a "motion for a new trial based on any [grounds other than newly discovered evidence] shall be made within 14 days after verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). The Fourth Circuit has cautioned that "these are highly disfavored motions that a court should grant only 'sparingly.'" *Ali*, 991 F.3d at 570 (citation omitted). A new trial is warranted only "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *Id.* (citing *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985)). It bears noting that "the district court is owed deference in granting a new trial under Rule 33." *United States v. Elfenbein*, 144 F.4th 551, 571 (4th Cir. 2025) (citing *United States v. Rafiekian*, 68 F.4th 177, 187 (4th Cir. 2023)).

## III.    THE PARTIES' ARGUMENTS

Defendants argue that a new trial is warranted "to avert a perceived miscarriage of justice." ECF 306, at 8 (citing *Sanchez*, 969 F.2d at 1413). Defendants maintain that "[o]nce she accepted an offer of employment with the government, the CRD's continued role in the case created an ongoing conflict." *Id.* at 9. Defendants admit that "[t]here are no cases, one way or the other, addressing what a trial court should do when the courtroom deputy assigned to a trial has accepted a job with one of the parties." *Id.* at 10. However, they maintain that the "nature of the CRD's conflict is such that a reasonable observer might question the impartiality of the proceedings." *Id.* Defendants make reference to the standard for judicial recusal, noting that federal law mandates recusal "in any proceeding in which [the judge's] impartiality might reasonably be questioned." *Id.* at 11 (citing 28 U.S.C. § 455). In determining whether disqualification of the CRD would have been warranted had her acceptance of employment at the USAO been known prior to trial, Defendants again cite to the standard for judicial recusal and argue that "the question is whether a reasonable observer, not the judge or even someone familiar with the judicial system, but rather

an average member of the public, would harbor doubts about the judge's impartiality." *Id.* (citing

*United States v. DeTemple,* 162 F.3d 279, 287 (4th Cir. 1998)). And, Defendants continue,

"[w]hen a key member of the Court's trial staff intends to work for a party to the case, the public's

faith that the administration of justice is fair and impartial is shaken." *Id.* at 12. The only remedy,

Defendants contend, "is for Mr. Hairston and Mr. Stanley to have a fair trial," *id.*, which in their

view, is a new trial.

The Government counters with a threshold challenge to the timeliness of Defendants'

motion. ECF 311, at 16–22. As to the merits of Defendants' claim, the Government argues that a

CRD performs purely "ministerial tasks" that, in this case, were "largely limited to tracking

evidence and attending to other routine courtroom administration tasks." *Id.* at 24. The

Government argues that the CRD's unrefuted testimony reflects that "her interactions with the

jury, [] were professional and appropriate," and notes "that the CRD had no improper contacts or

communications with the jury." *Id.* Thus, even if the CRD had a conflict of interest—a point the

Government contests—any such conflict cannot be imputed to the Court. *Id.* at 25. And in the

event Defendants are arguing that the conflict in and of itself gives rise to the appearance of

impropriety, the Government posits that "a reasonable observer fully informed of the facts" would

"not conclude that [the] trial was tainted by an appearance of partiality." *Id.* at 22. As such, the

Government contends that a new trial is unwarranted.

## IV.   ANALYSIS

### A.  The Timeliness of Defendants' Arguments

Under Fed. R. Crim. P. 33(b)(2), a motion for a new trial must be filed "within 14 days

after the verdict or finding of guilty" if, as here, it is "grounded on any reason other than newly

discovered evidence."[9] Defendants concede that the matter was not raised within fourteen days of the verdict. ECF 306, at 7. They further concede that the matter was not raised within fourteen days of learning, on July 3, 2024, of the CRD's new employment. *Id.* Defendants argue that the failure to file the motion within fourteen days should be excused under Fed. R. Crim. P. 45(b)(1)(B), which permits a late filing upon a finding of "excusable neglect." *Id.* The Government disagrees and argues that under the applicable factors detailed in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395 (1993), Defendants have failed to make a case for excusable neglect. Defendants counter that "[t]he rule's plain language ties the 14-day deadline to the return of the verdict" and "says nothing about the situation here – information that is discovered outside of fourteen days that impacts the integrity of the verdict but is not 'newly discovered evidence' for purposes of Rule 33." ECF 316, at 2. As such, Defendants argue "[t]he government's attempt to impose a 14-day deadline where the rule's text does not require one is nothing more than an attempt to shift the reason for delay in the case onto the defendants instead of the ex-CRD and her current employer." *Id.*

In *Pioneer Investment Services Co.*, the Supreme Court laid out the factors to be considered by this Court when determining whether a late filing is due to excusable neglect. 507 U.S. at 395. These factors are: 1) "the danger of prejudice to the [non-moving party]"; 2) "the length of the delay and its potential impact on judicial proceedings"; 3) "the reason for the delay, including whether it was within the reasonable control of the movant"; and 4) "whether the movant acted in good faith." *Id.* In laying out these factors, the Supreme Court cautioned that "whether a party's

---

[9] Rule 33(b)(1) notes that "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Defendants concede that the CRD's employment is not "newly discovered evidence" within the meaning of the rule because it is not "evidence that bears on the verdict," such as "facts not presented to the jury that should have been, false testimony, or *Brady* violations." ECF 306, at 6 (citations omitted).

neglect of a deadline is excusable . . . is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* "The *Pioneer* factors[, however,] do not carry equal weight; the excuse given for the late filing must have the greatest import." *United States v. Jones*, 658 F. App'x 188, 191 (4th Cir. 2016) (alteration in original) (quoting *United States v. Munoz*, 605 F.3d 359, 372 (6th Cir. 2010)).

The Government argues that the Rule's fourteen days should commence on July 3, 2024. ECF 311, at 18 ("The government does not dispute that the month between the verdict and the Court's July 3 letter is excusable because trial counsel for both parties were unaware of the CRD's employment with the USAO before that letter."). Putting aside the fact that the Government fails to point the Court to any applicable caselaw in support of its contention that "the fourteen-days after the verdict" rule extends to subsequent post-verdict discoveries of the kind at issue here, its argument ignores the unique equitable concerns at play in this case. In agreeing that the clock should not start on the day the verdict was announced, the Government implicitly concedes that the information that led to the motion—the CRD's new employment with the USAO—was known to the USAO on the date of the verdict and not shared with Defendants until well after the verdict. Though the Court repeats that that the prosecutors assigned to this case were obviously unaware of the CRD's employment, it also bears noting that in the tangentially related context of discovery material owed to defendants pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), the duty to disclose extends beyond what was known to the line prosecutors assigned to a case. *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995) (noting that the prosecutor's duty to disclose *Brady* material includes material that is "known only to police investigators and not to the prosecutor"). Therefore, to argue that Defendants here were somehow tardy in seeking a new trial based on information that was known to others in the USAO and never disclosed to Defendants (or the

prosecutors assigned to the case) is, to put it mildly, unfair. Since the Court's inquiry is an equitable one, the Court easily finds that the balance of equities tips strongly in Defendants' favor.

Even assuming that Defendants missed a deadline, an application of the remaining *Pioneer* factors reveals that any neglect is excusable. As to the prejudice to the Government, any lost memory due to a delay in re-trying this case—a delay that is notably mooted by the outcome of the motion on the merits—can be addressed through traditional means of impeachment or refreshing the recollection of witnesses with earlier sworn testimony. The length of delay is also negligible, and largely the result of the Court's own briefing and hearing schedule that arguably sent the message that no motions seeking a new trial should be filed until *after* the CRD testified.[10] Indeed, the Court explicitly noted that after the CRD's testimony, it intended to give all parties "some time to digest [it], potentially order a transcript, and then prepare [a] formal written submission." ECF 303, at 56:16–19. Further, Defendants acted in good faith as the record before the Court reflects that they diligently sought more information about the CRD's abrupt transition, her training,[11] and any impact both may have had on the proceedings before filing their motion. Recognizing that the inquiry "is, at bottom, an equitable one," *Pioneer Inv. Servs. Co.*, 507 U.S. at 395, the Court declines to hold that Defendants are time-barred from pursuing a new trial and will proceed to evaluating the merits of their claim.

---

[10] Counsel for Hairston explicitly noted on February 7, 2025, that "what [he] expect[ed] to do at the end of the fact finding [was] to file a motion for a new trial for Mr. Hairston . . . ." ECF 291, at 13:3–4. The Government offered no objection to defense counsel's suggestion and raised no issues of potential prejudice if the requested filing was delayed. It was not until the hearing on February 27, 2025, that the Court arguably invited the Government to address issues related to the timing of the motion, *see* ECF 303, at 64:10–14, which it subsequently did.

[11] The Court permitted counsel to review online trainings completed by the CRD for possible use in support of Defendants' motion. Coordinating review of these protected materials, which could only be viewed *in camera* and at separate times for counsel for Defendants and counsel for the Government, also delayed the filing of the motion.

## B. The Merits[12]

### 1. Most of the CRD's Tasks Were Ministerial, so the Standard for Recusal for Judicial Law Clerks Does Not Apply Here.

Generally speaking, the "courtroom deputy's function is administrative, not substantive." *In re Horne*, No. CIV.A. 13-00258-CB-B, 2014 WL 1370151, at \*5 (S.D. Ala. Apr. 8, 2014), *aff'd in part & remanded in part*, 630 F. App'x 908 (11th Cir. 2015). That description proved true in this case when the CRD performed tasks including "deal[ing] with logistics," like ensuring jurors were present and accounted for each day, had pens and paper for notes, or coffee and water in the jury room. ECF 303, at 26:11–18, at 40:23–24. These tasks are ministerial in that they generally involve "obedience to instructions or laws instead of discretion, judgment, or skill." *Ministerial*, Black's Law Dictionary (12th ed. 2024).

Defendants understandably disagree and appear to contend that because the CRD deemed herself to be the "face of the courtroom," ECF 306, at 11, it matters little if her tasks were actually ministerial because the appearance of impropriety to the "man on the street" tainted the entire trial, *id.* at 6 ("Mr. Stanley and Mr. Hairston's claim arises out of the appearance of impropriety caused by the CRD's failure to disclose her job offer with a party to the trial."). In support, they cite to *United States v. DeTemple*, a Fourth Circuit case affirming that as it relates to recusals by a

---

[12] As a threshold matter, the Court accepts the testimony Ms. Kelly provided at the February 25, 2025 hearing as credible. Her answers were complete and consistent with her recitation of events during the trial and similarly consistent with answers given during an interview with the Chief Deputy Clerk of Court. Her demeanor at the hearing reflected no attempts at deception and she provided full and candid answers to all questions posed. Though Defendants raise some concern with alleged inconsistencies in the reasoning she provided for recusing herself during the testimony of one trial witness, *see* ECF 306, at 4, the Court finds her testimony on this point generally consistent and further notes that any discrepancy is best described as immaterial. Further, it is assumed for purposes of evaluating the merits of the pending motion that Ms. Kelly accepted the job at the USAO on April 16, 2024, a month prior to the commencement of the trial. ECF 303, at 60:5–13.

presiding judge, the proper standard is an objective one that "asks whether the judge's impartiality might be questioned by a reasonable, well-informed observer who assesses 'all the facts and circumstances.'" 162 F.3d at 286 (quoting *United States v. Sellers*, 566 F.2d 884, 887 (4th Cir. 1977)). Defendants' arguments for recusal also rest on cases involving law clerks. *See* ECF 316, at 5 (quoting *First Interstate Bank of Ariz., N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 989 (9th Cir. 2000), for the proposition that "[t]he safest course where a law clerk has a conflict of interest, is that she be instructed by the judge 'not to do any work on the matter'" and collecting cases involving law clerk conflicts of interest). However, in jumping to the application of this objective test for judges and law clerks, Defendants fail to point the Court to any caselaw establishing that the CRD is in a position akin to a law clerk such that the standard of recusal for law clerks—and the volumes of caselaw interpreting it—should apply to CRD conflicts. The Court concludes that as it relates to the general duties of a CRD, the standard for recusal applicable to law clerks simply cannot apply.

First, a CRD's duties, at least in the United States District Court for the District of Maryland, are not similar to those of a judicial law clerk. As the Fifth Circuit noted:

> Law clerks are not merely the judge's errand runners. They are sounding boards for tentative opinions and legal researchers who seek the authorities that affect decision. Clerks are privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be.

*Hall v. Small Bus. Admin.*, 695 F.2d 175, 179 (5th Cir. 1983). Thus, "[e]ven if the judge has no reason to recuse herself based upon her own circumstances, a law clerk's relationships might cause the impartiality of decisions from that judge's chambers in which the clerk participates reasonably to be questioned." *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1416 (9th Cir. 1995).

In contrast, a CRD in Maryland is not privy to the judge's thoughts nor are they a participant in decision-making in the same way a law clerk is, a point made clear by Ms. Kelly's

testimony affirming that she was not consulted on any major decisions made before, during, or

after trial. ECF 303, at 46–48. Further, the CRD's office is on a different floor than the presiding

judge's chambers. *Id.* at 46. Thus, the CRD's role did not rise to the level of a judicial law clerk

and, even assuming a conflict of interest, the CRD's alleged lack of impartiality had no way of

manifesting itself on any significant decisions made by the Court during the trial.

Second, judicial ethics rules do not contemplate that a CRD is akin to a law clerk, even

when assisting the judge at trial. The Guide to Judicial Policy's Code of Conduct for Judicial

Employees ("Guide to Judicial Policy")[13] notes that a "member of a judge's personal staff"

includes "a courtroom deputy clerk or court reporter whose assignment with a particular judge is

reasonably perceived as being comparable to a member of the judge's personal staff." Guide to

Judicial Policy, § 310.30(a). While it is true that all judicial employees should "avoid conflicts of

interests in the performance of official duties," *see id.* § 320, Canon 3(F)(1)(a), even assuming a

finding that a CRD could reasonably be perceived as a member of the Court's personal staff,

judicial policy does not require recusal under the same circumstances as a law clerk.[14] Indeed, the

applicable rules mandate that "[i]f any law firm, lawyer, or entity with whom a *law clerk or staff*

---

[13] The Guide to Judicial Policy took effect on January 1, 1996. Code of Conduct for Judicial Employees § 310.20(b). It applies to "all employees of the judicial branch, including interns, externs, and other volunteer court employees, except it does not apply to Justices; judges; and employees of the United States Supreme Court, the Administrative Office of the United States Courts, the Federal Judicial Center, the Sentencing Commission, and federal public defender offices." *Id.* § 310.10(a). It can be found at https://www.uscourts.gov/administration-policies/judiciary-policies/ethics-policies/code-conduct-judicial-employees.

[14] Under Canon 3(F)(2), "[c]ertain judicial employees, because of their relationship to a judge or the nature of their duties, are subject to [] additional restrictions." These additional restrictions apply specifically to "staff attorney[s and] law clerks," Canon 3(F)(2)(a), whereas "[a] secretary to a judge, or a courtroom deputy or court reporter whose assignment with a particular judge is reasonably perceived as being comparable to a member of the judge's personal staff" is still permitted to perform their duties upon certain findings, *see* Canon 3(F)(2)(b).

*attorney* . . . is seeking or has obtained future employment appears in any matter pending before the appointing authority, the *law clerk or staff attorney* should promptly bring this fact to the attention of the appointing authority." *Id.* § 320, Canon 4(C)(4) (emphasis added). While all members of a judge's staff are obliged to "avoid conflicts of interest in the performance of official duties," *id.* § 320, Canon 3(F)(1), the fact remains that the Guide to Judicial Policy treats law clerks differently than CRDs.[15] Further, unlike cases where "a law clerk's relationships might cause the impartiality of decisions from that judge's chambers in which the clerk participates reasonably to be questioned," *see Hamid*, 51 F.3d at 1416, no party has made the Court aware of any case extending 28 U.S.C. § 455(a)'s recusal requirements to a CRD.

Finally, a CRD is not trained to avoid conflicts in the same way that a judicial law clerk is. Law clerks are, as noted, subject to the heightened standards in the Guide to Judicial Policy and are privy to a body of caselaw (and attendant trainings) that warn them that "[i]f a law clerk continues to work on the case in which his or her impartiality might reasonably be questioned, . . . the clerk's actual or potential conflict may be imputed to the judge." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1311 (10th Cir. 2015) (citing *Hall*, 695 F.2d at 180). Such is not the case with CRDs, a fact confirmed by Ms. Kelly as she recalled primarily receiving on-the-job

---

[15] It bears noting that the scenario presented here does not appear to even represent a technical conflict of interest as defined in the Guide to Judicial Policy, a fact Defendants appear to concede by acknowledging that "the Code of Conduct of Judicial Employees defines conflicts narrowly by limiting them to situations whether the employee has a personal or financial interest in the case," *see* ECF 306, at 9, a fact that is not present here. Though Defendants correctly note that persons "reasonably perceived to be members of the judge's personal staff" are subject to slightly higher recusal standards, ECF 306, at 10 (citing Guide to Judiciary Policy, § 320, Canon 3(F)(2)(b)), even this heightened standard for conflicts does not appear to be met here. *Id.* (noting a conflict of interest may be present when a "courtroom deputy . . . knows that he or she . . . (i) is a party to the proceeding, or an officer, director, or trustee of a party; (ii) is acting as a lawyer in the proceeding; (iii) has an interest that could be substantially affected by the outcome of the proceeding; or (iv) is likely to be a material witness in the proceeding"). Again, none of these scenarios are present here.

training, *see* ECF 303, at 16–17, in addition to trainings on "Ethical Pitfalls" that do not counsel automatic recusal whenever a potential conflict arises, *see generally* ECF 308 (under seal).[16] Even Defendants' own filings points out the impracticability of imputing law clerk-like recusal requirements onto a CRD. For example, Defendants note a training in which a bankruptcy court case manager is asked to assist in processing filings in a "big high profile case" involving the case manager's former employer that may impact the "value of [her] vested pension." ECF 308-1, at 1. Even under that circumstance, the training only advises bringing the potential conflict to a "supervisor's attention" and does not advise that recusal is mandatory. *Id.* Additional training slides provided by Defendants suggest bringing potential "outside employment" to a supervising officer's attention. *Id.* at 5. To be clear, all training materials cited by the defense appear to suggest that open communication with the employer about potential conflicts is a best practice, with one noting that a court employee should "[d]iscuss with [their] supervisor any specific or unique requirements concerning . . . [s]eeking future employment, including [] applying to or interviewing with prospective employers." ECF 308, at 2. However, none of the materials cited include the unambiguous bright lines, as do the many "cases addressing motions to recuse judges under § 455(a) *based on their law clerks' relationships*." *Mathis*, 787 F.3d at 1311 (emphasis

---

[16] Defendants assert that the CRD incorrectly testified that "she received no training on conflicts." ECF 306, at 9. Defendants' recounting of the CRD's testimony is not entirely accurate. Ms. Kelly was asked at the evidentiary hearing whether, "[a]t the time that [she] joined the court, . . . [she had] receive[d] any training or information on any conflicts that the court had[.]" ECF 303, at 16:24–25, at 17:1. She did not deny receiving any such training, but noted only that she could not "recall" receiving any trainings on "conflict policies." *Id.* at 17:2. Further, the allegedly relevant training cited by Defendants is entitled "Avoiding Ethics Pitfalls" and does not explicitly caption itself as one addressing "conflicts." ECF 308, at 1–2; ECF 308-1, at 1–5. Thus, the Court does not construe Ms. Kelly's answer as an inaccurate denial that she received training on conflicts, but merely an understandable failure to recall the specifics of an online training module that she likely last reviewed in 2021. ECF 303, at 16 (noting that Ms. Kelly started her employment at the courthouse in October of 2021).

added). As such, the Court cannot agree with Defendants' argument that a CRD's work, in general, is akin to a law clerk's. Accordingly, the standard of recusal for judicial law clerks does not apply.[17]

That the CRD regularly interacts with jurors does not change the analysis. Many jurors interact with courthouse employees as trials unfold, from courtroom security officers to other staff from the Clerk's Office. Many of these individuals may have perceived conflicts that, if imputed to the presiding judge, might mandate automatic recusal. But like a CRD, these individuals generally do not have *substantive* interactions with jurors, at least under normal circumstances. It is true that a CRD's interactions with jurors are typically unmonitored and more substantial than mere greetings. Indeed, many jurors—as was the case here—speak of their interactions with the CRD as a highlight of their jury service. *See* ECF 301, at 34:15–17 (recording Juror #5's observation that the CRD has "been a great liaison for us so I appreciate that"). Regardless, the Court has no reason to question that such interactions remained "professional, [] polite, [and] short." ECF 303, at 26. In fact, Defendants effectively concede as much as it relates to the trial

---

[17] Even applying the objective standard for law clerk or judicial recusal, the relevant question would then be whether a CRD's "impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts of a case." *Moran v. Clarke*, 296 F.3d 638, 648 (8th Cir. 2002). The Court notes that it is far from certain that a "reasonable, well-informed observer" aware of "all the facts and circumstances" would conclude that a recusal was mandated when a conflicted CRD performs normal, ministerial tasks. Though the CRD here agreed that she was the "face of the courtroom," ECF 303, at 36, it is not her description of a CRD's duties that controls. A reasonable person aware of "all the facts and circumstances" would know that though a CRD is visibly present during trial, their general duties include short, innocuous interactions with the jurors, ECF 303, at 25, counsel, *id.* at 21, and "keeping track of the evidence and exhibits that were entered," *id.* CRDs, like Ms. Kelly, have no "decision-making" authority on legal issues, *id.* at 23, or even the opportunity to share an opinion on such issues, *id.* at 41. Thus, "informed of all the facts" of the CRD's general involvement in a trial, one could question how a reasonable observer would believe the court's impartiality would be questioned by her admittedly compromised status when she largely "performed only ministerial duties." *United States v. Martinez*, 446 F.3d 878, 883 (2006).

here in abandoning their request for a *Remmer* hearing, *see* ECF 306, at 3 n.1, and in failing to

elicit any significant interaction between the CRD and jurors beyond those occurring on May 15–

16, 2024, *see* ECF 298, at 18–19. Further, jurors are assessed for their ability to maintain an open

mind, are warned repeatedly not to discuss the case at hand with anyone, and pledge to remain fair

and impartial throughout trial. That was true in this trial perhaps even more so than in a typical

trial, as jurors were voir dired twice during the trial, each one affirming their ability to be fair and

impartial.

      2.  The CRD's Limited Non-Ministerial Functions Do Not Merit a New Trial Under
the Unique Circumstances Presented Here.

As explained, the Court rejects the argument that CRD conflicts must *always* be evaluated

in the same manner as law clerk or judicial conflicts, and the Court finds the caselaw provided by

Defendants involving law clerk malfeasance, or accusations thereof, largely irrelevant. More

importantly, the Court easily concludes that the general day-to-day activities of Ms. Kelly during

trial here were best described as ministerial. Until, of course, they were not.

That day came early in the trial when Ms. Kelly was brought into a conversation with jurors

about topics including safety. As the CRD noted at the time, and re-affirmed in the evidentiary

hearing earlier this year, ECF 303, at 48, she was asked whether "jurors ever cry in federal court,"

ECF 298, at 17:11–18, and was later asked about courthouse safety, *id.* at 17:19–22.[18] This led to

---

[18] Defendants appear to suggest that the email from Juror #9 should be treated similarly to the more
substantive conversation about courtroom security or the call with Juror #5. ECF 316, at 6.
However, the record reflects that as it relates to the email, Ms. Kelly responded only to say she
would "forward it to the Judge." ECF 303, at 29; *see also* ECF 207, at 1 (letter to counsel
memorializing email). Further, though the telephone conversation with Juror #5 may
have involved some back and forth, the record before the Court reflects that Ms. Kelly largely just
listened as Juror #5 shared their thoughts about the Court's earlier inquiry into safety, and then
promptly notified the Court of the call. *See* ECF 301, at 30–34 (testimony of Juror #5); ECF 207,
at 1–2 (memorializing call from Juror #5). As it relates to the email, the Court concludes that the
CRD was acting in a ministerial role when she received it and forwarded it to the presiding judge.

an additional conversation about a widely-viewed video of a courtroom disturbance in a state courthouse in Las Vegas and general courthouse security practices, *id.* at 17:23–25, at 18:1–12, to which the CRD responded that "federal court [has] more security" and noted that she had "never seen anything like that here," *id.* at 19:1–7. Later, during a telephone conversation with Juror #5, the CRD listened as Juror #5 shared her thoughts about the Court's earlier inquiry into safety and may have offered a short response. *See* ECF 301, at 30–34 (testimony of Juror #5); ECF 207, at 1–2 (memorializing call from Juror #5). The Government essentially contends that the CRD's participation in these conversations was also ministerial and only "remotely substantive." *See* ECF 311, at 30. The Court cannot agree. Far from simply "placing phone calls to interpreters and completing minute sheets," *id.* at 31 (citing *United States v. Martinez*, 446 F.3d 878, 881 (2006)), in at least one of these encounters the CRD was called upon to use her own judgment in an apparently vibrant back and forth with jurors over security in the courtroom. In both, she provided answers to pressing questions posed by jurors outside the presence of the parties and the presiding judge. As Defendants note, this "required the CRD to use her own judgment, interpretation, and discretion to respond appropriately before bringing the matter before the judge." ECF 316, at 6. Since these specific interactions required her to use her own discretion, her role cannot be classified as merely ministerial as it relates to both.

Defendants would end the inquiry with the finding that the CRD engaged in non-ministerial interactions with the jurors. They contend that because the CRD used her judgment and discretion and because her appearance of impartiality is now compromised, a new trial must be ordered. However, this position ignores that questions of recusal are "extremely fact intensive and fact

---

The Court will, however, treat the phone call with Juror #5 differently despite finding that the record before the Court reflects that the CRD's participation in the conversation was minimal.

bound, and must be judged on [their] unique facts and circumstances more than by comparison to situations considered in prior jurisprudence." *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995). And even where failure to recuse is error, a review of the specific facts of the case is required to determine whether that error requires a new trial. *Id.* at 158–59. When the Court engages in a required fact-intensive inquiry here, there is no doubt that, regardless of any improper appearance Defendants would have the Court view, Hairston and Stanley received a fair trial.

As noted, the record is clear that all but two of the CRD's interactions with the jurors were innocuous and presented no opportunity to impact the impartiality of the jury. It bears repeating that the Court provided Defendants with ample opportunity to explore the CRD's interactions with the jurors. ECF 291, at 15 (describing questions about "interaction with the jurors as being fair game"). Though Defendants did establish that the CRD had "contact with jurors," ECF 303, at 21, the only specific conversations Defendants chose to probe while the CRD was under oath were those that had already been fully dissected in prior hearings.[19] *Id.* at 28–29. This terrain had already been covered not just in the earlier questioning of jurors, but in prior filings and arguments in support of a motion for a *Remmer* hearing, *see* ECF 201, and later in a motion for a mistrial, *see* ECF 208. In addressing the first of these motions, jurors were individually questioned and affirmed that they could remain "fair and impartial" despite "anything [a juror] heard" in the conversation involving the CRD. ECF 300, at 28:1–36:17. In addressing the second request for a mistrial, the jurors involved were thoroughly questioned about their interactions with the CRD, and even asked about additional interactions between jurors that were not themselves the subject

---

[19] Indeed, counsel for Defendants acknowledged during the questioning of Ms. Kelly that the relevant conversations were "part of the May 15th and 16th transcripts." ECF 303, at 29:7–8. Counsel also asked about another short conversation between the CRD and Juror #6, ECF 303, at 30: 8–21, but this brief discussion is not raised as a basis for a new trial.

of initial inquiry. *See* ECF 301, at 13–18 (Juror #9), at 32–34 (Juror #5). Both questioned jurors affirmed that they could remain fair and impartial and agreed that they could each continue to follow the Court's instructions. *Id.* at 18:2–18 (Juror #9), at 33:1–6 (Juror #5). The lone instances where the CRD stepped out of her largely ministerial role in this case have been thoroughly explored and absolutely no improper influence on the jury has been uncovered. To grant a new trial on the record before the Court would be to improperly vacate the finding of a jury "on the bases of rumors, innuendos, unsupported allegations, or claims that like blind moths, flutter aimlessly to oblivion when placed under the harsh light of the full facts." *In re San Juan Dupont Plaza Hotel Fire Litig.*, 129 F.R.D. 409, 413–14 (D.P.R. 1989).

In making this finding, the Court again notes that the CRD's failure to disclose that she had accepted an offer with the USAO, tentatively or not, represented a tremendous lapse in judgment that could have easily tainted the verdict had the trial not played out as it did. That the USAO did not bring the issue to the prompt attention of the attorneys trying the case further complicated the matter. However, despite the undeniable fact that the situation presents a proverbial "bad look," the Court concludes, without reservation, that the jurors faithfully executed their sworn duties free from bias and improper influence.

The Court is further convinced that a "hypothetical reasonable observer" would come to the same conclusion if that observer was, as the standard requires, "well-informed about the surrounding facts and circumstances." *In re Sherwin-Williams Co.*, 607 F.3d 474, 478 (7th Cir. 2010) (citing *In re Mason*, 916 F.2d 384, 386 (7th Cir. 1990)). One can easily conjure up far-fetched hypotheticals as to how the CRD's future employment could have, under circumstances not present here, resulted in unfair prejudice to Defendants. However, the musings of a "hyper sensitive or unduly suspicious" person have no role to play in the fact-specific inquiry the Court

must engage in here. *Id.* at 478. That inquiry reveals that in the few instances where the CRD exercised independent judgment in her interactions with the jurors, she was professional and impartial, generated no bias among the jurors, and thus did not tip the scales in favor of the Government. Thanks to the robust record memorializing these interactions—and the juror's reactions to them—a reasonable person would "discern [that] any appearance of impropriety is merely an illusion." *Id.*

The Court is of course mindful of the fact that "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954). However, even in cases where "facts might cast doubt in the public's mind" as to a judge's "ability to remain impartial" or, "at minimum, . . . raise the appearance of impropriety," the solution is not always a do-over. *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1525 (11th Cir. 1988). As the Supreme Court noted in *Liljeberg v. Health Servs. Acquisition Corp.*, "[t]here need not be a draconian remedy for every violation of [28 U.S.C.] § 455(a)," the statute governing judicial recusals. 486 U.S. 847, 862 (1988). Indeed, § 455 "neither prescribes nor prohibits any particular remedy for a violation of" the duty it imposes. *Id.* Instead, "Congress has wisely delegated to the judiciary the task of fashioning the remedies that will best serve the purpose of the legislation." *Id.* Accordingly, "in determining whether a judgment should be vacated for a violation of § 455(a)," the Supreme Court held that "it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Id.* at 864.

Though these factors have historically been applied to civil cases, and more so to cases on appellate review, the Court notes that their application here counsels in favor of denying the motion for a new trial. As noted above, there is no injustice in permitting the jury's verdict to stand as the

30

record reflects the CRD's purported conflict did not result in any actual improper influence on the jury. Further, to the extent the consideration of "injustice in other cases" has any relevance here, the Court notes that the Clerk of Court has already revamped its trainings and held a staff meeting to address the situation where a courthouse staff member pursues employment with law firms or parties who may appear before the Court. Plus, though the prosecutors assigned to the instant case understandably avoided discussing the issue with their colleagues while the matter was pending, *see* ECF 291, at 18:7–12, leadership at the USAO is aware of what happened here, *id.* at 20:4–12, and the Court is confident that the mistakes of the past are not likely to be repeated and thus there is minimal risk that the Court's denial of the requested relief will "produce injustice in other cases." *Liljeberg*, 486 U.S. at 862.

Finally, the Court is convinced that the "public's confidence in the judicial process," *Liljeberg*, 486 U.S. at 864, will not be undermined by permitting the verdict to stand given the unique factors at play in this case, namely the individual questioning of jurors as to their ability to remain fair and impartial despite their interactions with the CRD. Indeed, to vacate a jury verdict on the record before this Court—a record that reflects no improper influence on the part of the CRD and reveals that all jurors affirmed their commitment to impartiality during trial—would arguably undermine the public's confidence in the judicial process since "[j]udicial decisions based on such technical arguments not relevant to the merits contribute to the public's distrust in our system of justice." *Parker*, 855 F.2d at 1527. On the record before the Court, even if the CRD should have recused herself from serving, a new trial would represent the type of "draconian remedy" the Supreme Court counsels against. *Liljeberg*, 486 U.S. at 862.

## V.    **CONCLUSION**

For the reasons noted above, the motion for a new trial, ECF 306, is **DENIED**.[20]  The

parties are to jointly contact chambers by email to schedule sentencings for Hairston and Stanley.

A separate Order will follow.

Dated: <u>September 5, 2025</u>                                    _____/s/_____
                                                                                   Brendan A. Hurson
                                                                                   United States District Judge

---

[20] As noted in hearings on the matter and without objection from the parties, the Court will unseal documents related to the issue at the heart of Defendants' motion for a new trial.  The Clerk is directed to unseal the following docket entries:  ECF 250 (August 12, 2024 letter from Defendants); ECF 251 (August 13, 2024 letter from the Court); ECF 263 and 263-1 (August 30, 2024 letter from Defendants and attachments); ECF 273 (Government's motion to seal); ECF 274 (Government's response to the Court's August 13, 2024 letter); ECF 278 (September 13, 2024 letter from Defendants); ECF 279 (Government's motion to seal); ECF 280 (Government's September 17, 2024 letter).