## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. BAH-22-140** |
| **DENNIS ALLEN HAIRSTON,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM IN SUPPORT OF A SENTENCE OF LIFE IMPRISONMENT FOR DENNIS ALLEN HAIRSTON

*"We are going to play with fire"*
— Dennis Hairston to victim A.T., May 5, 2021

*"If you're not going to talk, we are going to play with fire."*
— Dennis Hairston to victim A.T., May 5, 2021

*"Please don't let them burn me anymore."*
— A.T. to Dennis Hairston's codefendant, May 5, 2021



(A.T.'s injuries, Government's Exhibit No. 3.13, p. 4-5)

*"I like burning people"*
— Dennis Hairston to victim J.H., May 15, 2021

*"I heard a hissing sound."*
*"They were burning my stomach."*
*"They said they were going to kill my parents."*
— J.H. testimony (burned at least 6-7 times)



(J.H.'s injuries, Government's Exhibit No. 5.2, p. 3, 9, 11)

Dennis Allen Hairston was convicted for orchestrating and carrying out two shockingly violent abductions. After impersonating law enforcement and kidnapping A.T. at gunpoint, Hairston and his codefendants bound and masked A.T. and forced her into the rear of their car. Hairston the repeatedly beat A.T., sexually assaulted her, and used a blow torch to burn and torture her. A.T. is permanently scarred and disfigured, and the psychological damage is similarly irreparable. Two weeks later, Hairston planned and led the abduction of J.H., who was similarly abducted, bound, masked, burned, and tortured. J.H.'s physical and emotional scars will likely last a lifetime.

These disturbing crimes are a continuation and escalation of Hairston's long history of violent criminal acts. Hairston has multiple prior convictions, including two violent armed carjackings, and he has previously served lengthy prison sentences. Hairston was on supervised release when he committed these offenses, and the instant offenses represent the defendant's third federal conviction. Hairston's conduct demonstrates that he is both violent and sadistic, and that he will not be deterred by another lengthy prison sentence or even federal supervision. For these reasons and those discussed more fully below, Dennis Hairston should be sentenced to imprisonment for life.

## I.    **PROCEDURAL BACKGROUND**

On April 4, 2022, the defendant was indicted as the lead defendant in a twelve-count indictment charging him with various offenses arising out of three particularly violent armed abductions. Following a three-week jury trial in May and June 2024, the jury found the defendant guilty of the offenses relating to the first two incidents. As to the first abduction, the jury convicted the defendant of kidnapping conspiracy (Count 1), conspiracy to affect commerce by robbery (Count 2) kidnapping (Count 3), carjacking (Count 4), affecting commerce by robbery (Count 5),

and use, carry, possession, and brandishing a firearm (Count 6).  As to the second abduction, the jury convicted the defendant of kidnapping (Count 7) and carjacking (Count 8), and acquitted him of the firearm count (Count 9).  The jury acquitted the defendant of all counts relating to the third abduction (Counts 10, 11, and 12).

The sentencing hearing on this matter is scheduled for November 13, 2025.  United States Probation Officer Nicole Wonneman prepared the Presentence Report (ECF 283), which provides for a final offense level of 43, a criminal history category V, and an advisory guidelines of life imprisonment, and 7 years consecutive.  The government agrees with the final guideline calculation in the Pre-Sentence Report (PSR).

## II.    <u>FACTUAL BACKGROUND</u>

The facts in this case are truly disturbing and reflect the clear and ongoing danger that the defendant poses to the public.  The following facts were established at trial, and are reflected in the PSR at paragraphs 6 through 50:

Hairston was the leader and organizer of the conspiracy.  Codefendant Franklin Smith testified that Hairston developed a plot to surveil, kidnap, and rob victims, using violence if necessary.  Hairston recruited his codefendants and others, selected the victims, devised the plan including to impersonate law enforcement, and procured the kidnapping materials (vests, radios, badges, zip ties, duct tape, firearms, and gun holsters).  There is no question that Hairston was in charge: He conducted the surveillance, he decided the roles his codefendants would play, and he gave the orders.  Hairston also took sophisticated steps to avoid detection.  He procured "burner" phones—cheap, prepaid cell phones with no contractual commitments—and instructed his coconspirators to use the burner phones in planning and carrying out the kidnappings.  Cell site location records showed that the defendants did indeed use the burner phones in carrying out the

kidnappings, and also showed that the burner phones linked back to addresses associated with the defendants. Hairston's role as the leader of the conspiracy was corroborated throughout the trial, through recorded jail calls and text messages where he directed the codefendants and others, through the testimony of the victims, and through the testimony of other witnesses.

      **a.  May 5-6, 2021, Kidnapping of A.T. (Counts 3-6)**

The evidence at trial established that on May 5, 2021, shortly after 8 p.m., Hairston and Stanley kidnapped victim A.T. just minutes away from the Check Cash Depot where A.T. worked. The defendants held A.T. for hours, during which they interrogated her. Hairston also sexually assaulted A.T. and beat her and burned her with a blowtorch so severely that she has injuries from which she has not recovered more than three years later.

The defendants had been surveilling A.T. for some time. Cell site location information for Hairston's and co-defendant Donte Stanley's personal phones placed them in the vicinity of the Check Cash Depot approximately 24 hours before the kidnapping, indicating that the defendants were casing the area. Franklin Smith testified that Hairston had identified A.T. as an eventual victim because her job afforded her access to large amounts of cash, and that Hairston had affixed a GPS tracking device on A.T.'s vehicle to track her movements. Smith also testified that his co-defendants had surveilled A.T. at the Check Cash Depot where she worked. Consistent with Smith's testimony. A.T. testified that while the defendants were holding her, they made statements revealing that they were familiar with A.T.'s work schedule and residence—information that they could have known only if they had been watching her.

On the afternoon of May 5, 2021, in the hours before the defendants kidnapped A.T., Hairston, Stanley, and Smith communicated by text in a three-way group chat. The evidence at trial established that although the defendants attempted to keep their communications vague, they

were coordinating the intended kidnapping of A.T.  By text, Smith stressed the need to "communicate"; Smith sent a photo of the Ford Fusion that would be used to carry out the kidnapping; and all three men sent messages coordinating a meeting.  Smith and Stanley were driving together, as reflected in messages between Smith and his then-girlfriend, Shana Bazemore.

Smith testified that he met up with Hairston and Stanley near the Check Cash Depot in Baltimore, Maryland.  Hairston and Stanley were in Bazemore's white Ford Fusion, with Stanley driving.  Hairston told Smith the plan: Hairston and Stanley would follow A.T. as she left work, and messaged Smith that A.T. was heading in his direction, and Smith, dressed in an orange construction vest, would divert A.T. onto a quieter street to avoid witnesses.

Around 8 p.m., A.T. left her job at the Check Cash Depot and drove her normal route heading home.  After driving just a few blocks, A.T. testified that she was diverted off a main road onto a more secluded street by apparent construction work.  A white Ford Fusion with a siren and police-style lights pulled A.T. over.  Hairston and Stanley got out of the Fusion and approached A.T.'s vehicle, posing as law enforcement officers.  They wore masks and were dressed in police-style tactical vests with the word "police" written on them.  They also wore police badges and carried and brandished firearms to remove A.T. from her vehicle.  They handcuffed A.T.'s hands behind her back and forced her into the rear of the Fusion.  Once inside, A.T.'s feet were zip-tied, and she was blindfolded with a mask that was secured by duct tape around her face.  A.T. testified that during the kidnapping, the defendants stole her keys (including the keys to the Check Cash Depot), her wallet, phone, and paperwork relating to the Check Cash Depot.

Smith testified that he watched Hairston and Stanley abduct A.T. and then returned to his home at 175 Cherrydell Road in Catonsville, Maryland.

Smith observed Hairston and Stanley abduct A.T. on the side street and testified that after A.T. was forced into the Fusion, Stanley drove while Hairston rode in the rear of the vehicle. Both defendants interrogated A.T., demanding to know details about the cash kept in safes at Check Cash Depot and how to access the safes. A.T. was unable to provide details to the defendants' satisfaction. Hairston repeatedly beat A.T. during the questioning. Hairston told A.T. at one point, in sum and substance, that if A.T. was not going to talk, he was going to "play with fire." Hairston removed A.T.'s pants and underwear, ripped her shirt and bra, and sexually assaulted her by touching her breast and her legs, including her inner thigh. While demanding information from A.T. Hairston produced a blow torch and used it to burn A.T.'s chest, stomach, leg, and breast, leaving injuries that have still not healed. A.T. testified that the pain was so intense, she repeatedly blacked out. Hairston then beat and burned A.T. to rouse her so he could resume his interrogation.

A.T.'s description of her assailant (the shorter, stockier of the two mean) confirmed that it was Hairston who repeatedly beat, sexually assaulted, and burned her. Additionally, Smith testified that he drove Stanley home after the kidnapping, during which time Stanley said that Hairston burned A.T. Smith further testified that, days later, Hairston admitted to burning A.T.

The defendants drove A.T. around for hours, during which time they made several stops and continued to interrogate A.T. A.T. remained handcuffed and blindfolded throughout. At one point, the defendants stopped the Fusion at Smith's home at 175 Cherrydell Road. Cell site location data confirmed that around approximately 12:30 a.m. on May 6, 2021, Hairston, Stanley, Smith, and the burner phones used in the crime were all at the Cherrydell residence. Smith testified that when Hairston and Stanley came to his residence, he learned that two other men, whom he knew only by the nicknames "Boosie" and "GoHard" were also involved in the kidnapping.

When the Ford Fusion was parked at the Cherrydell residence, Smith received a text to go into the alley, where he observed the Fusion with A.T. handcuffed in the rear of the Fusion. Smith entered the Fusion and observed that A.T. was burned and partially undressed, and further testified that he could smell the scent of burned flesh. Smith testified that he helped A.T. put her clothes on and gave her some water. Smith also testified that A.T. begged him to not let "them"—referring to Hairston and Stanley—burn her again.

Smith's then-girlfriend, Shana Bazemore, also testified that she owned the white Ford Fusion used in A.T.'s kidnapping, and that Smith and Hairston used the car with and without her permission. Bazemore also witnessed portions of the kidnapping, although, she testified, she did not appreciate what was happening. Text messages show that Bazemore and Smith were texting throughout the evening of May 5-6, 2021. When Smith was in the car with A.T., he texted Bazemore asking her to bring him a beer because the woman in the car—A.T.—was "getting on his nerves." Bazemore testified that she brought Smith a beer as requested. As she approached the Ford Fusion, she encountered Hairston, who attempted to stop Bazemore from approaching the car. Bazemore pushed past Hairston to deliver the beer to Smith, and testified that she saw a woman in the rear of the car. Bazemore also testified that when she next used the Ford Fusion a few days later, she smelled bleach and discovered a receipt or pay stub from a check cashing store. Bazemore testified that Smith and Hairston both told her that the bleach smell was their attempt to clean up from Hairston having sex in the car with a woman from a check cashing business.

Smith testified that after Bazemore delivered the beer, Hairston, Stanley, Smith, Boosie, and GoHard arrived in the alley and the group of men moved A.T. from the Fusion back into her Jeep. A.T. testified that one of the individuals demanded her name and typed it in a note in a cell phone. The men told A.T. that they were corrupt police and so A.T. should not bother calling the

police.  A.T. was driven in the Fusion to Braeside Road, where the men removed her from the Fusion and placed her face down on the floorboard of her own vehicle, which had also been driven from near the Check Cash Depot to Braeside Road.  The conspirators, including Hairston and Stanley, covered A.T.'s Jeep Compass with a tarp and secured the tarp with bungee cords.  The defendants all but left A.T. for dead: They left her extensively burned, still handcuffed, blindfolded and face down on the rear floorboard of the covered vehicle.  Approximately five hours after she was first abducted, sometime after 3 a.m. on May 16, 2021, A.T. forced her way out of her vehicle and ran to a nearby residence where she pleaded for help.  Officers and medics responded.  A.T. was treated in a hospital for her injuries, but she testified that her burn injuries have not fully healed.

Witness testimony and cell site location records showed that around 7 a.m. to 9 a.m. on May 6, Hairston and Smith returned to the vicinity of the Check Cash Depot.  Smith testified that he and Hairston returned to the vicinity to determine if there was some way to get money out of the kidnapping.

### b.  May 15-16, 2021, Kidnapping of J.H. (Counts 7-9)

Ten days later, Hairston, Stanley, Smith, Davonne Dorsey, and others kidnapped J.H.  As with the first victim, the defendants held J.H. for hours, during which time they interrogated him, robbed him of a necklace that cost thousands of dollars, and burned him with a blowtorch.

The evidence established that, as with A.T., the defendants surveilled J.H. before kidnapping him on May 15, 2021.  In 2024, investigators discovered that a GPS tracking device had been affixed to the underside of J.H.'s car.  The tracking device was identical to a tracking device discovered at Stanley's residence in January 2022—except that the device found under J.H.'s car in 2024 was weathered and rusted, indicating it had been there for an extended period.

Additionally, cell phone location data showed that Smith's phone and the burner phones used by the defendants were in the vicinity of J.H.'s cell phone in the hours before he was abducted. Hairston also sent Smith a series of texts in which he gave Smith the phone numbers for Boosie, GoHard, and Dorsey. Hairston added in a text message that Dorsey was not familiar with "our ways"—referring to the way in which the prior abduction was handled.

Around midnight on May 15, 2021, the defendants and others kidnapped J.H. from his vehicle in Edgewood, Maryland. J.H. testified that just minutes after leaving a friend's residence in his vehicle, he was stopped by a sedan (later determined to be the Fusion), displaying police-style lights. Two men approached J.H.'s car from the rear. Once again, the men wore masks, gloves, and police-style vests with the word "police" written on them. They were also armed with firearms. They identified themselves as police and instructed J.H. to exit his car. J.H. complied. They told J.H. he was under arrest, handcuffed him, and placed him in the rear of the Fusion. J.H. observed four men in the Fusion, who also wore police-style vests with "police" written on them, masks, and gloves. The men covered J.H.'s eyes and mouth with a mask and duct tape, and bound his feet. J.H. was driven away in the Fusion while others followed in J.H.'s vehicle.

Smith testified that he was not present when J.H. was first kidnapped but joined the kidnapping in progress. On the evening of May 15, Smith was at a bar when he received a message from Hairston telling him to join the kidnapping already in progress. Smith left the party to join the kidnappers. Via text, Smith informed Bazemore, his then-girlfriend, that he was going to "work."

While in the Fusion, the men repeatedly demanded money or drugs from J.H., told him they knew where he lived, and threatened to kill his family if he did not cooperate. J.H. also testified that, during the course of the kidnapping and interrogation, he heard a click that he

recognized as coming from a gun.  When J.H. did not answer questions, one man burned him on his chest, shoulder, and back with a blowtorch, causing permanent scarring.  J.H. testified that he was burned at least 6-7 times during the abduction.  Smith testified that GoHard was the one who burned J.H.  Cell site location records showed that Hairston's personal phone was in the same location as J.H.'s phone at approximately 12:25 a.m. (driving on the highway) and again at approximately 3:50 a.m. (in Baltimore City).  Cell site location records also showed that Stanley's personal phone was turned on for the first time shortly after 4 a.m.  When it was turned on, Stanley's phone was also in the same vicinity as J.H.'s phone.

During the kidnapping, the men took J.H.'s phone and scrolled through his contacts.  The men used one of their own burner phones to call Marquis Horsey, a contact from J.H.'s phone.  Horsey testified that kidnappers initially told him that his brother and J.H. had been involved in a car accident and told him to go to a location.  Horsey went to the location but saw nothing there.  He then called the kidnappers back at the phone number they had used to call him.  On that call, Horsey testified, the kidnappers demanded money and/or drugs from him.

After more than five hours, at around 5:20 a.m., the men released J.H. in Baltimore City.  They stole a necklace worth thousands of dollars from J.H., but returned his phone, keys, vehicle, and wallet.  The men instructed J.H. to meet them later that day at a designated location with $10,000 cash.  Instead, J.H. drove directly to the Harford County Sheriff's Office.

### c.  The Kidnapping of A.K. on August 2, 2021 (Counts 10-12)

The jury also heard testimony from a third victim, A.K., about her kidnapping on August 2, 2021.  A.K. testified that she worked at ACE Cash Express, a check cashing business, and that she was held for hours, during which she was interrogated for information the kidnappers could use to get cash from the ACE Cash Express.  The jury also heard testimony that the kidnappers

wore police-style vests with "police" written on them., that they kidnapped A.K. at gunpoint, and that A.K. observed a blowtorch and bottle of bleach in the vehicle in which she was held. The jury also saw evidence establishing that on August 1, 2021—one day before A.K.'s kidnapping— Hairston and Dorsey purchased two burner phones that would be used in A.K.'s kidnapping.

The jury did not convict Hairston in connection with charges relating to A.K.'s kidnapping (Counts 10-12). The Sentencing Guidelines prohibit the Court from considering acquitted conduct in determining sentencing guidelines computations, *see* U.S.S.G. §1B1.3(c), although the Court is not prohibited from considering acquitted conduct overall when determining the appropriate sentence under 18 U.S.C. § 3661. For the avoidance of doubt, the government does not ask that the Court's sentence consider conduct for which the defendant was acquitted.

### d.    August 26, 2021, Attempted Burglary of US Fuel

On August 26, 2021, Hairston and co-defendant Dorsey were arrested fleeing the scene of an attempted burglary in Baltimore County. At approximately 3:23 a.m., the owner of a garage connected to a US Fuel gas station called 911 to report a burglary in progress. Responding officers testified that they observed activity in the trees behind the garage and saw Hairston and Dorsey run from the trees. Hairston and Dorsey jumped the chain link fence behind the garage and ran along railroad tracks.

As Hairston and Dorsey fled, another officer arrived on the scene and saw them running across the street away from the US Fuel and towards a residential area. He ordered the two men to stop. Both men continued to flee, but Hairston was unable to continue running and abruptly stopped. The officer recovered a set of keys and two burner cell phones from Hairston's pockets. Both phones were used in the prior kidnappings.

12

Officers testified at a pre-trial motions hearing that, at the time of his arrest, Hairston repeatedly refused to give officers his name. Hairston requested a medic and repeatedly refused to give his name to paramedics who arrived to treat him. While in the ambulance and at the hospital, Hairston provided a false name, false date of birth, and false address.

Officers also tracked, located, and arrested Dorsey, who was found hiding inside a storage trunk next to a house. When both Hairston and Dorsey were in custody, an officer returned to the trees behind the US Fuel where the two men had been hiding earlier. They located a hammer, prybar, and sledgehammer. They also located a third burner cell phone that was also used in the prior kidnappings. A witness testified that Hairston texted her from two of the phones during May and June 2021, proving that Hairston used the burner phones from the kidnappings for personal use around the time of the kidnappings.

### e. Transfer of Kidnapping Gear from Stanley to Dorsey and January 6, 2022, Search Warrants

In the fall of 2021, while in custody in connection with the US Fuel attempted burglary, Hairston directed his conspirators to move and destroy evidence. In a recorded jail call, Hairston contacted Stanley to instruct Stanley to destroy or remove evidence. A few days later, Stanley told Hairston he had done so.

Recorded jail calls also showed that in October and November of 2021, Hairston, Stanley and others discussed the bag that contained their kidnapping gear, including police vests, handcuffs, police-style flashing lights, badges, and other similar items. During these calls, Hairston and Stanley discussed that Stanley was in possession of the bag and that Stanley planned to use the bag to make money. In one recorded call between Hairston and Stanley in October 2021, Stanley stated that he wanted to hold onto the bag because he was "definitely still working with it." Hairston cautioned he did not want the contents of the bag to be "collecting dust." Later

13

calls established that Stanley had not used the bag to make money, that codefendant Davonne Dorsey wanted the bag, and that Hairston decided that the bag should be transferred from Stanley to Dorsey.  Stanley initially resisted giving up the bag, but Hairston eventually arranged for an acquaintance to transfer the bag from Stanley to Dorsey.  The evidence established that, at Hairston's instruction, another individual acted as a go-between and delivered the bag from Stanley to Dorsey.

On January 6, 2022, officers conducted search warrants at various addresses, including Dorsey's home.  The bag that was the subject of discussion among Hairston, Stanley, and Dorsey was found in a closet at Dorsey's residence.  The bag contained two police vests, police-style radios, gun holsters, police badges, duct tape, and police-style light badges.  Subsequent forensic testing showed that several of the items had Dorsey's and Stanley's DNA on them.  With respect to Stanley, his DNA was found on two of the police badges, both police vests, and a gun holster. Additionally, officers executing a search warrant at Stanley's residence found a third police vest, which also had Stanley's DNA on it.  Officers also found a GPS tracker at Stanley's residence, and the tracker was virtually identical to the tracker that would be found on the underside of victim J.H.'s car years later.

### f.  Obstruction:  January 6, 2022: Hairston's Attempts to Destroy Evidence and Stanley's Flight

Following the execution of search warrants on January 6, 2022, Hairston (who was still in custody) immediately set about ordering the destruction of evidence.  In recorded calls, Hairston instructed his wife to discard evidence in their home, telling her to "get rid of everything."  He also admonished her for failing to use an "alcohol patch" to wipe down surfaces.  On January 6 and in the weeks that followed, Hairston urged his wife to not speak to investigators or the grand

jury. He told her to tell investigators, falsely, that she did not know anything. He also stated in a recorded call that he advised Donte Stanley to "stop using his phone."

For his part, the evidence established that Stanley went on the run immediately upon learning about the execution of a search warrant at his home and remained on the run for four months. A supervisor from his employer testified that Stanley was scheduled to work on January 6 and clocked in in the early morning, before the warrant was executed. Shortly after the warrant was executed, Stanley left work without a word to anyone, and never returned. A state warrant for Stanley's arrest was issued, but Stanley remained on the run for months.

Law enforcement witnesses testified that Stanley was not found until April 7, 2021. Investigators tracked Stanley's new phone to an apartment building in Baltimore City. Stanley was arrested as he exited the apartment building and entered a car driven by his friend. During the search of the apartment at which Stanley had been staying, investigators found mail addressed to Stanley, as well as a loaded semi-automatic handgun with Stanley's DNA on it.

### g. Trial

Hairston and Stanley's Coordinated Attempt to Avoid Trial:

First, in a coordinated effort, both defendants attempted to avoid coming to court on the first day of trial. The trial was scheduled to begin on May 13, 2024. The evening before trial, Stanley attempted to make himself unavailable by causing a self-inflicted medical emergency. Specifically, he removed a port from an ostomy bag, which resulted in his hospitalization. Hairston also attempted to disrupt by trial by refusing to leave his cell on to go to court on the morning of May 13. Ultimately, Stanley was discharged from the hospital on May 13 and was produced for trial, and Hairston appeared in court without having to be extracted from his cell.

Hairston's Defiant and Disruptive Behavior During His Testimony:

15

After the government rested, the defense cases proceeded.  As is his right, Hairston elected to testify in his own defense.  He was advised of his rights and the consequences of testifying, and was specifically informed that, if he testified, he would also be subject to cross-examination by the government.  Hairston acknowledged he understood his rights and indicated that he wanted to testify.

Hairston's direct testimony was consistently rambling, nonresponsive, and irrelevant.  In response to straightforward questions, Hairston delivered lengthy monologues that were calculated to do nothing more than deliver a speech about his life and defense to the jury.  Hairston's attorney, the government, and the Court all attempted to rein in Hairston's rambling and frequently improper answers.  Yet he continued to defy the Court and insisted on giving objectionable and non-responsive testimony.

Chaos ensued when government counsel began cross-examination.  Before government counsel could ask a single question, Hairston erupted with a belligerent string of expletives and false and clearly inadmissible statements.  In the presence of the jury, Hairston falsely stated that the government was seeking "triple life" for him and was seeking only 5 years' incarceration for Franklin Smith.  There is no doubt that Hairston planned to use his testimony as an opportunity to make these false claims in attempt to improperly persuade the jury.

Hairston continued to address counsel and the Court so aggressively that the jury was quickly excused from the courtroom.  When the Court calmly explained the process of witness testimony, Hairston responded with additional expletives, stating, in substance, that that he would not answer any of the government's questions, but that government counsel would have to answer *his* questions.  That statement was made in the context of a case in which Hairston interrogated kidnapping victims and injured or burned them with blowtorches when they were unable to answer

his questions to his satisfaction.  Despite the Court instructing Hairston to answer the government's questions, Hairston continued to refuse.  The next day, after having an opportunity to meet with his attorneys and consider the Court's directions, Hairston still refused to answer any questions on cross examination.  Also in defiance of the Court's instruction, Hairston even refused to take the witness stand.

### III.    SENTENCING CALCULATION

#### a.    Statutory Maximum Sentences

The maximum sentences that may be imposed for the counts of conviction are as follows:

i. Count 1:  Kidnapping Conspiracy, 18 U.S.C. § 1201(c):

- Life imprisonment

ii. Count 2:  Conspiracy to Affect Commerce by Robbery, 18 U.S.C. § 1951(a):

- 20 years' imprisonment

iii. Count 3:  Kidnapping, 18 U.S.C. § 1201(a):

- Life imprisonment

iv. Count 4:  Carjacking, 18 U.S.C. § 2119:

- 15 years' imprisonment

v. Count 5:  Affecting Commerce by Robbery, 18 U.S.C. § 1951(a):

- 20 years' imprisonment

vi. Count 6:  Use, Carry and Brandish a Firearm During and in Relation to a Crime of Violence, 18 U.S.C. § 924(c)(1)(A)(i)(ii):

- Life imprisonment
- Mandatory minimum of 7 years' imprisonment

vii. Count 7:  Kidnapping, 18 U.S.C. § 1201(a):

- Life imprisonment

viii.   Count 8:  Carjacking, 18 U.S.C. § 2119:

- 15 years' imprisonment

**b.    Offense Level Computation**

The defendant's violent criminal conduct that makes up the instant offenses results in two separate groups that compute to an offense score of 49, as described here:

Group 1:  Conspiracy and May 5, 2021, Kidnapping of Victim A.T. (Counts 1-6)

Kidnapping Conspiracy and Kidnapping (Count 1 and Count 3):

a.   Pursuant to U.S.S.G. §2A4.1, the base offense level is **32**.
b.   Pursuant to U.S.S.G. §2A4.1(b)(2)(A), **4** levels are added because the victim sustained a permanent or life-threatening injury.
c.   Pursuant to U.S.S.G. §2A4.1 (b)(5), **6** levels are added because the victim was sexually exploited.
d.   Therefore, the anticipated adjusted offense level is **42**.

Conspiracy to Commit Hobbs Act Robbery, Carjacking, Hobbs Act Robbery (2B3.1) (Count 2, Count 4, Count 5):

a.   Pursuant to U.S.S.G. §2B3.1(a), the base offense level is **20**.
b.   Pursuant to U.S.S.G. §2B3.1(b)(3)(C), **6** levels are added because the victim sustained permanent or life-threatening injury.
c.   Pursuant to U.S.S.G. §2B3.1(b)(4)(A), **4** levels are added because any person was abducted to facilitate the offense.
d.   Pursuant to U.S.S.G. §2B3.1(b)(5), **2** levels are added because the offense involved carjacking.
e.   Therefore, the anticipated adjusted offense level is **32**.

Role in the Offense:

Pursuant to U.S.S.G. §3B1.1(a), **4** levels are added because the defendant was an organize or leader of a criminal activity that involved five or more participants or was otherwise extensive.

Obstruction:

Pursuant to U.S.S.G. §3C1.1, **2** levels are added because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the

investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the

obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct;

or (B) a closely related offense was an organize or leader of a criminal activity that involved five

or more participants

Thus, the anticipated adjusted offense level for Group 1 for Hairston is **48**.

Count 6 (18 U.S.C. § 924(c)):

Pursuant to U.S.S.G. §2K2.4(b), the guideline sentence for Count 6 is the minimum term

of imprisonment – 7 years.

Group 2:  May 15, 2021, Kidnapping of Victim J.H. (Counts 7-8)

Kidnapping (Count 7):

a. Pursuant to U.S.S.G. §2A4.1, the base offense level is **32**.
b. Pursuant to U.S.S.G. §2A4.1(b)(2)(C), **3** levels are added because the victim sustained between serious body injury and permanent or life-threatening injury.
c. Pursuant to U.S.S.G. §2A4.1(b)(3), **2** levels are added because a dangerous weapon was used.
d. Therefore, the anticipated adjusted offense level is **37**.

Carjacking, Hobbs Act Robbery (2B3.1) (Count 7, Count 8):

a. Pursuant to U.S.S.G. §2B3.1(a), the base offense level is **20**.
b. Pursuant to U.S.S.G. §2B3.1(b)(2)(C), **5** levels are added because a firearm was brandished or possessed.
c. Pursuant to U.S.S.G. §2B3.1(b)(3)(D), **5** levels are added because the victim sustained injury between serious body injury and permanent or life-threatening injury.
d. Pursuant to U.S.S.G. §2B3.1(b)(4)(A), **4** levels are added because any person was abducted to facilitate the offense.
e. Pursuant to U.S.S.G. §2B3.1(b)(5), **2** levels are added because the offense involved carjacking.
f. Therefore, the anticipated adjusted offense level is **36**.

Role in the Offense:

Pursuant to U.S.S.G. §3B1.1(a), **4** levels are added because the defendant was an organize or leader of a criminal activity that involved five or more participants or was otherwise extensive.

Obstruction:

Pursuant to U.S.S.G. §3C1.1, **2** levels are added because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense was an organize or leader of a criminal activity that involved five or more participants

Thus, the anticipated adjusted offense level for Group 2 for Hairston is **43**.

Grouping:

Pursuant to U.S.S.G. § 3D1.4, Group One is treated as one unit and group Two is treated as a half unit. Consequently, there are 1 ½ total units, and 1 level is added to the Group with the highest offense level (in this case, Group One, which has an offense level of 48) resulting in a final combined offense level of 49.[1] Thus, the defendant's final offense level will be 43, with a resulting guidelines of life imprisonment with a 7 years' consecutive sentence.

**c.    Criminal History**

The defendant has ten criminal history points. ECF 283, ¶ 97. Of particular import, in the defendant committed armed carjackings in 2007 and 2010. In 2007, the defendant pointed a shotgun at the throat of the victim and said that he should kill him and then struck the victim in the head with the shotgun barrel, before taking the victim's car and fleeing from the police at 100

---

[1] Although the total adjusted offense level results in a score of 49, this case presents one of those "rare" instances where the total offense level is calculated in excess of 43, thus the offense level is treated as a level 43. See Chapter 5, Part A (comment n.2).

miles per hour. *Id.* ¶ 91. In 2010 the defendant committed *two* armed carjackings in less than a week. During the first carjacking, the defendant and another man forced the victim out of his car with handguns and took the victim's car. The victim's car was then used in an armed robbery, and the stipulated facts from the federal carjacking note that "The defendant, Dennis Hairston, does not concede any involvement in the armed robbery." *Id.* at 93. Four days later the defendant approached a victim, then pointed a handgun the victim's head and cocked the hammer, told the victim to leave his wallet and cell phone in the vehicle and stated, "if you call anybody, I know where you live." *Id.* Two loaded handguns were seized during the ensuing chase and arrest. *Id.*

The defendant was sentenced to 84 months to the Bureau of Prisons, and was placed on supervised release in December 2018. The crime spree that led to his next conviction occurred in November and December of 2019, less that one year from his BOP release, and while he was still on supervised release. *Id.* at ¶ 94. The defendant was convicted of Interstate Transportation of Stolen Motor Vehicles, involving at least 4 vehicles and $272,000 loss. *Id.*

Because the defendant on supervised release at the time of these offenses, one point is added to his criminal history calculation, resulting in a criminal history scored of 10, and a criminal history category of V. This results in a guideline sentence of life.

## IV.    SENTENCING RECOMMENDATION

Hairston's violent and disturbing conduct shows the worst of human nature. He hatched and orchestrated a devious plot to kidnap and torture innocent victims, and he took extensive steps (including relying on a network of burner phones) to ensure he could never be caught for his misdeeds. His violent conduct in this case is just the latest in a long string of serious criminal conduct. And while he received serious punishments for his prior crimes, those punishments did

nothing to deter him here. The defendant's conduct, taken with the sentencing factors set forth in 18 U.S.C. § 3553(a), demands a life sentence.

"In sentencing a defendant, first the district court 'shall consider ... the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.' 18 U.S.C. § 3553(a)(4)(A)." Regarding sentencing, the Supreme Court states, "the Guidelines should be the starting point and initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines are the "natural starting point from which the sentencing court exercises its discretion under § 3553(a). *United States v. Langford*, 516 F.3d 205, 212 (3d Cir.2008). This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).

Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Another factor that Section 3553(a) considers are similar sentences for similarly situated defendants for to avoid sentence disparities. 18 U.S.C. § 3553(a)(6). Consideration of these factors necessitates a life sentence.

### A. Nature and circumstances of the offense

The nature and circumstance of the defendant's offenses are abhorrent. As described in detail above, the defendant was the leader of an elaborate kidnaping/carjacking/robbery conspiracy which had *as part of the plan* to torture and burn the victim. During A.T.'s abduction, Hairston beat and sexually assaulted A.T., before horrifically burning her to the point where the smell of her burned flesh remained in the car for hours. Hairston literally enjoyed burning and torturing A.T., and immediately began to plan the abduction, burning, and torture of J.H., which he carried out two weeks later.

Although this Court must consider other factors beyond the defendant's offense conduct, this Court should nonetheless give significant weight to Hairston's offense conduct in crafting his sentence here. By torturing and burning A.T. and J.H., Hairston has likely wreaked a lifetime of emotional damage on each victim, as well as their families. Any sentence other than a life sentence is insufficient and does not adequately account for the offense conduct.

### B. History and characteristics of the defendant

The defendant's history and characteristics also weigh strongly in favor of a life sentence. As outlined above, the defendant was convicted in 2007 and 2020 for violent armed carjackings where he engaged in senseless violence towards the victims. In 2007 Hairston used a shotgun to threaten the victim and then struck the victim in the head with the shotgun. He was arrested, convicted, and released on probation. Less than a year after his release and while still on probation, Hairston committed two more armed carjackings, including telling a victim that he knew where he lived. Again the defendant was arrested, convicted, and sentenced to prison – this time to 130 months. He was on supervised release from those convictions when he committed additional federal crimes (2018-2019), and when he committed these violent offenses.

### C.  The need for the sentence imposed.

There can be no doubt the prevention of violent crimes, particularly the violence committed in this case, constitutes a government objective of surpassing importance.

"Retribution is a valid penological goal." *Glossip v. Gross*, 135 S. Ct. 2726, 2769 (2015) (Scalia, J. concurring).  As the Eleventh Circuit has explained: "the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." 612 F.3d at 1206.  The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just deserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct.  From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.  (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010).  Punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion.  *See Gregg v. Georgia*, 428 U.S. 153, 184 n. 30 (1976) (citing Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950)).

Here, the seriousness of the crimes, taken with the need for just punishment and the goal of promoting respect for the law, weigh heavily in favor of a life sentence.

### 1.  <u>Reflect the seriousness of the offense, promoting respect for the law, and provide just punishment.</u>

This Court's sentence must consider the need to "promote respect for the law." 18 U.S.C. § 3353(a)(2)(A).  The defendant's violent and sadistic conduct violated federal law, but it also transgressed normative principle undergirding our laws.  Whether in 2007, 2009, or twice in 2021, the defendant's committed severe acts of violence for his own greed and personal gratification.

The defendant has forever affected many victims, but none as much as A.T. and J.H. and their families. This Court's sentence must express an appropriate level of social condemnation of his crimes.

### 2. Adequate deterrence and need to protect the public.

Hairston has demonstrated that he will not conform his conduct to the laws of society. He has also shown that he will commit increasingly brazen and disturbing acts of violence and is unconcerned with the health and safety of others, and is equally unconcerned with the consequences he may face in the courts. Importantly, Hairston has shown an escalation of violent and sadistic conduct that reflects his intent to inflict pain on others. The sentence of this Court should account for the danger posed by the defendant and should seek to guarantee that he does not engage in violent criminal conduct again.

The sentence imposed by this Court should leave no doubt that the defendant will never be released from incarceration to rob, harm or torture another victim, and should also send the message that repeat armed violence and sadistic burning of victims will receive the harshest possible sentence.

### D. Impact on the Victims

As the Court observed, the victims testified at trial, and their trauma was demonstrated in different ways. J.H. literally struggled to even take the stand and testify. His fear of the defendant was palpable. A.T. similarly struggled to tell her story and broke down multiple times during her testimony. The government does expect one or more victims (or family members) to attend the sentencing, and some may wish to address the Court. Undersigned counsel has learned from the family of A.T. that A.T. has endured numerous surgeries, and that even today her physical injuries have not healed. In addition to permanent scarring in sensitive and intimate areas, A.T. has

continued infections from the burns. Four years later, she has difficulty performing physical tasks that were previously easy.

As to the emotional impact, A.T. feels like a different person than she was before the abduction. She continues to have flashbacks and regular nightmares that someone is coming after her. She is afraid to go out at night and is afraid to go far from her home. Her family describes her as lonely and frequently depressed. A.T.'s work performance has suffered, and she believes that people, all people, look at her differently. A.T., a strong woman who set an example for her children, now believes that she is no longer capable of being the head of her family.

### E. Length of Sentence Imposed

As demonstrated, the defendant's conduct is reprehensible. His criminal history and conduct in this case show that he is an extremely high risk to recidivate. He is a danger to the community, regardless of his age. His conduct will not change, and this conduct must be adequately punished. A life sentence, as the guidelines recommend, adequately accounts for the §3553(a) factors. The sentence imposed by this Court should leave no doubt that the defendant will never be released from incarceration to victimize another person, and should also send the message that repeat violent offenders and those who intentionally maim and torture victims will receive the harshest possible sentence.

Further, the nature and scope of the defendant's conduct is reprehensible and alone more than justifies a life sentence. Combined with the defendant's prior convictions and sentences for violent conduct, a life sentence is clearly called for. The negative and lasting impact that the defendant has wreaked on the victims, *demands* a life sentence. The defendant simply cannot, and will not, be deterred. The need to protect the public from this conduct also demands a life sentence.

IV.    <u>**CONCLUSION**</u>

Hairston devised a plan to abduct and torture A.T. and J.H. in part, for greed.  But clearly, the defendant also planned these disturbing crimes for his personal gratification.  No sentence will heal the pain and suffering to A.T., J.H., and their families – but the sentence in this case should reflect the impact of the Hairston's crimes.

A sentence of life is sufficient but not greater than necessary in this case. The evidence at trial and the verdicts by the jury established that Hairston planned these shocking crimes, and that he burned A.T. and J.H. for greed and pleasure.  Simply put, the defendant demonstrated his disregard for human suffering when he burned and tortured the victims. He demonstrated a callousness and an evil that shocks the conscience of even the most hardened criminals.

Ultimately, the defendant committed shockingly violent and sadistic crimes, and he did so under circumstances that, far from supplying any form of mitigation, demonstrate an utter disregard for human life.  That he did so after multiple crimes of violence and while on supervised supports the government's recommended sentence.  A sentence of imprisonment for the remainder of the defendant's natural life is both required and appropriate.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:

Paul E. Budlow
Spencer L. Todd
Assistant United States Attorneys