IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES** | : |
| | : |
| | : |
| **v.** | :     Case No. BAH-22-0140 |
| | : |
| **DENNIS HAIRSTON,** | : |
| | : |
| **Defendant** | : |

### DEFENSE SENTENCING MEMORANDUM

*Hope is an important and constitutive aspect of the human person. Those who commit the most abhorrent and egregious of acts and who inflict untold suffering upon others, nevertheless retain their fundamental humanity and carry within themselves the capacity to change. Long and deserved though their prison sentences may be, they retain the right to hope that, someday, they may have atoned for the wrongs which they have committed … To deny them the experience of hope would be to deny a fundamental aspect of their humanity and, to do that, would be degrading.*

    *Judge Power-Forde of the Republic of Ireland*

    The words of Judge Power-Forde capture the essence of what this sentencing proceeding must ultimately recognize: that even in the wake of serious wrongdoing, the law does not and must not abandon the belief in a person's capacity for redemption. Sentencing is not merely a measure of retribution; it is also an acknowledgment of the enduring humanity of the individual before the Court. The Court's task is not an easy one: it must impose a sentence that honors the gravity of the crime and the pain inflicted upon the victim, while still recognizing the possibility of redemption that lies within every person. The conduct in this case is grave and deserving of accountability, we make no attempts to minimize it. It is equally important to consider the mitigating circumstances, the progress already made toward rehabilitation, and the genuine potential for transformation.

    For the reasons explained here, the following sentence strikes the right balance in Mr. Hairston's case:

1

- A 96-month imprisonment as to Counts 1-5, 7, 8 to run concurrently to each other; 84 months as to count 6, to run consecutively to the other counts for a total term of imprisonment of 180 months;

- 5 years of supervised release;

- With conditions requiring Mr. Hairston to participate in mental health counseling.

This sentencing memorandum and the arguments made at the scheduled sentencing hearing will explain why.

## BACKGROUND

**A. While Mr. Hairston grew up around a lot of family, one cannot ignore environment he was raised in and the complex trauma he experienced.**

Dennis Hairston was born to Michael Hairston and Denise Ologundudu and primarily grew up in West Baltimore. As a child, Mr. Hairston remembers living in a home full of relatives. His maternal grandmother lived "on one side of the street," while his paternal grandmother "lived directly across from her." The house was so crowded that Mr. Hairston and his brother slept on the floor in the hallway. He describes many of his family members as "being in the streets." What that meant for young Mr. Hairston is that it was a daily occurrence for him to see violence, drug dealing, drug use, and prostitution in the home. In community, he continued to be exposed to the same trauma. At the age of five, he witnessed his first shooting – the shooting of his mother's boyfriend, someone he had grown to consider a stepfather. By the age of 7 or 8, he "saw someone get killed for the first time." By age 15, he was the victim of a robbery during which his friend was shot in the head.

While Mr. Hairston was surrounded by family that was at least physically present, the abandonment of his father really affected him. He remembers a particular instance when his father unexpectedly came to visit as he often did after being gone for long period of time. His father promised him that the next day he would take him out to the mall to buy some new clothes for the

2

upcoming school year, showing him the money that they would spend together. Young Mr. Hairston was ecstatic not only because he was getting new clothes, but because he was going to be able to spend some time with his father. The next day, he remembers waiting and waiting and waiting, but his father never came. He was later told that his father was seen intoxicated in the neighborhood. It was then Mr. Hairston realized that the money that was to be used for their trip to the mall with squandered on drugs.

Growing up Mr. Hairston did his best to suppress the negative feelings of his father not being present. He romanticized the fact that he had other family members present, even though those members had struggles of their own. In hindsight, Mr. Hairston now realizes what a profound effect his father's absence had on him. During the PSR interview, Mr. Hairston broke down in tears as he explained to the PSR writer, "having your dad be alive but not care about you is traumatic."

Through all this, there were minimal attempts to provide Mr. Hairston with any therapeutic rehabilitative support. He remembers at a young age seeing a counselor for a short period of time. Although it was apparent Mr. Hairston was struggling, he was never truly evaluated, because of his family's negative perceptions of mental health. In hindsight, and now as Mr. Hairston continues to struggle with his mental health while being incarcerated, he realizes the benefit of being able to discuss some of his experiences. He has been diagnosed with depression and anxiety and is currently prescribed Zoloft and Hydroxyzine.

**B. With little to no positive role models, Mr. Hairston struggled throughout his teenage years.**

As Mr. Hairston continued through adolescence and into emerging adulthood[1], he struggled with susceptibility to peer pressure, poor decision making, and impulsivity – characteristics not uncommon in teenagers but certainly exacerbated by his childhood experiences. This developmental phase, emerging adulthood, is marked by unique challenges including burgeoning occupational, relational, and financial instability; and increased risk taking.[2] Researchers have concluded that young adults aged eighteen to twenty-four are cognitively more similar to juveniles than adults. Their decision-making ability is still developing, and they remain more likely than adults to engage in risky behavior, discount the future, and struggle to moderate their responses to emotionally charged situations.[3]

Barely an adult legally and certainly nowhere near full brain development, Mr. Hairston was charged and later sentenced in adult court for a carjacking. Although his attorney petitioned for transfer to the juvenile system to allow Mr. Hairston the opportunity to receive and benefit from rehabilitative services tailored to his age, the court denied that request and Mr. Hairston was forced to serve time in an adult setting. But adolescents' slow but steady development of means of

---

[1] Emerging adulthood is a developmental stage that is neither adolescence nor young adulthood but is theoretically and empirically distinct from them both, spanning the late teens through the twenties, with a focus on ages 18 to 25. *See* Jeffery Jensen Arnett, *Emerging adulthood: A theory of development from the late teens through the twenties*, 55(5) American Psychologist 469-480, 469 (2000)

[2] See The Oxford Handbook of Emerging Adulthood (Jeffery Jensen Arnett ed., Oxford University Press 2015).

[3] *See* Elizabeth S. Scott & Laurence Steinberg, Blaming Youth, 81 Texas L. Rev. 799, 801 (2003); Claire Bryan-Hancock & Sharon Casey, Psychological Maturity of At-Risk Juveniles, Young Adults and Adults: Implications for the Justice System, 17 Psychiatry, Psychol. & L. 57 (2010). *See also*, Kathryn C. Monahan et al., Trajectories of Antisocial Behavior and Psychosocial Maturity From Adolescence to Young Adulthood, 45 Developmental Psychol. 1654, 1658 (2009); Edward P. Mulvey et al., Theory and Research on Desistance from Antisocial Activity Among Serious Adolescent Offenders, 2 Youth Violence And Juvenile Just. 213, 213 (2004).

self-control makes rehabilitation and successful integration into society more likely than for similarly situated adult offenders. Meaning that in a period during which Mr. Hairston was more primed to be receptive to therapeutic and rehabilitative interventions, he was denied the chance and forced to grow up in prison. Congress has "recogniz[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C. § 3582(a). That is exactly what the state court did – it imprisoned Mr. Hairston at such a young age, not promoting correction and rehabilitation.

Upon release, Mr. Hairston was 17 years old with an adult conviction for a very serious offense. Regardless of this, he made every effort to reintegrate into society positively. He worked for brief periods for several different employers like Giant Foods, Locke Insulators, Inc, McDonald's, Deli Brands of America, and Sisters Together & Reaching (STAR). While he was experiencing some moments of success, Mr. Hairston continued to struggle with his own mental health, substance abuse, trauma, and the growing obligations of being a parent. In this timeframe, Mr. Hairston was shot on two separate occasions, experiences the death and murder of several loved ones, and became a father. With very few protective factors, it was not long before Mr. Hairston again found himself young and incarcerated.

**C. Mr. Hairston's childhood and early forced entrance into the adult criminal system have had a profound effect on his trajectory.**

The transition from adolescence to adulthood is a tricky one, for anyone. And for Mr. Hairston, it became even trickier when he was sent to do it in the Bureau of Prisons. We cannot forget that because of the developmental stage that he was in, Mr. Hairston was more prone to impulsiveness, peer susceptibility, and poor decision-making, all further compounded by his adverse childhood experiences. This is not to say that the BOP is all bad, but it certainly puts into perspective that Mr. Hairston was put in an environment that was not rehabilitative during a critical

part of his development and instead was put into an environment that often is more has a more criminogenic effect rather than a rehabilitative one. Still in a critical phase of his development, Mr. Hairston was a small fish thrown into a big pond. Growing up with few positive role models, other than his mother and his Uncle Carl, left him to learn about manhood and adulthood from those he met in the BOP.

When a 19-year-old is given a sentence, there are multiple purposes behind the sentence. Just as in the federal sentencing scheme, punishment plays a role in crafting that sentence. But, for a young man, rehabilitation should play an important part too. Mr. Hairston, however, spend much of the next decades in a system rife with drugs, violence, and which was lacking the rehabilitative resources he would have needed. To survive prison, inmates "tend to develop characteristics institutionally selected for survival: circumspection, canniness, coldness, and cruelty." *United States v. Bannister,* 786 F. Supp. 2d 617 (E.D.N.Y. 2011). As Representative Paul Ryan put it in 2014, "[r]ather than encouraging criminals to become peaceful, productive citizens, prison culture often has the opposite effect, operating as a graduate school for crime." Paul Ryan, Chairman of the House Budget Committee, *Expanding Opportunity in America* 56 (June 24, 2014).[4]

> Enduring years of separation from family and community-deprived of material possessions, subjected to high levels of noise and artificial light, crowded conditions and/or solitary confinement, devoid of privacy, with reduced options, arbitrary control, disrespect, and economic exploitation-is maddening and profoundly deleterious. Anger, frustration, and a burning sense of injustice, coupled with the crippling processes inherent in imprisonment significantly reduce the likelihood that prisoners are able to pursue a viable relatively conventional life after release.[5]

---

[4] *Available at* https://time.com/wp-content/uploads/2014/12/expanding_opportunity_in_america.pdf

[5] JFA Institute, *Unlocking America: Why and How to Reduce Americas Prison Population* 10 (Nov. 2007) available at https://www.prisonpolicy.org/scans/jfa/UnlockingAmerica.pdf

Numerous authorities, including the United States Sentencing Commission itself, have long acknowledged the "criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties." U.S. Sent'g Comm'n, *Sentencing Options Under the Guidelines* (1996).

This time when Mr. Hairston was released, he was 28 years old. The government may try to portray Mr. Hairston as someone who completely blew off supervised release and immediately continued in his criminal behavior. The record does not follow that timeline. Now in his late 20s, Mr. Hairston did his best to rebuild a new life; and he was motivated to do so.

Upon his release he started working as an inspector with Chep Inc. in Cherry Hill, Maryland, in 2018. He worked there until 2019 when he was forced to leave work for some time after a pallet came crashing down on his leg crushing his ankle. He continues to walk with a limp. Even with this major setback, Mr. Hairston attempted to push though. In November 2019, Mr. Hairston wrote to the court for permission to attend a real estate conference. In a letter to the court, in his case before Judge Bennett, Mr. Hairston writes, "[s]ince returning to society it's been difficult aligning myself with the right people with the right opportunities." *See* RDB-09-546 at ECF 40. Mr. Hairston continues, "Aside from those obvious things though it also gives me hope. I've buried several family members this year alone including my grandad and only nephew. It's honestly overwhelming to lose people so close to you while still being in the process of reconstruction." *Id*. At this time, Mr. Hairston had remained compliant with the conditions of supervised release, had tested negative for illicit substances and maintained a stable residence. *See* RDB-09-546 at ECF 41. Eventually his grief, his ongoing injury that made employment difficult, the stress and pressure to provide for his family all coupled with his own mental health challenges weighed heavily on Mr. Hairston.

# DISCUSSION

The federal sentencing statue, 18 U.S.C. § 3553(a), directs this Court to impose a sentence sufficient, but not greater than necessary, to accomplish four key goals: 1) just punishment, 2) community protection, 3) deterrence, and 4) rehabilitation. The proposed sentence accomplished all these goals.

**A. A 15-Year Sentence is in Keeping with other Sentences for Similar or more severe Conduct.**

Although the Presentence Report calculates Mr. Hairston's applicable guidelines range to be life, PSR ¶ 140, the 180-month sentence is appropriate given Mr. Hairston's personal history and circumstances and what defendants in this District and other Districts have been received for similar—and indeed, more severe—conduct.

The following cases are all useful comparators that demonstrate the requested sentence adequately reflects the seriousness of the offense, provides a general deterrent, and prevents disparity for similar offenses.

- In *United States v. David Zanders*, D.D.C. No. RCL-22-00287, the U.S. District Court for the District of Columbia sentenced the defendant, who pretended to be an Uber Driver to kidnap two males, robbed the victims, and drove them to various ATMs to withdraw money using their credit cards, to 15 years.

- In *United States v. Kevin Alexis Hernandez-Guevara*, No. PX-17-0382, the Court sentenced the defendant, an MS-13 member who helped lure a victim to a secluded location where gang members shot, assaulted, and fatally stabbed him and, in another incident, shot and stabbed two victims, causing them to sustain serious and life-threatening permanent injuries, to 24.3 years. *See* Plea Agreement, ECF No. 192.

- In *United States v. Moreno-Martinez, et al.*, No. PX-17-0154, three MS-13 gang members pleaded guilty to a conspiracy to kidnap, but their actual conduct involved premeditated murder of a victim. The leader, Neris Moreno-Martinez, received a sentence of 30 years, and his co-conspirators, Jose Melendez-Rivera and Reynaldo Granados-Vasquez, each received sentences of 20 years.

- In *United States v. Ziyon Thomspon*, No. SAG-22-0206, the Court sentenced the defendant to 22 years after he plead to aiding and abetting the discharge of a firearm resulting in death. The case involved the kidnapping of the victim in an effort to extort his family for money and marijuana. In furtherance of the conspiracy, the victim was shot and killed and the scene of the crime was set on fire to conceal the killing.

To put the requested sentence further in perspective, the national average sentence for all 2A4.1 cases with and without convictions for 924(c) from FYs 2019-2023 was approximately 190 months and the average for sentences in Maryland for all 2A4.1 cases during those same fiscal years was approximately 170 months, with no convictions for 924(c).[6] In light of the sentences imposed in the cases above, Mr. Hairston's history of complex trauma, and his mental health challenges, the requested sentence is the sentence that is sufficient but not greater than necessary to meet the purposes of sentencing in this case.

Mr. Hairston has been detained since August 26, 2021, when he was arrested for an attempted second-degree burglary. He was later sentenced on an unrelated Western District of Pennsylvania case to time served on January 23, 2024.[7] Given that Mr. Hairston will only receive credit on this case going forward from January 23, 2024. Additionally, Mr. Hairston is pending a violation of supervised release before Judge Richard Bennett, in which he faces an additional 5 years held consecutive to whatever sentence the Court is to impose in this case. If one was to add the 29 months Mr. Hairston served prior to when he entered this court's jurisdiction, the 15 years requested, and consecutive five years on the violation of supervised release, Mr. Hairston would serve a total of 269 months. Even assuming he receives the maximum amount of good-time credit,

---

[6] The data used for these analyses were extracted from the U.S. Sentencing Commission's "Individual Datafiles" spanning fiscal years [insert dates searched here – largest possible range from SRC's "Excel2019-2023" is 2019 to 2023]. The Commission's "Individual Datafiles" are publicly available for download on its website. U.S. Sent'g Comm'n, *Commission Datafiles*, https://www.ussc.gov/research/datafiles/commission-datafiles.

[7] See *United States v. Pollard*, et al, United States District Court Western District of Pennsylvania 2:20cr—00029-MJH.

9

Mr. Hairston will be around 52 years old when he is released—an age at which the likelihood of recidivism goes down substantially. U.S.S.C., *The Effects of Aging on Recidivism Among Federal Offenders* Fig. 15 (Dec. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (showing the rate of re-incarceration of those who were released between the ages of 50 to 55 is 12.8 percent compared to the rate of 33.7 percent for those who were released between the ages of 25 to 29, which was the age group Mr. Hairston was when released after his first federal offense).

### B. A 15-year sentence will address the Court's concerns of both general and specific deterrence.

A central point of life sentences or life-equivalent sentences is the idea that making punishments more severe will reduce criminal behavior, both generally and specifically. But as explained below, the reality is that the mainstream use of long sentences deprives people of dignity, fails as a useful deterrent, incapacitates people who have aged out of criminal activity, and diverts public resources from more effective crime prevention policies.

There is a tendency to support increasingly harsh punishments to deter others against crime, but evidence proves this impulse wrong. Contrary to deterrence ideology and "get tough" rhetoric, the bulk of research on the deterrent effects of harsher sentences fails to support these assertions.[8] This is a well-known, empirically based fact: "Criminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment." *See* Valerie Wright, The Sentencing Project, "Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of

---

[8] Anthony Doob & Cheryl Webster, *Sentence Severity and Crime: Accepting the Null Hypotheses*, Crime & Justice, 30:143-195, 2003

Punishment" 4 (Nov. 2010).⁹ Likewise, Daniel Nagin, a leading deterrence scholar, concludes that "[t]he evidence in support of the deterrent effect of the certainty of punishment is far more consistent and convincing than for the severity of punishment" and that "the effect of certainty rather than severity of punishment reflect[s] a response to the certainty of apprehension." Daniel S. Nagin, "Deterrence in the Twenty-First Century: A Review of the Evidence," Crime & Justice, Vol. 42, No. 2013.

This finding is echoed elsewhere. *See* National Research Council, National Academies Press, "The Growth of Incarceration in the United States: Exploring Causes and Consequences" 90 (2014) ("Three National Research Council studies have examined the literature on deterrence and concluded that insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects. Nearly every leading survey of the deterrence literature in the past three decades has reached the same conclusion." (citations omitted));¹⁰ Ray Paternoster, "How Much Do We Really Know About Criminal Deterrence?", 100 J. Crim. L. & Criminology 765, 801 (2010) ("Certainty of punishment is generally considered to be more important than the severity of that punishment."). The Department of Justice's National Institute of Justice has issued its own guidance reflecting that "[i]ncreasing the severity of punishment does little to deter crime" and *"[t]he certainty of being caught is vastly more powerful deterrent than the punishment."* See U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, "Five Things About Deterrence" 1-2 (May 2016) (emphasis added).¹¹

---

⁹ https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf
¹⁰ https://www.nap.edu/read/18613/chapter/1.

¹¹ https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

Although one stated rationale for lengthy sentences is to discourage criminal behavior through fear of punishment, research consistently shows that increasing the severity of sentences has minimal impact on crime reduction. Certainty of punishment, rather than its severity, is a more effective deterrent.

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe (2016), attached hereto as Exhibit 4. To be sure, the best available evidence establishes that imprisonment does not reduce recidivism more than non-custodial sanctions. Francis T. Cullen et al., Prisons *Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties and *exposing* less serious offenders to older more serious offenders - leads to increased recidivism. See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002, 6 Criminology & Public Policy 589 (2007). *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887) ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

**C. The requested sentence recognizes that with each period of incarceration, Mr. Hariston's life expectancy reduces.**

According to the 2014 Social Security Actuarial Life Table (the most recent publicly available data), a thirty-five-year-old man has a life expectancy of just over forty-two years.[12] In other words, under normal circumstances, Mr. Hairston could expect to live to be about seventy-

---

[12] Available at: https://www.ssa.gov/oact/STATS/table4c6.html

seven. Poverty, and the constellation of problems accompanying it, can reduce a man's life expectancy by nearly fifteen years. Chetty, R., *et. al.,* The Association Between Income and Life Expectancy in the United States, 2001-2014, Executive Summary (2016).[13]

Beyond poverty, incarceration itself substantially reduces life expectancy. Dr. Evelyn Patterson conducted a study of life expectancy looking at people who received parole in New York State between 1989 and 2003. Patterson, E. *The Dose-Response of Time Served in Prison on Mortality*, *New York State, 1989-2003*, American Journal of Public Health (2013), Exhibit C. Her study examined a cohort that was mostly male and mostly under thirty-five. *Id*. at 524. The study, which examined people who had been in prison and then released, concluded that "for each year served in prison, a person could expect to lose approximately 2 years of life." *Id.* at 526. The longer a person was out of prison, the less the effect became. *Id.* But, in order to regain a regular life expectancy, a person needed to be out of prison for two-thirds of the time he or she had served. *Id*. Although the study did not look the life expectancy of people in prison, because life expectancy increased as a person has further from their prison term, one can easily conclude that the powerful effect of incarceration on life expectancy impacts those in prison every bit as hard as it does recent releasees.

Mr. Hairston is thirty-five. Already because he grew up in poverty, he can expect to die far sooner than someone raised in better circumstances. Factoring in the effect of his past prison sentences, his life expectancy is even lower. Indeed, Mr. Hairston has spent the past nearly twenty years in and out of jail – with more time in than out. According to the statistics above, he has already outlived his life expectancy. Unfortunately, Mr. Hairston is in poor health. He has a history of asthma, arthritis in his left foot, history of broken bones, and several previous hospitalizations

---

[13] Available at: https://healthinequality.org/documents/paper/healthineq_summary.pdf

after being a stabbed and shot. The grim point remains; Mr. Hairston is unlikely to survive a lengthy sentence. The statistics suggest he may not even survive the fifteen-year sentence he asks the Court to impose.

## **CONCLUSION**

Mr. Hairston asks the Court to sentence him to 180-months incarceration followed by a five-year period of supervised release. Unlike many before the Court, Mr. Hairston is asking the Court to recommend that the Bureau of Prison designate him to a facility far removed from Baltimore and where there are likely not a lot of people from Ballimore. This is in recognizing he needs to change his surroundings and his associates. After consulting with counsel, Mr. Hairston has identified three facilities for a designation request:

1. FCI Berlin, with a recommendation that he participate in the carpentry apprenticeship program or other vocational training;

2. FCI Otisville, with a recommendation that he participate in the horticulture program or other vocational training; and

3. FCI Ray Brook, with a recommendation for any appropriate vocational or apprenticeship program.

This is a delicate sentencing to get right. It is critically important to balance punishment against the need to nurture Mr. Hairston's family ties and provide him with effective therapy. The proposed sentence – 15 years, followed by 5 years of supervised release, including a requirement that Mr. Hairston participate in mental health counseling – strikes the right balance. It is a long sentence, all the longer for Mr. Hairston who, having lived a hard life, will leave prison as an old man. For the above reasons, and those that come to light at the November 13, 2025, hearing, the Court should impose an 180-month sentence.

        Respectfully submitted,

        JAMES WYDA
        Federal Public Defender
          for the District of Maryland


        \_\_\_/s/_____
        Sasha Garcon (#817494)
        Andrew R. Szekely (#16407)
        Assistant Federal Public Defenders
        100 South Charles Street
        Tower II, 9th Floor
        Baltimore, Maryland 21201
        Phone: (410) 962-3962
        Fax:  (410) 962-0872
        Email: sasha_garcon@fd.org
                andrew_szekely@fd.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2025, a copy of the foregoing was served via CM/ECF to parties in this matter.

                                                          _____/s/_____
                                                         Sasha Garcon